**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

THE DALLES IRRIGATION DISTRICT,

Plaintiff,

v.

UNITED STATES,

Defendant.

Case No. 05-1042 C
Judge Charles F. Lettow

---

**PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION TO DISMISS**

---

## INTRODUCTION

The defendant moves to dismiss on the face of the pleadings, asserting a jurisdictional defect, but the defendant means that it wants to raise a statute of limitations defense. That is an affirmative matter and it is premature. On the face of the Amended Complaint a claim clearly was brought within any possible application of a six year statute of limitations.

The plaintiff is The Dalles Irrigation District, and it entered into a contract with the defendant in 1961, by which the defendant agreed to provide power and energy for the District's irrigation needs. The charge for that power and energy, after an initial rate of 1 mill per kilowatt-hour, was to be determined by actual charges for generating the power. This claim by the District is to determine what those actual charges should have been and to restrict the defendant to nothing more than actual charges for the future.

The defendant's duty under the contract was to calculate those actual charges and to inform the plaintiff. The defendant has not done so. Instead, the defendant has passed along the bill it receives from the Bonneville Power Administration (BPA) to the District, which has no contractual or other relationship with BPA. The Bureau of Reclamation of the Department of the Interior can enter into whatever arrangements it may wish with the BPA, but those arrangements are no substitute for the contract between the defendant, through the Department of the Interior, by its Bureau of Reclamation, and the District.

**BACKGROUND AND FACTS**

The Dalles Dam is currently one of 31 federally owned multipurpose dams on the Columbia and its tributaries that are part of the Federal Columbia River Power System (FCRPS). Plt. App. 4. The FCRPS is a collaboration among three U.S. government agencies – the Bonneville Power Administration, the U.S. Army Corps of Engineers (the Corps) and the Bureau of Reclamation. Plt. App. 4. Collectively, the goal of these agencies is to maximize the use of the Columbia River by generating power, protecting fish and wildlife, controlling floods, providing irrigation and navigation, and sustaining cultural resources. Plt. App. 4. The surplus power created by the Dalles Dam is sold by the FCRPS through the BPA. Plt. App. 4. The FCRPS provides about 60 percent of the region's hydroelectric generating capacity. Plt. App. 4.

Congress authorized construction of the Dalles Dam in 1960 as part of the Dalles Federal Reclamation Project. *See*, 43 USC § 615w, § 2 of Pub.L. 86-745, Def. App. 1-2 (hereafter "the Act"). The stated purpose of the Act was to "furnish [. . .] water for the irrigation of approximately five thousand five hundred acres of arid land in Wasco County, Oregon." Def. App. 1. The Act further authorized the Secretary of the Interior to

enter into a Repayment Contract for the purpose of repayment of the dam's construction costs. Def. App. 1. Under the Act, the irrigators were given 50 years in which to pay the construction costs of the Dam. Def. App. 9. The Act also required that:

> Power and energy required for irrigation pumping of the western division of the Dalles Federal Reclamation Project shall be made available by the Secretary from the Dalles Dam powerplant and other Federal plants interconnected therewith at rates not to exceed the costs of such power and energy from the Dalles Dam taking into account all costs of the Dam, reservoir, and powerplant which are determined by the Secretary under the provisions of the Federal reclamation laws to be properly allocable to such irrigation pumping power and energy.

Def. App. 1.

Not surprisingly, the Repayment Contract entered into in 1961 by the defendant and the irrigators who formed the Dalles Irrigation District reflected this statutory mandate. In fact, § 14(a) mirrors the statutory language, stating that "for the purpose of operating and maintaining the project works, the Secretary will make available to the District that power and energy required for irrigation pumping during the irrigation season from the Dalles Dam powerplant and other federal powerplants connected therewith." [1] Section 14(a) further provides that such power and energy:

[1] The Defendant's Brief erroneously cites this section of the Repayment Contract and the authorizing legislation as providing that "power would be furnished to Dalles from hydroelectricity generated at the Dalles Dam, operated by the United States Army Corps of Engineers ("Corps"), and transmitted by the Bonneville Power Administration, which markets power generated by Federal Facilities located within" the FCRPS. Def. Brief, 3. While it is true that the facility is operated by the Corps and that power from the Dam is marketed by the BPA, neither the contract nor the authorizing legislation specifically provide that the Corps will operate it or that the BPA will market the power. Instead, it provides that that the Secretary make available "power and energy required for irrigation pumping during the irrigation season from the Dalles Dam powerplant and other federal powerplants connected therewith," but then limits the Secretary to charging a rate sufficient to cover only the costs of such power and energy from the Dalles Dam, reservoir and power plant which are properly allocable to irrigation pumping power and energy. See, Def. App. 1 and 16-17. This distinction is significant because the Repayment Contract does not contemplate that the rate charged for irrigation power will reflect any costs incurred by the BPA, or the Corps. Those agencies may enter into agreements with the Bureau of Reclamation (BOR), the Secretary's designated agency, but they are not the contracting parties for the irrigation district; only the BOR has the statutory mandate; only the BOR has the contract with the irrigation district; only the BOR may submit energy charges to the district, as their contract, between those <u>two</u> parties, provided.

> [W]ill be furnished to the district at rates per kilowatt-hour sufficient to cover the costs of such power and energy from the Dalles Dam, taking into account all costs of the dam, reservoir and power plant which are determined by the Secretary under the provision of the Federal Reclamation Laws to be properly allocable to such irrigation pumping power and energy.

Def. App. 16.

Section 14(a) of the Repayment Contract then sets the initial rate at 1 mill per kilowatt-hour the first irrigation season. Def. App. 17. The Repayment Contract then gives the Secretary the right to determine whether a different rate, "in accordance with the provisions" of that section, is applicable and to make that determination no more than "once in any five year period." Def. App. 17.

Section 14(b) of the Repayment Contract sets forth the procedure for the Secretary to implement § 14(a)'s requirements. Section 14(b) provides that "payment of the District's charges for the power supply under this article shall be made each calendar year on the basis of annual estimates by the Secretary." Def. App. 17. These annual estimates are to be furnished on or before February 1 for the calendar year in which the charges are to be applied. Def. App. 17. The District is required to pay by April 1 of that calendar year. Def. App. 17.

The defendant's continuing duty to provide this power supply to the District and to calculate the rate charged for the power supply in accordance with the provisions of § 14(a) includes a concomitant annual duty under § 14(b) to analyze the payments made by the District after each calendar year is concluded and to determine whether those payments exceeded the District's "actual power charges" under the provisions of § 14(a). Def. App. 16-17. Under § 14(b), if the District's payment exceeds the "actual power charges" permitted under § 14(a), the Secretary is required to apply a credit to the District

"to the power charges to become due from the District for succeeding years." Def. App. 18.

Thus, under § 14(b) of the Repayment Contract, the defendant has a recurrent, yearly duty to compare the payments made by the District to the "actual power charges" that are "properly allocable to irrigation pumping power and energy" in accordance with § 14(a). Def. App. 16-18. Pursuant to § 14(b)'s express terms, that defendant's duty of performance only becomes due after the District's payment for the previous year has been made. Def. App. 17-18. Although the Repayment Contract does not specify when the defendant's duty to perform under § 14(b) ends, it does specify when the duty begins – and that point is clearly not until after the District has made its payments for any given year pursuant to § 14(b). Def. App. 17-18.

For 21 years, after the Repayment Contract was executed in 1961, the District paid 1 mill per kilowatt-hour as the rate for the energy supplied by the defendant. In 1982, however, the Bureau of Reclamation tried to raise the rates, causing the District to ask why. Had the defendant calculated actual charges to show that the costs were greater for the generation of the power, than in time past? See, Plt. App. 22-23. As a result of a legal opinion obtained from the solicitor of the Department of the Interior, the Bureau had to concede that it could not raise the rates. See Plt. App. 14.

In 1990, the Bureau of Reclamation, pushed by BPA, tried again, and this time there was no intervention by a solicitor from the Department of the Interior. Nor was there any provision of actual cost data. (See Opatrny Declaration ¶¶ IV and VII.) And every five years thereafter came another declaration by the Bureau of Reclamation that the rates would be raised. However, these declarations were never, before the filing of

this lawsuit, accompanied by any data which would enable the District to determine the actual charges for the generation of power. The Bureau of Reclamation always passed along a BPA calculation, but BPA had no contractual requirement for providing actual charges and crediting surpluses. That was the Bureau's contractual responsibility, and it never was met. The short of the matter is that the District has been paying for over 40 years, triggering the responsibility of the Bureau's annual review of actual charges, to provide credits for surplus payments. Not once has that occurred. In 2004, the Bureau finally compiled the data from which actual costs for generation of power could be calculated. Accordingly, the District's suit is timely under 28 USC § 2501.

**STANDARDS**

Although the defendant's motion is characterized as a motion to dismiss for lack of subject matter jurisdiction, because it challenges the truth of the jurisdictional facts in the complaint, the court may look beyond the pleadings to consider all available evidence in order to determine jurisdiction. *Rocovich v. U.S.*, 933 F.2d 991, 993 (Fed. Cir. 1991). Similarly, if the court has doubts regarding jurisdiction, it may look at all the evidence presented to satisfy itself regarding the jurisdictional facts. *RHI Holdings, Inc. v. U.S.*, 142 F.3d 1459, 1461 (Fed. Cir. 1998). Accordingly, in this response brief, the District relies on the Defendant's Appendix already in the court record, as well an additional Plaintiff's Appendix and the Affidavit of Carol Opatrny submitted herein.

**LEGAL ARGUMENT**

The Defendant's Motion to Dismiss pursuant to 28 USC § 2501 fails for three reasons. First, the defendant fails to apply the methodology required by the most recent United States Supreme Court case analyzing "accrual" under 28 USC § 2501. Second, it

mischaracterizes the basis for the breach of contract claim asserted by the District, thereby applying the wrong general contract principles to determine the accrual date applicable under § 2501. Third, it fails to consider whether § 2501 was tolled because the cause of action was "unknowable" until 2002, when the defendants finally compiled the data to determine whether the rates charged were greater or less than the "actual power charges" allocable to irrigation power pumping and energy.

I. The Defendant Fails to Apply the Methodology for Analyzing "Accrual" under § 2501 from *Franconia Assocs. v. U.S.*, 536 U.S. 129, 141-142 (2002).

Pursuant to 28 U.S.C. § 2501, the District's claim is timely if it was "filed within six years after [the District's] claim first accrue[d]." This is a jurisdictional requirement. *Collins v. U.S.,* 14 Cl. Ct. 746, 751, *aff'd*, 865 F.2d 269 (Fed. Cir. 1988), *cert. denied*, 109 S. Ct. 3222 (1989). It runs from the date the District filed its original complaint in the United States District Court, August 18, 2004.[2]

In 2002, the United States Supreme Court decided *Franconia Assocs. v. U.S.*, 536 U.S. 129, 141-142 (2002). In *Franconia,* the Court made it clear that, in applying § 2501, the question of whether "petitioners' claims were filed "within six years after [they] first accrued . . . depends upon" "principles of general contract law." *Franconia*, 536 U.S. 129, 141 citing *Priebe & Sons, Inc. v. U.S.*, 332 U.S. 407, 411, 92 L. Ed. 32, 68 S. Ct. 123, 109 Ct. Cl. 870 (1947) and 1 C. Corman, *Limitations of Actions* § 7.2.1, p. 482 (1991). The Supreme Court based this conclusion on the established principle that

[2] Pursuant to 28 USC § 1631, 28 USC 2501's six-year statute of limitations is measured from the date on which the action was filed in district court, not from the date it is filed in the Federal Court of Claims. *Stockton E. Water Dist. v. U.S.*, 62 Fed. Cl. 379, 389 (Ct. Cl. 2004), citing *Henke v. U.S.*, 60 F.3d 795, 800 (Fed. Cir. 1995) ("Had [plaintiff's] case been transferred by the district court to cure the want of jurisdiction, pursuant to 28 U.S.C. § 1631, the date of filing in the district court would be taken as the date of commencing the action in the Court of Federal Claims."). Thus, the application of the six year period of limitation in this case is measured backwards from the August 18, 2004, the date on which the District filed its original complaint in the District of Oregon.

"[w]hen the United States enters into contract relations, its rights and duties therein are governed generally by the law applicable to contracts between private individuals." *Franconia,* 536 U.S. at 141-42.

Oddly, the Government does not cite *Franconia* at all in its briefing, despite the fact that it is the most recent United States Supreme Court case to address § 2501 and the only case that has been decided by the high court since 1967 which addresses how the United States Claims Court/Court of Federal Claims should interpret the language of § 2501. This omission is particularly troubling given that, in *Franconia,* the United States Supreme Court expressly rejected the Government's application of the same flawed methodology and emphasis on the word "first" in § 2501's phrase "first accrual" that the defendant is relying on in this case. In addition, it should be noted that all but one of the cases cited by the defendant were decided before *Franconia*.[3] Therefore, to the extent that these cases do not use the methodology for analyzing § 2501's accrual provision under general contract principles, these cases should not be considered by the court.

A. <u>The *Franconia* Methodology For Analyzing Accrual Under § 2501.</u>

In *Franconia,* the Court considered when a breach of contract claim based on the Government's failure to accept a borrower's prepayment of certain loan contracts accrued for purposes of § 2501. The Government argued that the borrower's claims accrued when Congress passed certain legislation preventing prepayment of the loans. *Franconia*, 536 U.S. at 142. It argued that legislation caused a present breach of the loan contracts and that that the borrowers claims "first accrued" when the legislation was passed more than six years before the borrowers filed suit. *Franconia*, 536 U.S. at 142-

[3] The one case defendant cited after *Franconia*, is *Davidson v. U.S.*, 66 Fed. Cl. 206, 209 (Ct. Cl. 2005), which concerned application of the continuing claims doctrine, which is not relevant here because this is a continuing contract. This issue is discussed below.

45. Accordingly, the Government argued that the borrower's claim for breach of the loan contracts was time barred under § 2501. *Id.* The Court rejected the Government's theory on when the borrower's breach of contract claims accrued and its interpretation of how § 2501's accrual provision operates. *Id*. at 145-49. In doing so, the Supreme Court laid out several principles for analyzing claims under § 2501 which apply here.

At the outset of its analysis, the Court rejected the Government's argument that the term "first" in the text of § 2501, was the "key" to the determination of when an accrual occurred. *Franconia,* 536 U.S. at 144. The Court also rejected the Government's position that it must apply § 2501 to the "earliest possible date" on which a claim could accrue:

> We do not agree that § 2501 creates a special accrual rule for suits against the United States. Contrary to the Government's contention, the text of § 2501 is unexceptional: A number of contemporaneous state statutes of limitations applicable to suits between private parties also tie the commencement of the limitations period to the date a claim "first accrues." See J. Angell, *Limitations of Actions* 536-588 (6th ed. 1876) (quoting state statutes of limitations). Equally telling, in its many years of applying and interpreting § 2501, the Court of Federal Claims has never attributed to the words "first accrues" the meaning the Government now proposes….In line with our recognition that limitations principles should generally apply to the Government "in the same way that" they apply to private parties, *Irwin v. Department of Veterans Affairs,* 498 U.S. 89, 95, 112 L. Ed. 2d 435, 111 S. Ct. 453 (1990), we reject the Government's proposed construction of § 2501. That position, we conclude, presents an "unduly restrictive" reading of the congressional waiver of sovereign immunity, *Bowen v. City of New York,* 476 U.S. 467, 479, 90 L. Ed. 2d 462, 106 S. Ct. 2022 (1986), rather than "a realistic assessment of legislative intent," *Irwin,* 498 U.S. at 95.

*Franconia*, 536 U.S. at 15 (footnote omitted).

Instead, the Supreme Court reiterated the rule cited in an earlier Supreme Court case that "the words 'first accrues' must be interpreted 'with due regard to those practical ends which are to be served by any limitation of the time within which an action must be

brought.'" *Franconia*, 536 U.S. at 146, citing *Crown Coat Front Co. v. U.S.*, 386 U.S. 503, 517, 18 L. Ed. 2d 256, 87 S. Ct. 1177 (1967). The Court noted that "When the United States enters into contract relations, its rights and duties therein are governed generally by the law applicable to contracts between private individuals." *Id.*, citing *Mobil Oil Exploration & Producing S.E., Inc. v. U.S.*, 530 U.S. 604, 607, 147 L. Ed. 2d 528, 120 S. Ct. 2423 (2000) (internal quotation marks omitted).

Having established those basic concepts, the Court then set forth the methodology for analyzing the accrual issue under § 2501. First, the court determined the applicable "principles of general contract law," applied to determine whether petitioners' daims were filed "within six years after [they] first accrued." *Franconia,* 536 U.S. at 146, (citations omitted). Second, the court held that, under those general contract principles, the application of 28 U.S.C. § 2501, "depends upon when the Government breached the prepayment undertaking stated in the promissory notes." *Franconia,* 536 U.S. at 142. Third, the Court analyzed the contract terms under those general contract principles, to determine when the Government's breach occurred, concluding that it did not occur until the Government's performance of the contract was due, when the borrowers tendered pre-payment of the loans to the Government. *Franconia*, 536 U.S. at 142. Finally, the Court concluded that because "the cause of action for breach of contract accrues, and the statute of limitations begins to run, at the time of the breach" for purposes of determining accrual under § 2501, the borrower's claims were timely because they were filed within 6 years of the borrower's tender of pre-payment. *Id.*

In performing that third step, the Court held that the Federal Circuit had erred in characterizing the passage of a certain statute preventing prepayment of these loans as a

"present breach" of the loan contracts. *Franconia,* 536 U.S. at 142. It rejected the Federal Circuit's reasoning that the Government had but one obligation under those agreements: "to continue to allow borrowers the unfettered right to prepay their loans at any time." *Franconia,* 536 U.S. at 142. The Court held that the Federal Circuit had erred because it "incorrectly characterized the performance allegedly due from the Government under the promissory notes" and that the Federal Circuit was wrong in concluding that the enactment of the legislation "immediately, totally and definitively" gave rise to a breach of that continuing duty. *Id.*

Instead of viewing the Government's act as a total and immediate breach, the *Franconia* Court characterized the legislation limiting the right to prepayment as an anticipatory repudiation because the legislation was a renunciation of a contractual duty before the time fixed for performance in the contract. *Franconia,* 536 U.S. at 142-3 (citations omitted). The Court held: "such a repudiation ripens into a breach prior to the time for performance only if the promisee 'elects to treat it as such.'" *Franconia*, 536 U.S. at 143, citing *Roehm v. Horst,* 178 U.S. 1, 13, 44 L. Ed. 953, 20 S. Ct. 780 (1900) (repudiation "gives the promisee the right of electing either to . . . wait till the time for [the promisor's] performance has arrived, or to act upon [the renunciation] and treat it as a final assertion by the promisor that he is no longer bound by the contract"). The Court reasoned that, because the borrowers had not treated the legislation as a present breach by filing suit prior to the date indicated for the Government's performance, "breach would occur when a borrower attempted to prepay, for only at that time would the Government's responsive performance become due." *Id.* Thus, for purposes of § 2501, the borrower's claims "first accrued" when they attempted to prepay, not when the Government first

expressed its intent to repudiate the terms of the loan agreements. *Id.* As such, the Court concluded the borrower's claims were timely under § 2501.

B. <u>The *Franconia* Methodology And The General Contract Principles Outlined Therein Apply in This Case</u>.

Although this case does not involve the kind of loan agreement at issue in *Franconia*, that case is nonetheless controlling because it lays out the proper methodology for analyzing when an accrual occurs for purposes of § 2501 and the general contract principles that apply when the Government repudiates a contract.

First, based on the Court's statements in *Franconia*, 536 U.S. at 144-45, this Court should reject the defendant's deliberate emphasis on the term "first" in analyzing the phrase "first accrual" under § 2501. See Def. Brief, 9. To the extent that the defendant here argues that this Court must look at when the events "<u>first</u> fixed the Government's liability" (emphasis in original), without any reference to the general contract principles which govern when an event causes a breach to occur under a contract, the Court should also reject those arguments, based on *Franconia*, 536 U.S. at 145. Def. Brief, 11.

Clearly, the defendant made only the most cursory attempt to apply general contract principles here, noting only that "a cause of action accrues when the breach occurs" and then glibly concluding that "all the events fixing liability" occurred in 1989 and 1990 when the Secretary "revised the power cost formula in 1989 and the Assistant Secretary approved the revised formula in 1990." Def. Brief, 11, citing *Alder Terrace, Inc. v. United States*, 161 F.3d 1372, 1377 (Fed. Cir. 1998). The District does not contest the general contract rule cited by the defendant – the Supreme Court cited the same rule in *Franconia*. A cause of action accrues when a breach occurs. But, as is plain

from the *Franconia* case, careful consideration of the contract and general contract principles is necessary to apply that rule in determining whether a particular breach of contract claim accrued for purposes of applying § 2501. Moreover, there are limitations on that general principle under contract law that the Court must consider.

It should be noted that the defendant appears to have gone out of its way to ignore the other contract principles which are applicable in this case. For example, in quoting the proposition, "a cause of action accrues when the breach occurs" from the *Alder* case, it leaves out the prefacing word, "generally," and fails to include the limitation on that principle contained in the next sentence in the quoted passage - ". . . a claim does not accrue until the claimant has suffered damages."[4] In addition to failing to consider when the District suffered damages for the period alleged, the defendant completely fails to consider the difference between a breach and a repudiation, whether the contractual duty is a continuing one and whether the alleged breaches were partial or total breaches. These omissions are significant because, had the defendant made any attempt to apply the methodology laid out by the United States Supreme Court in *Franconia*, it would have been apparent that these basic contract law concepts had to be considered in determining when the District's claim accrued for purposes of applying § 2501.

II. The Nature of the Breach of the Repayment Contract Asserted by the District.

Although the Defendant characterizes the District's breach of contract claim as based solely on "the application of the 1989 power cost formula since 1998," the

[4] The full text of the passage from *Alder* is: "Generally, "in the case of a breach of a contract, a cause of action accrues when the breach occurs." *Manufacturers Aircraft Ass'n v. U.S.*, 77 Ct. Cl. 481, 523 (1933); see also *Brighton Village Assocs. v. U.S.*, 52 F.3d 1056, 1060 (Fed. Cir. 1995). Although "a claim does not accrue until the claimant has suffered damages," *Terteling v. U.S.*, 167 Ct. Cl. 331, 334 F.2d 250, 254 (Ct. Cl. 1964), it is not necessary for purposes of claim accrual that the claimant be able to calculate the precise, final quantum of damages, see *Alder v. U.S.*, 785 F.2d 1004 (Fed. Cir. 1986)."

District's claim is actually for a series of partial breaches of the Repayment Contract's provisions. Specifically the District's claim is based on a breach of the Defendant's annual duty under § 14(b) of the Repayment Contract to ensure that the District has not paid any amount in excess of the "actual power charges" allocable to irrigation pumping and power for the Dalles Dam for the previous year and to credit back any overpayments to the District.

The "1989 power cost formula" is an analytical tool used by the Secretary to determine the rates under § 14(a) of the Repayment Contract for the years from 1990 – the present. That formula, and the various subsequent modifications of it, are certainly relevant to the issues here to the extent that the Secretary claims to have relied on it (or any of its subsequent iterations) to fulfill the Secretary's contractual duties. However, it was not the announcement or "adoption" of that formula which caused the breach of contract alleged by the District. Instead, the defendant's breach of duties is based on the defendant's failure to charge annually and review the amounts paid by the District pursuant to the rate set in § 14(a) and credit the District for any amounts charged above the "actual power charges" for each calendar year as provided in § 14(b). That is the mechanism set in the contract to correct and review the Secretary's actions in applying the power rate charged to the District. It is that provision of the contract that the District claims has been breached when the defendant's performance came due under §14(b) each year. See, Amended Complaint, ¶ VII.

III. Because the Repayment Contract Is a Continuing Contract, the Defendant's Partial Breaches Can Accrue Individually.

Applying the proper methodology laid out in *Franconia*, this Court is charged with applying general contract principles to determine 1) the type of contract at issue and

the nature of the defendant's duties under the contract, 2) the event or events which triggered a breach under that contract, 3) when the District's claim for breach of contract accrued, and, 4) whether this claim was brought within six years of that accrual date under §2501.

In this case, this process is significantly aided by the fact that there is another case which analyzes when an Irrigation District's breach of contract claims accrued for purposes of § 2501 under a similar Repayment Contract with the Department of Interior/Bureau of Reclamation. In *San Carlos Irrigation & Drainage Dist. v. U.S.,* 23 Cl. Ct. 276 (Ct. Cl. 1991), the Court of Claims decided a statute of limitations issue under § 2501 in favor of the San Carlos Irrigation & Drainage District ("San Carlos Irrigation District"). Although the *San Carlos* case predates *Franconia*, the Court of Claims applied the same methodology used by the United States Supreme Court in *Franconia* in determining when a claim "first accrues" under § 2501. Accordingly, a close examination of this case should be helpful to the court in analyzing the § 2501 issues concerning the Repayment Contract in this case.

It should be noted that, despite the fact that the *San Carlos* case clearly concerns the application of § 2501 to a Repayment Contract for the building, operation and maintenance of a federally funded dam project like the one at issue here, as is the case with the *Franconia* decision, the *San Carlos* decision is curiously omitted from the defendant's brief in this case. This omission is even more puzzling given that *San Carlos* is the only published decision interpreting § 2501 that concerns a Repayment Contract between the Department of the Interior/Bureau of Reclamation and an irrigation district.[5]

---

[5] Although *Stockton E. Water Dist. v. U.S.*, 62 Fed. Cl. 379, 392 (Ct. Cl. 2004) concerned the timeliness of a claim for breach of a water services contract against the Government, it was decided on relation back

A. <u>In *San Carlos*, The Federal Circuit Determined That An Irrigation District's Repayment Contract Contained A Continuing Duty And That Claims Of Each Partial Breach Of That Duty Were Timely Under § 2501.</u>

In *San Carlos,* the Irrigation District entered into a repayment contract with the Secretary of the Interior/Bureau of Reclamation to construct a power plant, irrigation plant, and an electricity transmission and distribution system. *San Carlos,* 23 Cl. Ct. at 279. The Repayment Contract with the San Carlos Irrigation District provided that the Government agreed to maintain and operate the dam, reservoir, and other associated works and that the Irrigation District agreed to pay 50 percent of the construction costs and all operating and maintenance costs. *San Carlos,* 23 Cl. Ct. at 278. The San Carlos Irrigation District filed suit against the Government for breach of that contract when high water damage resulted in a shutdown of the dam and power plant, leaving no way to generate electrical power or store water. *Id.* The District sought specific damages for one-half of the irrigation water lost and one-half of the electrical energy lost as a result of the dam's inoperability. *San Carlos Irrigation & Drainage Dist. v. U.S.*, 877 F.2d 957, 959 (Fed. Cir. 1989).

Initially, the Court of Claims dismissed the action, concluding that the duties alleged by plaintiff were not created by the Repayment Contract, and, therefore, plaintiffs had failed to state a claim for which relief could be granted. *San Carlos Irrigation & Drainage District v. U.S.*, 15 Cl. Ct. 197, 203-04 (1988), *rev'd*, 877 F.2d 957, 959 (Fed. Cir. 1989), later proceeding, 23 Cl. Ct. 276 (1991). However, the Federal Circuit

grounds. Although § 2501 was raised as a defense in *Truckee-Carson Irrigation Dist. v. U.S.*, 14 Cl. Ct. 361, 374 (Ct. Cl. 1988), that case did not concern a Repayment Contract, but an "implied in fact" contract and the court concluded that "our finding of no implied-in-fact contract ever arising, as a general proposition, makes this defense moot."

reversed, finding that the Repayment Contract established that the Government had contracted to keep the entire dam works in a state of repair and to guard against their failure. *San Carlos Irrigation,* 877 F.2d at 960. The Federal Circuit determined that the general duty to operate and maintain the entire works included specific duties to operate and maintain the spillways and the electric generation system. *Id.*

On remand, the government argued that the San Carlos Irrigation District's claims based upon the improper maintenance of the spillway gates were time-barred under 28 USC § 2501 because the claims of improper maintenance of the spillway gates accrued no later than 1966, and arguably as early as the 1940s, when the District first became aware that the spillway gates were inoperable. *San Carlos*, 23 Cl. Ct. at 278-79. Alternatively, the Government maintained that, at the latest, the spillway gate claim accrued when the reservoir first overflowed in February 1980, more than six years before the San Carlos Irrigation District's Complaint was filed. *San Carlos*, 23 Cl. Ct. at 279. In "essence," according to the Court, the Government's argument was that "the District could have brought suit at the time of the first breach of the contractual duty to operate and maintain the Joint Works, and since it failed to do so, its spillway claims are time-barred." *Id.*

That is, of course, exactly what the Government is arguing here. It argues that because the District was told of the "power rate formula" in 1989 and could have "first" brought suit at that time, since it failed to do so, its claims accrued at that time and are now time barred. Def. Brief, 10-11. The defendant's claim here should be rejected for the same reasons that the Court rejected the Government's claims in the *San Carlos* case. In *San Carlos*, the Court of Claims concluded that the Government had

"misapprehend[ed] the nature of the contractual duty imposed by the Repayment Contract." *San Carlos*, 23 Cl. Ct. at 279 Instead, the Court "agreed with the argument" of the San Carlos Irrigation District and held that the Government was under a "continuing duty" under the Repayment Contract, not a "one time" duty to maintain. *Id.*

The Court held that, although "[t]he events in 1980, in 1966 and in the 1940s," were "alleged breaches of the Repayment Contract for which the United States claims the District should have brought suit," "the breaches were partial, not total ones." *San Carlos,* 23 Cl. Ct. at 279. The court held that a partial breach is "[a] claim for damages . . . based on only part of the injured party's remaining rights to performance." *San Carlos,* 23 Cl. Ct. at 279-80, citing *Restatement (Second) of Contracts* § 236(2) (1979). It distinguished a partial beach from a total breach, noting that "[a] claim for damages for total breach is one for damages based on all of the injured party's remaining rights to performance." *San Carlos,* 23 Cl. Ct. at 280, citing *Restatement (Second) of Contracts* § 236(1). The Court held that there was no total breach because the Government did not repudiate the Repayment Contract as a whole, but instead continued attempts to perform there under. *Id.*

The Court then reasoned that, because every partial breach gives rise to a claim for damages, **a new claim accrues each time a partial breach occurs**. *San Carlos*, 23 Cl. Ct. at 280. As a result, the Court held, even if one accepted the Government's argument that the events in the 1940s, in 1966, and in 1980 constituted breaches of the Repayment Contract, each partial breach was a separate claim and 28 USC 2501's limitations period applies to each partial breach separately. *Id.*

B. The *San Carlos* Court Determined That the "Continuing Claims Doctrine" Does Not Apply to Continuing Contracts.

In ruling in favor of the San Carlos Irrigation District as to when its claims under the Repayment Contract accrued under § 2501, the Federal Circuit rejected the Government's attempt to use the restrictions on the "continuing claims doctrine" to bar the San Carlos Irrigation District's claims. As it does here, the Government argued that, because the continuing claim doctrine is narrowly applied, it should not be extended beyond the presently approved contexts or applied to the situation presented in this case. *San Carlos*, 23 Cl. Ct. at 280-281. In fact, in the *San Carlos* case, the defendant even relied on one of the same cases it relies on here, *Friedman v. U.S.*, 159 Ct. Cl. 1, 7, 310 F.2d 381, 384-85 (1962) to support its argument on this point. *San Carlos,* 23 Cl. Ct. at 280.

In soundly rejecting the government's argument regarding the continuing claims doctrine, the *San Carlos* Court noted that the Government had missed the point because the "District is not claiming a continuing breach of the Repayment Contract, but rather that there were partial breaches of a continuing contract. Therefore, continuing claims cases are not on point." *San Carlos,* 23 Cl. Ct. at 280. Like the San Carlos Irrigation District, the District in this case is claiming that there were repeated partial beaches of a continuing contract, not a continuing breach. Therefore, the Court should reject the defendant's arguments as to the "continuing claim" doctrine in this case for the same reason the Court rejected those arguments in *San Carlos.*

///

///

C. <u>The Provisions of § 14(b) Establish That This Was a Continuing Contract; Claims Accrued Only When Each Partial Breach Occurred</u>.

The Government may argue that *San Carlos* is different from this case because it involved the Government's duty to maintain the spillway under the Repayment Contract, not the Government's duty to provide and accurately charge for power that the District is entitled to under the Repayment Contract. However, this is not a difference that matters for the purpose of § 2501 analysis, because, like the duty to maintain, here the Government's duty to provide the power for irrigation and set rates is not a "one-time duty." This duty is a continuing one and, accordingly, the contract is a continuing contract. The fact that the Repayment Contract provides a mechanism for the defendant to perform this continuing duty each year in § 14(b) does not transform it into a different kind of contract.

As noted at Def. App. 17, § 14(b) of the Repayment Contract provides that, after the District has made its annual payment to the Government based on the rate authorized by § 14(a) and the estimates provided by the Secretary, the defendant then must compare the amounts paid by the District for any given year and determine whether those payments exceeded the District's "actual power charges" as permitted by the contract under § 14(a). If there is any surplus, the Secretary is required to apply a credit "to the power charges to become due from the District for succeeding years" for that surplus. Under § 14(b), the Government clearly owes the District this duty of performance on an annual basis. The time for performance of this duty does not arise until after the District has made payment for the prior year's power charges pursuant to §14(b). As such, each year that the defendant failed to perform this duty, a partial breach occurred and the

District immediately had a right to sue for breach of contract as to the failure to perform that year's duty. *San Carlos*, 23 Cl. Ct. at 280.

Whenever the defendant's initial decision to include improper costs in the rate charged to the District under § 14(a) occurred, in 1989 or at any other time, that decision was a breach of the continuing duty to set rates under § 14(a) of the Repayment Contract, and obviously neither the defendant nor the District treated it as a total breach or a complete repudiation of the contract at that time. The contract continues, after all. The only documents to support the Government's claim that a total breach occurred in 1989 or 1990 are the two letters at Def. App. 42 and 45. The Government certainly cannot characterize these benign letters as support for a claim that the District had declared a "total" breach and treated the contract as terminated at that time. They are merely requests for information.

Moreover, if the District had elected to treat the rate increase under § 14(a) as a total breach or complete repudiation of the contract in 1989, it would not have made any further payments under § 14(b) after receiving notice of the increase. That is clearly not the case. Both parties continued to perform the remaining duties under the Repayment Contract. The District does not allege a claim based on *all* of the District's remaining rights to performance by the defendant under the Repayment Contract. *San Carlos*, 23 Cl. Ct. at 279-280; Restatement (Second) of Contracts § 236(1)("A claim for damages for total breach is one for damages based on all of the injured party's remaining rights to performance"). Based on these contract principles, the Court should reject the defendant's suggestion that there was a total breach of the contract which could have

triggered the accrual of the District's claims. The District's claim is for a series of partial breaches of the Repayment Contract.

Even if the defendant asserts that it silently repudiated the Repayment Contract, nevertheless, the time for performance under § 14(b) had not matured and could not mature until the District would complete the payments for which it properly was billed. Therefore, any such repudiation by the Government could only be anticipatory, for which no damages could accrue until after all of the District's payments had been made. See *Franconia*, 532 U.S. at 143. ("A promisor's renunciation of a 'contractual duty before the time fixed in the contract for . . . performance' is a repudiation.")

An anticipatory repudiation ripens into a breach "prior to the time for performance only if the promisee "elects to treat it as such."" *Id.* There is no evidence that the District elected to treat the Secretary's adoption of the 1989 power cost formula as a total breach of the contract. As in the *Franconia* case, the District elected to continue to perform under the contract, ever hoping and planning as it was contractually entitled to do, that the Government would meet all of its contractual duties. As a result, even if the 1989 power cost formula was an anticipatory repudiation, it would not have triggered the accrual of the District's claims because the District did not elect to treat it as a breach.

Moreover, 1989 power cost formula could not have triggered an accrual of the claim for an even more basic reason – no damages under the Repayment Contract accrued when the formula was adopted because the defendant's performance under § 14(b) was not yet due. As noted by the Federal Circuit in *Alder Terrace, Inc.* although a cause of action generally accrues "when the breach occurs," "a claim does not accrue until the claimant has suffered damages." *Alder Terrace, Inc.* 161 F.3d at 1377. Although

the defendant left out this language when it quoted this passage from *Alder Terrace*, this limitation is important here because damages resulting from the defendant's failure to perform under § 14(a) could not possibly arise until after the defendant's performance under § 14(b) was due. Section 14(b) provided the mechanism for actually charging the District based on the rate established in fulfillment of its duties under § 14(a). No breach could have occurred before the time of performance because no damages accrued until the District actually paid more than what was required under the contract. "[A] breach of contract is a failure to perform a contractual duty *when it is due*." *Trauma Serv. Group v. U.S.*, 104 F.3d 1321, 1325 (Fed. Cir. 1997) (emphasis added).

Because the defendant's duty to perform renewed itself each year under § 14(b), each year the District paid more than the "actual power charges," a new claim based on the Government's failure to compare the District's payments to the "actual power charges" and credit the District for the surplus arose each year. [6] The time lag built into the contract between the defendant's duty to set the rate in § 14(a) and its duty to compare the amount paid by the District against the "actual power charges" and credit back any surplus in § 14(b) precludes any possibility that the claim could have accrued at the time the rate was set.

Here, as in *San Carlos*, a partial breach of the contract arose each year the Government failed to perform its duties under § 14(b). Each of these partial breaches gave rise to a separate cause of action for purposes of analyzing when the claims first

[6] Presumably the credits accrue from year to year, as to entitlement. But that is a theoretical construct, since no credit was ever provided, notwithstanding the fact, established after the commencement of this lawsuit, that at least for some of the years the actual charges were significantly less than the estimates billed to and paid by the District. See the deposition testimony of Bill Lloyd, Plt. App. 16-18 and the exhibits identified therein, Plt. App. 19-20, 22-23.

accrued under § 2501. Accordingly, the District can recover for the partial breaches of the Contract based on the failure to perform under § 14(b) at least for the six years preceding the date on which the Complaint was originally filed in this action. Accordingly, its claim for damages at least from 1998 to the present is timely.[7]

IV. The Limitations Bar In § 2501 Should Be Tolled Under These Facts Because the Breach Was Unknowable.

In addition, the District should be able to recover not only the damages from 1998 to the present date, but also for those years prior to 1990 in which the defendant failed to fulfill its duties under § 14(b). The six year limitation period in § 2501 should be tolled under the "concealment or unknowability" doctrine. That doctrine provides that the statute of limitations contained in § 2501 does not run against a plaintiff during a period in which the plaintiff is unaware of the cause of action because defendant concealed its actions or because the injury was inherently unknowable at that point in time. *Navajo Nation v U.S.*, 46 Fed Cl 217 (2000), *aff'd*, Fed Appx 951 (Fed. Cir. 2001).

The evidence submitted by the Government shows that the District did not know and could not have known that the defendant had breached § 14(b) of the Repayment Contract in 1989. The September 6, 1989, letter from the District's Chairman asks why the rate had increased 2 ½ times in five years and seeks clarification of how the costs had been calculated. Def. App. 42. The September 28, 1989, letter provides a "Combined Statement of Commercial Power Revenues" for the Federal Columbia River Power System. Def. App 44. The data compiled on Def. App. 44 did not permit anyone, with or without expertise, to determine the cost basis for the calculation of rates. Declaration of

[7] The claim for damages from the time the original Complaint was filed in 2004 to the present is also timely under § 2501 because damages incurred after a suit for partial breach of continuing contract is filed are considered to accrue for the purposes of the statute of limitations at the time such damages are incurred. *Ind. Mich. Power Co. v. U.S.*, 422 F.3d 1369, 1378 (Fed. Cir. 2005).

Opatrny, ¶ IV. In fact, the District responded to the defendant's letter enclosing that chart, stating in Def. App. 45 that it "does not appear to be pertinent to calculating our power cost, since our rate is based only on generation cost at the Dalles Dam." There is nothing in these materials to indicate that the District had any idea that the rate charged did not reflect the "actual power charges" for the Dalles Dam that were permitted under § 14(a).

Indeed, according to the Dalles' expert, Carol Opatrny, there is no indication in any of the materials submitted by the defendant in support of its motion that could have explained to the District how actual costs or categories of costs "attributable to the generation of power at the Dalles Dam properly allocable to irrigation pumping power and energy" were calculated or determined and how they resulted in any rates charged. Declaration of Opatrny, ¶ IV. In fact, the District did not discover until early 2004 that complete cost and rate data from the BPA, the U.S. Army Corps of Engineers and the Bureau of Reclamation had never even been compiled in setting the rates in 1989 or 1995, much less furnished to the District. Declaration of Opatrny, ¶ VII.

Until it discovered that the defendant had not even compiled the relevant data to calculate the "actual power charges" from the Dalles Dam allocable to irrigation, the District could not have known that the defendant was not performing the annual comparison between the payments the District made and the "actual power charges" required by §14(b) These facts show that the District could not have known anytime before 2004 that the defendants had breached the terms of § 14 of the Repayment Contract.

A claim accrues, and the statute of limitations begins to run, when the underlying facts of a claim become known or knowable to plaintiff. *Menominee Tribe of Indians v. U.S.*, 726 F.2d 718, 720-21 (Fed. Cir.), *cert. denied*, 469 U.S. 826, 105 S. Ct. 106, 83 L. Ed. 2d 50 (1984); *Sankey v. U.S.*, 22 Cl. Ct. 743, 745 (Ct. Cl. 1991). The District has identified evidence which indicates that, until 2004, it could not have known that the defendant had failed to compile the data necessary to perform its duties under the contract as to the payments it made for the years from 1990-2004. Until then, the claim was unknowable and the statute of limitations in § 2501 was tolled. Accordingly, because the District sued within six years of the date that these facts were finally revealed to them by the defendant, they are entitled to damages for all of the years in which the defendant failed to perform its contractual duties under § 14 of the Repayment Contract.

**CONCLUSION**

Because this was a continuing contract, at the earliest the Government's breaches "first accrued" when the Government failed to perform its duties under § 14(b) each year as they came due. The District then had six years from the date of each of those breaches in which to file this lawsuit. The lawsuit was filed in 2004; damages at least for the years from 1998 forward, accordingly, are timely under § 2501. In addition, the District should be permitted to recover for the surplus between the payments it made and the "actual power costs" for all the payments made because the District, until 2004, could not have

///

///

///

///

known that the defendant had not only failed to perform its duties under § 14(b) of the Repayment Contract, but that it had not even compiled the data necessary to do so.

DATED this 27th day of February, 2006.

Respectfully submitted
SHENKER & BONAPARTE, LLP

By:__/s/ Robert E. L. Bonaparte____
**Robert E. L. Bonaparte**
OSB No. 88341
bob@bb-law.net
Shenker & Bonaparte, LLP
One SW Columbia, Ste. 475
Portland OR 97258-2002
Telephone: 503-294-1118
Facsimile: 503-294-0015

Attorneys for Plaintiff:
THE DALLES IRRIGATION DISTRICT

## Certificate of Filing

I HEREBY CERTIFY that on the 27th day of February, 2006, a copy of the foregoing **Plaintiff's Response to Defendant's Motion to Dismiss** was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

Dated this 27th day of February, 2006.

SHENKER & BONAPARTE, LLP

By:_ __/s/ Robert E. L. Bonaparte_____

**Robert E. L. Bonaparte** OSB No: 88341
Shenker & Bonaparte, LLP
One SW Columbia, Ste. 475
Portland OR 97258-2002
Telephone: 503-294-1118
Facsimile: 503-294-0015
Email: bob@bb-law.net
Attorneys for Plaintiffs: **THE DALLES IRRIGATION DISTRICT**