# In the United States Court of Federal Claims

No. 05-1042C

(Filed: June 19, 2006)

| | |
|---|---|
| * * * * * * * * * * * * * * * * * * * * * ) | Alleged breach of contract; charges for hydroelectric power from The Dalles Dam; motion to dismiss; statute of limitations; 28 U.S.C. § 2501; continuing claim doctrine |
| THE DALLES IRRIGATION DISTRICT, ) | |
| Plaintiff, ) | |
| v. ) | |
| UNITED STATES, ) | |
| Defendant. ) | |
| * * * * * * * * * * * * * * * * * * * * * | |

Arden E. Shenker, Shenker & Bonaparte, LLP, Portland, Oregon. With him on the briefs was Robert E. L. Bonaparte, Shenker & Bonaparte, LLP, Portland, Oregon.

Gregory T. Jaeger, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for defendant. With him on the briefs were Assistant Attorney General Peter D. Keisler, David M. Cohen, Director, Franklin E. White, Jr., Assistant Director, and Kelly B. Blank, Trial Attorney, Commercial Litigation Branch. Of counsel was Clark Miller, Attorney-Advisor, Office of the Solicitor, United States Department of the Interior, Boise, Idaho.

## OPINION AND ORDER

LETTOW, Judge.

This breach of contract case was transferred to this court from the District Court for the District of Oregon ("district court"). It stems from a contract entered by The Dalles Irrigation District ("The Dalles" or "district") with the United States Department of the Interior, Bureau of Reclamation ("Bureau") for the provision of hydroelectric power to The Dalles, to be used by the district for irrigation pumping. The Dalles is an organized irrigation district along the Columbia River in Oregon. The energy was to be produced by The Dalles Dam power plant. The Dalles claims that since 1998 the government has overcharged the district for energy by $400,000 in

contravention of the terms of the contract. Compl. at 3. The Dalles also seeks declaratory relief from the court that the district should only be charged for those costs specified in the contract. *Id*. at 3-4.

The government has filed a motion to dismiss for lack of subject matter jurisdiction, contending that the six-year statute of limitations, 28 U.S.C. § 2501, bars relief. The government argues that the underlying formula the Bureau uses to assess annual charges against The Dalles was established in 1990 and that the adoption of the formula constitutes the basis for The Dalles' claim. Because The Dalles filed its complaint in the district court in 2004, fourteen years after 1990, the government avers that The Dalles' claim is untimely.

A hearing on the pending motion was held on May 9, 2006. For the reasons stated below, the government's motion is denied.

## BACKGROUND[1]

The Reclamation Act of 1902, Pub. L. No. 57-161, 32 Stat. 388, "authoriz[ed the] construction of dams for irrigation and land settlement" throughout the western half of the United States. Plaintiff's Response to Defendant's Motion to Dismiss Appendix ("Pl.'s App.") at 4 (Federal Columbia River Power System brochure (Aug. 2003)); *see Orff v. United States*, __ U.S. __, __, 125 S. Ct. 2606, 2608 (2005) (citing *California v. United States*, 438 U.S. 645, 650 (1978)) (stating that the "Reclamation Act of 1902 set in motion a massive program to provide federal financing, construction, and operation of water storage and distribution projects to reclaim arid lands in many Western States.").

Over the next century, 31 federally-owned multipurpose dams were constructed on the Columbia River and its tributaries, forming the Federal Columbia River Power System ("Columbia River System"). Pl.'s App. at 4.[2] In 1960, the government "authorize[d] the Secretary of the Interior ("Secretary") to construct, operate, and maintain the western division of The Dalles Federal reclamation project," which would include pumping plants and a distribution system, for the "purpose of furnishing water for the irrigation of approximately [500,500] acres of arid land in Wasco County, Oregon." Act of Sept. 13, 1960, Pub. L. No. 86-745, 74 Stat. 82 (1960). The statute specifically provided that

---

[1]The recitations that follow do not constitute findings of fact by the court. Rather, the recited factual elements are taken from the parties' filings and are either undisputed or alleged and assumed to be true for purposes of the pending motions.

[2]The Columbia River System "is a unique collaboration among three U.S. government agencies - the Bonneville Power Administration (BPA), the U.S. Army Corps of Engineers (the Corps), and the Bureau." Pl.'s App. at 4.

> [p]ower and energy required for irrigation pumping for the western division of The Dalles Federal reclamation project shall be made available by the Secretary from The Dalles Dam powerplant . . . at rates not to exceed the costs of such power and energy from The Dalles Dam taking into account all costs of the dam, reservoir, and powerplant which are determined by the Secretary under the provisions of the Federal reclamation laws to be properly allocable to such irrigation pumping power and energy.

*Id*. § 2(c), 74 Stat. at 82.

Thereafter, on October 19, 1961, The Dalles Irrigation District entered into Contract No. 14-06-100-2276 with the Bureau. Defendant's Motion to Dismiss Appendix ("Def.'s App.") at 5-40 (Contract (Oct. 19, 1961)).[3] The contract, styled "Repayment Contract Between the United States of America and The Dalles Irrigation District," remains in effect as of the date of this decision. It has a perpetual term and can only be terminated "by mutual agreement of the parties." *Id*. at 7 (Contract § 7). Under the contract, the United States constructed a pumping plant to divert water from the Columbia River, "[a] closed pipe distribution and lateral system to provide irrigation water delivery," and "[e]lectrical facilities to . . . transmit pumping power from" The Dalles Dam. *Id*. (Contract § 8(a)). The district, in turn, became obligated to pay for a fixed-portion of the construction costs in fifty annual installments. *Id*. at 9 (Contract § 9).

A "development period," lasting ten years, began in "the year for which water [wa]s announced as available to the District by the Secretary." Def.'s App. at 10 (Contract § 11(a)). During that period, the district was excused from making payments on its construction-charge obligation, but did collect charges "sufficient to cover all operation and maintenance costs involved, including power charges." *Id*. at 11 (Contract § 11(a)). "Beginning with the close of the development period," the district was obligated to collect annual assessments against the lands in the district on a uniform per-acre basis, equaling "an amount necessary to cover the costs of operation and maintenance." *Id*. at 15 (Contract § 13(b)).

Respecting power, the contract provides that the Bureau will make available to the district "that power and energy required for irrigation pumping during the irrigation season from The Dalles Dam powerplant and other federal powerplants connected therewith." Def.'s App. at 16 (Contract § 14(a)). The Dalles Dam is operated by the United States Army Corps of Engineers, and the hydroelectric power that is produced by the dam's power plant is transmitted by the Bonneville Power Administration ("BPA") to the district. Defendant's Motion to Dismiss

---

[3]The Bureau of Reclamation entered into the contract upon authorization of the Secretary of the Interior. Def.'s App. at 5 (Contract, preamble).

("Def.'s Mot.") at 3.[4] Under Section 14(a) of the contract, the district is obligated to pay for this power and energy

> at rates per kilowatt-hour sufficient to cover the costs of such power and energy from The Dalles Dam, taking into account all costs of the dam, reservoir and powerplant which are determined by the Secretary under the provisions of the Federal Reclamation Laws to be properly allocable to such irrigation pumping power and energy.

Def.'s App. at 16-17 (Contract § 14(a)). The rate was initially fixed in the contract at one mill per kilowatt-hour and was effective until such time that the Secretary determined that a different rate be applied. *Id.* at 17. The contract specifies that a determination of a different rate "[can]not be made more frequently than once in any five-year period." *Id.*

During the ten-year development period, the power charge was included in the development-period charges. Def.'s App. at 17 (Contract § 14(b)). Thereafter, payment of the charges for power supply has been and is to be "made each calendar year on the basis of annual estimates by the [Bureau]." *Id.* The Bureau is obliged to furnish a notice of the annual estimate to the district "each year on or before February 1 of the calendar year for which it is to be applicable." *Id.* The Dalles has to provide payment by April 1 of that year. *Id.* If the Bureau finds that the "funds so advanced will be inadequate to pay the actual costs being incurred" for power under the contract, the Bureau may provide a "supplemental power charge notice stating therein the additional amount . . . required," and the district is required to pay that amount by the date specified in the notice. *Id.* at 17-18 (Contract § 14(b)). If the funds advanced by the district exceed the "actual power charges" for the year, the surplus is credited towards the succeeding years' power charges. *Id.* at 18.

Under the contract,

> [t]he costs which make up the various obligations to be paid by the [d]istrict to the United States under this contract shall embrace all expenditures of whatsoever nature or kind in relation to the function for which the charge is made, including, but without limitation by reason of this enumeration, cost of surveys and investigations, labor, property, material and equipment, engineering, legal work, superintendence, administration, overhead, general inspection services, and damage claims of all kinds, whether or

---

[4]BPA "markets, transmits, purchases, exchanges, and sells electric energy in the wholesale market. Federal dams in the Pacific Northwest generate the hydroelectric energy BPA sells in this market." *Southern Cal. Edison v. United States*, 69 Fed. Cl. 66, 69 (2005) (citing 16 U.S.C. §§ 832, 832a(b)).

> not involving the negligence of officers, agents or employees of the United States.

Def.'s App. at 20-21 (Contract § 18(b)). In addition,

> "[t]he [Bureau]'s determination as to what cost is properly chargeable under this contract, and the classification of those charges for repayment purposes, shall be conclusive."

*Id*. at 21.

After execution of the contract in 1961, the Bureau declined to include a transmission operation and maintenance ("transmission O&M") cost in the rate charged to The Dalles for hydroelectric power. Pl.'s App. at 19-20 (Letter from Neil Stessman, Regional Supervisor, Bureau to L.W. Lloyd, Regional Director, Bureau (Sept. 1, 1982)) (discussing a letter to BPA dated December 1, 1961). In 1961, the Bureau had concluded that "[a] repayment contract had already been executed which established the repayment obligation of the irrigation district," "[n]o transmission O&M costs had been included in determining the district's repayment obligation as we had been unaware of such costs," and "[i]f we were to include transmission O&M costs, we would have to recalculate the repayment obligation and renegotiate the repayment contract." *Id*. at 19. At that time, BPA had agreed with the Bureau's decision and had waived all transmission O&M costs. *Id*.

In 1982, The Bureau observed that generation O&M costs had "decreased from 1.0 mill to 0.52 mills per kilowatt-hour [mills/kwh]." Pl.'s App. at 19. The Bureau concluded that "[i]t would be difficult to support [cutting the rate paid from 1.0 to 0.52 mills/kwh] in view of the need to recover project O&M costs, the fact that The Dalles' rate is already one of the lowest in the Region, the rate has been unchanged for 20 years, and that most other projects have recently had their rates raised substantially." *Id*. The Bureau had received a proposal from BPA to establish a generation charge of 0.52 mills/kwh and a transmission O&M charge of 0.93 mills/kwh, for a total of 1.45 mills/kwh. *Id*. at 19. The Bureau concurred in BPA's recommendation based upon the fact that the contract language respecting costs neither included nor precluded transmission O&M charges. *Id*. at 20.

In 1982, upon receiving notice from the Bureau of the increase in rates from 1 mill/kwh to 1.45 mills/kwh, The Dalles objected to the proposed increase in its energy rates. Pl.'s App. at 21 (Letter from Una Mae Harman, Office Manager, The Dalles, to Bill Lloyd, Regional Director, Bureau (Oct. 25, 1982)), 22-23 (Letter from Don W. Bailey, President, The Dalles Board of Directors, to Lloyd (Dec. 9, 1982)). The district questioned BPA's involvement in the rate calculation and requested additional information on how the new rate of 1.45 mills/kwh was calculated. *Id*. at 21. The Dalles specifically argued that it paid for energy supplied by The Dalles Dam powerplant and that the contract contained no reference to O&M charges or transmission charges in that connection. *Id*. at 23. Moreover, The Dalles contended that the

contract vested in only the Secretary of the Interior the power to determine whether a different rate was applicable, and that it was the district's understanding that the Secretary had not acted in this respect. *Id*. Ultimately, the rate was not increased and The Dalles continued to pay an energy rate at 1.0 mill/kwh. *See* Pl.'s App. at 14 (Deposition of Terrald E. Kent, Program Manager, Facility Operations and Maintenance, Bureau (June 16, 2005)) (concurring that the energy rate had not been increased from 1.0 mill/kwh despite the proposals made in 1982), 16-18 (Deposition of Lloyd (June 15, 2005)) (same).

Beginning in the late 1980s, the Bureau began work with BPA to establish more uniform methodology for rates "for service to small projects," including The Dalles. Def.'s App. at 47 (Mem. from Commissioner, Bureau to Assistant Secretary - Water and Science, Interior (Sept. 28, 1990)). This effort was carried out in the context of the five-year reviews of rates contemplated in the contracts between the Bureau and the projects, including The Dalles. *Id*. Following their initial determinations, the Bureau and BPA informed The Dalles and other irrigation districts of their proposed revised energy rates to begin in 1990. *Id*. at 41 (Letter from John W. Keys, Regional Director, Bureau, to Don Dean, Manager, The Dalles (Aug. 23, 1989)). For the years 1990-94, the charge to The Dalles for "irrigation pumping power" was to be 1.23 mills/kwh. *Id*. The Bureau informed The Dalles that the proposed revised energy rate of 1.23 mills/kwh was "based on the cost of generation at The Dalles Powerplant which [then] exceed[ed] 1 mill per kilowatt-hour." *Id*.

Promptly thereafter, The Dalles sought clarification of the rate increase, based in particular on its understanding that the cost for generation was 0.52 mill/kwh five years previously. Def.'s App. at 42 (Letter from Bailey to Keys (Sept. 6, 1989)). The Bureau responded by providing The Dalles with "a copy of a typical statement of power revenues and expenses of the Federal Columbia River Power System" to illustrate "the typical costs of The Dalles Powerplant which are used in determining the irrigation pumping power rate." *Id*. at 43-44 (Letter from Kent to Bailey (Sept. 28, 1989)). Upon receipt of the cost data, Mr. Bailey, Chairman of The Dalles' Board of Directors, informed the Bureau that the information did "not appear to be pertinent to calculating [The Dalles'] power cost, since [The Dalles'] rate is based only on generation cost at The Dalles Dam." *Id*. at 45 (Letter from Bailey to Bureau (Oct. 4, 1989)).

The revised charge for The Dalles and the other irrigation districts was calculated first by determining the historical cost of providing power and thereafter by increasing that amount "to compensate BPA for increases in cost that w[ould] occur over" the ensuing five years. Def.'s App. at 49-52 (Revision No. 1, BPA Contract No. 14-03-32210 (effective Jan. 1, 1990)) ("Charge and Calculations" for The Dalles Project, Edward W. Sienkiewicz, Senior Assistant Administrator for Power Management, BPA, and John W. Keys, III, Regional Director, Bureau

(Jan. 10, 1991)). The so-called "Lost Revenue Component Method" was used in these calculations. *Id.*[5]

In 1990, the Bureau assessed The Dalles an energy rate at 1.23 mills/kwh and subtracted from its overall charge a credit from BPA and an additional credit for the operation and maintenance of fish screens. Def.'s App. at 46 (Letter from Chief, Finance Branch, Bureau, to The Dalles (Feb. 15, 1990)). The Bureau noted at the time that the new rate had not yet been approved by the Secretary of the Interior. *Id.*[6] From 1990 through 1994, The Dalles was charged the fixed cost of 1.23 mills/kwh for energy and power from The Dalles Dam power plant: a historical cost of 1.160 mills/kwh, based on the average generation costs from 1985 through 1988, plus an additional 0.067 mill/kwh for "lost revenue." Def.'s App. at 49-52. In 1995, The Dalles' charge was increased to 1.31 mills/kwh, based upon the average generation cost from 1990 through 1993, *i.e.*, the historical cost, of 1.226 mills/kwh, adjusted upward by 0.086 mill/kwh for "lost revenue." *Id.* at 53-54 (Revision No. 2, Contract No. 14-03-32210 (effective Jan. 1, 1995)), 59-60 (Record of Execution of Contract) (approving the new charge). Concurrently, the Bureau proposed no changes to the methodology used to determine the energy rates. *Id.* at 57 (Mem. from Manager, Power Resources Office, to Director, Program Analysis (May 15, 1995)). Finally, for the period beginning in 2002, the charge for The Dalles' energy and power was increased to 2.59 mills/kwh, based on a historical cost of 1.846 mills/kwh, comprising the average generation cost from 1994 through 2000, adjusted upward by 0.748 mill/kwh for "lost revenue." *Id.* at 61-64 (Revision No. 3, Contract No. 14-03-32210 (effective Jan. 1, 2002)).[7]

---

[5]The method looked both backward and forward to calculate the rates. The term "lost revenue" for the previous five-year period represented "the difference between the actual cost of service and the revenue collected from the charge in effect for that period." Def.'s App. at 49. For a five-year period to come, "'lost revenue' refer[red] to the project inflation (*i.e.*, the difference between the historical cost of service and the projected cost of service in a given year)." *Id.* After "lost revenue" had been calculated, "the actual long-term interest rate for each of the past five years and the project cost for the next five years [wa]s determined," and those figures were applied to the "lost revenue" to produce "lost revenue plus interest." *Id.* at 50. After the "lost revenue plus interest" was discounted to obtain an annual cost, that amount was added to the historical cost to produce the ultimate charge for energy costs. *Id.*

[6]Apparently either the Secretary of the Interior or an Assistant Secretary subsequently approved "the methodology for calculating the rates." *See* Def.'s App. 60 (E-mail from Hendrick Willems to 1br1dm10.1pn11001.CBOLIN and 867f6.JSloan (May 13, 1996)) (reciting prior approval by the Secretary); *id.* at 48 (Mem. from Commissioner, Bureau, to Assistant Secretary (Sep. 28, 1990, with approval of Nov. 16, 1990)) (approval by the Assistant Secretary for Water and Science).

[7]The rate of 1.31 mills/kwh instituted in 1995 was in effect for seven years. Def.'s App. at 65 (Letter from Kent to Mike Richardson, Manager, The Dalles (Aug. 24, 2001)).

Prior to the most recent revision to the energy and power charge in 2002, The Dalles notified the Bureau of its objection to the methodology used since 1990 to calculate its energy costs and asserted that under the contract, it should only be charged with generation costs and not a "Lost Revenue Component." Def.'s App. at 66 (Letter from Marvin Polehn, Chairman of The Dalles' Board of Directors to Bill McDonald, Pacific Northwest Area Director, Bureau).[8] Subsequent to the 2002 revision of The Dalles' energy rate, counsel for both parties began meeting to discuss the appropriate methodology for determining The Dalles' energy charge, but ultimately failed to reach a resolution. *Id.* at 67-68 (Letter from Arden E. Shenker, Shenker & Bonaparte, LLP, to Kent (May 15, 2003)).

On August 18, 2004, The Dalles filed a complaint in the District Court for the District of Oregon, alleging that the Bureau and Department of the Interior had breached their contract. Def.'s Mot. at 6. In light of the Supreme Court's ruling in *Orff*, __ U.S. __, 125 S. Ct. 2606, the district court transferred the case to this court on September 28, 2005.[9] On October 25, 2005, The Dalles filed its amended complaint in this court.

**STANDARDS FOR DECISION**

Before the court may proceed to the merits of any action, the court's subject matter jurisdiction must be established. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 88-89 (1998). As the plaintiff, The Dalles has the burden of proving that this court has subject matter jurisdiction over its claim. *McNutt v. General Motors Acceptance Corp. of Ind.*, 298 U.S. 178, 189 (1936); *Reynolds v. Army and Air Force Exch. Serv.*, 846 F.2d 746, 748 (Fed. Cir. 1988). The court must accept as true the facts asserted in the complaint and "draw all reasonable

---

[8]The copy of this letter in the record is undated. *See* Def.'s App. at 66. During the hearing held on the government's motion, The Dalles' counsel represented to the court that the letter was written between June 1999 and November 2000. Hr'g Tr. 40:5 to 41:4 (May 9, 2006).

[9]The United States has explicitly waived sovereign immunity in cases where a party seeks to "join the United States as a necessary party defendant in any suit to adjudicate, confirm, validate, or decree the contractual rights of a contracting entity and the United States regarding any contract executed pursuant to Federal reclamation law." 43 U.S.C. § 390uu. Section 390uu states that "[a]ny suit pursuant to this section may be brought in any United States district court in the State in which the land involved is situated." *Id.* Subsequent to the filing of this case in the District Court for the District of Oregon, the Supreme Court in *Orff* held that Section 390uu is limited to cases where the United States is joined as a party defendant in an action between other parties and does not waive the government's sovereign "immunity from suits *directly against* the United States." *Orff*, __ U.S. at __, 125 S. Ct. at 2611 (emphasis added). Consequently, The Dalles could no longer pursue the case in the district court under Section 390uu, and the district successfully sought to have this case transferred to this court such that it could proceed under the Tucker Act, 28 U.S.C. § 1491(a)(1). *See* Hr'g Tr. 25:22 to 26:23 (May 9, 2006).

inferences in favor of the plaintiff" in determining whether jurisdiction exists in a particular case. *Goel v. United States*, 62 Fed. Cl. 804, 806 (2004) (citing *Henke v. United States*, 60 F.3d 795, 797 (Fed. Cir. 1995)); *see also Hamlet v. United States*, 873 F.2d 1414, 1415-16 (Fed. Cir. 1989)).

As a general matter, "[a]ll federal courts are courts of limited jurisdiction." *RHI Holdings, Inc. v. United States*, 142 F.3d 1459, 1461 (Fed. Cir. 1998). This court is no exception. In particular, this court's subject matter jurisdiction is "prescribed by the metes and bounds of the United States' consent to be sued in its waiver of immunity." *Id*. This waiver "cannot be implied but must be unequivocally expressed." *United States v. King*, 395 U.S. 1, 4 (1969). The Tucker Act constitutes explicit consent to suit for claims "against the United States founded . . . upon any express or implied contract with the United States." 28 U.S.C. § 1491(a)(1). The Tucker Act alone, however, is insufficient to confer jurisdiction. The plaintiff must also identify a substantive right enforceable against the United States for money damages. *United States v. Mitchell*, 463 U.S. 206, 216-17 (1983); *United States v. Testan*, 424 U.S. 392, 398 (1976). Furthermore, "[t]he 6-year statute of limitations on actions against the United States is a jurisdictional requirement attached by Congress as a condition of the government's waiver of sovereign immunity and, as such, must be strictly construed." *Hopland Band of Pomo Indians v. United States*, 855 F.2d 1573, 1576-77 (Fed. Cir. 1988); *see* 28 U.S.C. § 2501.[10]

**ANALYSIS**

The government avers that the six-year statute of limitations on The Dalles' claim began to accrue, at the latest, November 16, 1990, when the Assistant Secretary of the Interior for Water and Science approved a new formula for devising the power rate for the district. Def.'s Mot. at 9 (citing Def.'s App. at 48). The government further contends that the continuing claim doctrine does not apply in this case because the alleged wrong, the implementation of a new methodology to calculate energy costs, occurred when the formula was approved in 1990, and any readjustments or recalculations of subsequent power rates are not themselves independent wrongs but, rather, arise from the same underlying formula. Def.'s Mot. at 12-14. The Dalles counters that its claim is "based on a breach of the Defendant's annual duty under § 14(b) of the . . . [c]ontract to ensure that the District has not paid any amount in excess of the 'actual power charges' allocable to irrigation pumping and power for the Dalles Dam for the previous year and to credit back any overpayments to the District." Plaintiff's Response to Defendant's Motion to Dismiss ("Pl.'s Opp.") at 14. Moreover, The Dalles argues that it entered into a "continuing contract" and therefore each alleged breach of the contract by the government accrues individually. *Id*. at 14-24.

---

[10]28 U.S.C. § 2501 states: "Every claim of which the United States Court of Federal Claims has jurisdiction shall be barred unless the petition thereon is filed within six years after such claim first accrues."

A. The Dalles' Claim for Damages from 1998 to the Present Time

This court may exercise subject matter jurisdiction over a claim if it "is filed within six years after such claim first accrues." 28 U.S.C. § 2501. Within the meaning of the statute of limitations, a claim first accrues "when all the events have occurred which fix the liability of the Government and entitle the claimant to institute an action." *Brown Park Estates-Fairfield Dev. Co. v. United States*, 127 F.3d 1449, 1455 (Fed. Cir. 1997) (quoting *Brighton Vill. Assocs. v. United States*, 52 F.3d 1056, 1060 (Fed. Cir. 1995) and citing *Hopland Band*, 855 F.2d at 1577).

With respect to whether claims fall within the statute of limitations, and specifically the applicability of the continuing claim doctrine, this court is bound by the Federal Circuit's decision in *Brown Park*. "[F]or the continuing claim doctrine to apply, the plaintiff's claim must be inherently susceptible to being broken down into a series of independent and distinct events or wrongs, each having its own associated damages." *Brown Park*, 127 F.3d at 1456. In cases where the continuing claim doctrine has been traditionally applied, every "wrong constituted an alleged violation of a statute or regulation that accrued when that particular wrong occurred, independent of the accrual of other wrongs." *Id*. at 1457. The continuing claim doctrine has been applied by the Federal Circuit and its predecessors in a number of different contexts. In *Friedman v. United States*, the Court of Claims discussed the doctrine as applied to military pay cases and noted that each time an individual fails to receive his proper periodic pay, the government has committed a violation and a new claim arises upon which suit may be brought. 310 F.2d 381, 385 (Ct. Cl. 1962); *see also Corrigan v. United States*, __ Fed. Cl. __, __, 2006 WL 1283539, at *5 (May 10, 2006) (holding that the court possessed subject matter jurisdiction over a plaintiff's claims under the Fair Labor Standards Act and the Federal Employee Pay Act of unpaid overtime within, but not beyond, the limitations period).

In contrast, however, "a claim based upon a single distinct event, which may have continued ill effects later on, is not a continuing claim." *Brown Park*, 127 F.3d at 1456; *see Simmons v. United States*, __ Fed. Cl. __, __, 2006 WL 1084000, at *5 (Apr. 25, 2006) (concluding that the continuing claim doctrine did not apply to a failure by the government in managing certain trust property, where the failure preceded the statute of limitations period). Where "plaintiffs really only pointed to one alleged wrong by the government . . . even though it may have had later adverse effects," the continuing claim doctrine will not apply and the statute of limitations will begin to accrue on the date of that single event. *Brown Park*, 127 F.3d at 1457 (citing *Hart v. United States*, 910 F.2d 815 (Fed. Cir. 1990) and *Lane v. United States*, 208 Ct. Cl. 955 (1975)).

In the present case, the application of the six-year statute of limitations is measured from the date The Dalles first filed its complaint in the District Court for the District of Oregon, August 18, 2004. *See* 28 U.S.C. § 1631 ("the action . . . shall proceed as if it had been filed in or noticed for the court to which it is transferred on the date upon which it was actually filed in or noticed for the court from which it is transferred."); *see also Stockton E. Water Dist. v. United States*, 62 Fed. Cl. 379, 389 (2004) (citing *Henke*, 60 F.3d at 800). Consequently, The Dalles

seeks damages for the government's breach of contract "from [August 18,] 1998 to date." Compl. at 3.

Pursuant to Section 14(b) of the contract, "payment of the District's charges for power supply . . . *shall be made each calendar year* on the basis of *annual* estimates by the Secretary." Def.'s App. at 17 (Contract § 14(b)) (emphasis added). This section additionally provides that "notice shall be furnished . . . *each year*" and that The Dalles will thereafter pay the amount contained in such notice. *Id*. (emphasis added). The government, therefore, possessed an annual duty under the contract to provide The Dalles with estimated periodic charges, and The Dalles in turn had the corresponding obligation to pay its annual energy costs upon receipt of the Secretary's notice. The contract further provides that if the district submits payments greater than the actual energy costs for a particular year, "the surplus *shall be credited* to the power charges to become due from the District for succeeding years." *Id*. at 18 (Contract § 14(b)) (emphasis added). If the government, as The Dalles alleges, breached the contract by failing to determine every year whether The Dalles was due a credit for paying in excess of the actual power charges, Pl.'s Opp. at 14, such action would constitute "independent and distinct wrongs" each year they occurred. *Brown Park*, 127 F.3d at 1457; *see Restatement (Second) of Contracts* § 235(2) (1981) ("When performance of a duty under a contract is due[,] any non-performance is a breach."). Moreover, each of these wrongs would "accrue[] when that particular wrong occurred, independent of the accrual of other wrongs." *Brown Park*, 127 F.3d at 1457.

The government avers that The Dalles' entire claim is based on a single distinct event: the approval and implementation in 1990 of the formula by which all charges since that time through now have been calculated. Def.'s Mot. at 9, 12-14. Therefore, as the government would have it, the statute of limitations on The Dalles' claim accrued, at the latest, in 1990. *See id*. The government's assertion, however, does not acknowledge the annual obligations the contract imposed on the government. Thus, accepting as true all facts asserted by The Dalles, *see Goel*, 62 Fed. Cl. at 806, the alleged failure by the government to satisfy its annual contractual duties resulted in a distinct claim every year. *See Wells v. United States*, 420 F.3d 1343, 1347 (Fed. Cir. 2005) (rejecting the government's argument that a request that the Navy deduct money from the plaintiff's monthly retirement payment was the "triggering event," because *each time* money was withheld, a statute was violated giving rise to a distinct claim). Thus, a new statute of limitations accrued every time the government failed to satisfy its annual contractual obligations.

The government cites *Davidson v. United States*, 66 Fed. Cl. 206 (2005), as an example of why the continuing claim doctrine does not apply in this case. Def.'s Mot. at 13. *Davidson*, however, is distinguishable from this matter and, contrary to the government's assertion, indicates why the continuing claim doctrine *is* applicable to The Dalles' claim. In *Davidson*, a widow of a military officer filed suit in 2004, alleging that the government had failed to pay her the proper survivor benefits following a recalculation, implemented in 1995, of the annual amounts due. 66 Fed. Cl. at 207-208. The court held that the continuing claim doctrine did not apply on the ground that the plaintiff's claim arose from a "single distinct event," the recalculation of benefits in 1995, and therefore the statute of limitations on her claim expired in

2001, three years before she filed her complaint. *See id*. at 210. In *Davidson*, the plaintiff was aware that subsequent to the recalculation, with the exception of fixed increases, her payments would remain the same in perpetuity. *Id*. Here, the government has a contractual duty, pursuant to Subsections 14(a) and 14(b) of the contract, to make rate determinations no more frequently than once in a five-year period and also to provide a preliminary estimate of power charges *every year*. Def.'s App. at 17 (Contract § 14(a), (b)). The Dalles has a corresponding obligation to pay that estimated charge relatively early in the year, subject to an *annual duty* on the part of the government both to determine the "actual costs being incurred for a power supply," *id.* at 17 (Contract § 14(b)), and to reconcile any difference between the estimated charge paid and the actual charge incurred. *Id*. at 17-18 (Contract § 14(b)). No corresponding contractual duties, required to be performed each and every year, existed in *Davidson*.

Ultimately, The Dalles' claim for damages may be broken down into a "series of independent and distinct events," occurring in this case on cycles no more frequently than once in every five years *and on an annual basis*, with each wrong "having its own associated damages." *See Brown Park*, 127 F.3d at 1456. It is conceivable that the government may have breached the contract in a rate cycle or, alternatively, in one particular year. Each rate cycle stands on its own footing, the most recent of which was adopted in 2002. And, in any given year, the government might breach the contract by not providing The Dalles with a credit for overpayment of energy costs, but in turn may have satisfied its obligations in a subsequent year, by granting a catch-up credit to The Dalles equal to overage previously paid, set off against the estimated and then the actual power costs for that following year. In all events, The Dalles' claim may be broken down into yearly segments in determining whether the government did in fact breach its duties under the contract. Therefore, the continuing claim doctrine applies to The Dalles' claim, and The Dalles may seek damages, as it has in its complaint, dating back to August 18, 1998, six years prior to the filing of the original complaint in the district court. In short, this court possesses subject matter jurisdiction over The Dalles' claim from that date forward.

B. The Dalles' Incipient Claim for Damages from 1990 to 1998

The Dalles does not raise any damages claim prior to 1998 in its complaint. *See* Compl. at 3. In its response to the government's motion to dismiss, however, The Dalles states that it is "entitled to damages for all of the years in which the defendant failed to perform its contractual duties," which could conceivably encompass the period from 1990 to 1998. *See* Pl.'s Opp. at 26. The Dalles argues that the six-year statute of limitations, 28 U.S.C. § 2501, should be tolled on the ground that it was "unaware of the cause of action [at issue in this case] because defendant concealed its action or because the injury was inherently unknowable at that point in time." Pl.'s Opp. at 24.

"[T]o toll the statute of limitations for filing a claim against the government '[a] [p]laintiff must either show that defendant has concealed its acts with the result that plaintiff was unaware of their existence or it must show that its injury was 'inherently unknowable' at the

accrual date.'" *Venture Coal Sales Co. v. United States*, 370 F.3d 1102, 1107 (Fed. Cir. 2004) (quoting *Japanese War Notes Claimants Ass'n of the Philippines, Inc. v. United States*, 373 F.2d 356, 359 (Ct. Cl. 1967), *cert. denied*, 389 U.S. 971 (1967)). The party seeking to toll the statute of limitations bears the burden to prove either that the defendant concealed its acts or that the injury was "inherently unknowable." *Central Pines Land Co. v. United States*, 61 Fed. Cl. 527, 533 (2004) (citing *Catawba Indian Tribe of S.C. v. United States*, 982 F.2d 1564, 1571 (Fed. Cir. 1993)).

In the present case, The Dalles alleges that it "could not have known that the defendant had breached" the contract in 1990, and in particular the terms of Section 14(b) of the contract. Pl.'s Opp. at 24. The Dalles contends that it did not learn until 2004 that actual energy costs were never compiled by either BPA or the Bureau in 1989, 1995, or 2001, when The Dalles' energy charges were calculated. *Id*. at 25. Therefore, The Dalles argues that it could not have known prior to 2004 whether or not the Bureau ever determined if the district was due a credit for overpayment of energy charges. *Id*.

While the record is limited as to the extent of The Dalles' knowledge, the court concludes that The Dalles has failed to put forward evidence sufficient to generate a genuine dispute of material fact regarding whether the government concealed its acts or that the injury to The Dalles was "inherently unknowable." In 1989, The Dalles received advanced notice of the government's intentions, and it sought and obtained data from the Bureau in response to its requests for more detailed information. *See supra*, at 6. Those circumstances strongly suggest that The Dalles was put on notice that a change in methodology was being made that could be called into question under the contract. Indeed, The Dalles at that time made arguments to the Bureau to this effect. *Id*.

The Federal Circuit has previously concluded that once a party "'is on inquiry that it has a *potential* claim, the statute can start to run.'" *Welcker v. United States*, 752 F.2d 1577, 1580 (Fed. Cir. 1985) (emphasis added) (concluding that the statute of limitations should not be tolled with respect to the plaintiff's claim because he "strongly suspected" 30 years earlier that a claim existed) (quoting *Japanese War Notes*, 373 F.2d at 359). Since late 1989, The Dalles has consistently maintained its position that the Bureau was overcharging The Dalles pursuant to the contract, Def.'s App. at 66 (Letter from Polehn to McDonald (undated, but attributed to a time between June 1999 and November 2000)) (stating that The Dalles maintained the same position with respect to the calculation of the power rate as that set forth in 1989 and that the district's power charge should never have included a "lost revenue component"), and not correspondingly providing The Dalles with a credit for paying in excess of the actual energy charges. Furthermore, The Dalles concedes that the "settling up" process pursuant to Section 14(b) of the contract, whereby the Bureau determines whether The Dalles is due a credit or should incur additional charges to cover a shortfall, did not occur subsequent to the implementation of the new energy rate formula in 1990. *See* Hr'g Tr. 26:24 to 27:4 (May 9, 2006); Pl.'s Opp. at 5-6, 14. These acknowledgments by The Dalles must be analyzed in light of the fact that the district was well aware of the explicit language in the contract bearing on the costs to be encompassed within

its annual energy charges and also that the government was duty-bound annually to determine whether a credit or an addition should be made to The Dalles' energy charges in each year to reflect actual costs. *See* Def.'s App. at 17-18 (Contract § 14(b)).[11] Thus, the statute of limitations began to accrue on each distinct claim at the time each year when a breach allegedly occurred. *See Restatement (Second) of Contracts* § 235(2). "'This holds true notwithstanding plaintiff's contention that [it] did not have enough evidence to prove or substantiate [its] claim [until the government provided such information in 2004, because The Dalles] . . . could have filed [its] suit here and availed [itself] of the broad discovery powers afforded by this court to its litigants, and thereby have acquired the . . . evidence to prove [its] claim within the time allowed by the statute of limitations.'" *Welcker*, 752 F.2d at 1581 (quoting *Braude v. United States*, 585 F.2d 1049, 1054 (Ct. Cl. 1978)).

Accordingly, the statute of limitations is not tolled for those claims that occurred prior to August 18, 1998 and, thus, this court does not have subject matter jurisdiction over such claims.

This result is also supported by an alternative, analogous ground. Specifically, any alleged breach of contract by the government prior to August 18, 1998 is not actionable because it is time barred even though it is related to the breach of contract that is alleged in The Dalles' timely filed claims. *See National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002). In

---

[11]Implied in the parties' arguments over the contractual provisions bearing on application of the statute of limitations is a difference in position respecting the words "costs" and "actual costs" as used in Subsections 14(a) and (b) and Section 18 of the contract. As to power and energy charges, as contrasted to costs to construct the project works, the terms "costs" and "actual costs" are not defined in the contract. *Compare* Def.'s App. at 7-8 (Contract § 8(a)) (defining costs to construct the project works), *with id*. at 17-18 (Contract § 14) (relating to project power supply). Section 18 of the Contract is arguably ambiguous as to whether it pertains to power and energy charges as well as to "the actual cost of construction of the project works and the amount allocated to irrigation for repayment by the District." *Id*. at 20 (Contract § 18(a)). Because this is a situation where the contract was entered to satisfy a statutory requirement, *see supra*, at 2-3, the interpretation of the contract must be guided by an examination of the underlying statute. *See Roedler v. Department of Energy*, 255 F.3d 1347, 1352 (Fed. Cir. 2001) ("For determination of contractual and beneficial intent when, as here, the contract implements a statutory enactment, it is appropriate to inquire into the governing statute and its purpose.") (citing *Rendleman v. Bowen*, 860 F.2d 1537, 1541-42 (9th Cir. 1988); *American Hosp. Ass'n v. Schweicker*, 721 F.2d 170, 183 (7th Cir. 1983); *Busby School of N. Cheyenne Tribe v. United States*, 8 Cl. Ct. 596, 602 (1985)).

*Morgan*, the Supreme Court addressed a matter related to racial discrimination in the workplace, and specifically focused on the relationship between discrete discriminatory acts that occur within and outside the relevant statute of limitations. The Court unanimously reaffirmed its prior rulings that "discrete acts that fall within the statutory time period do not make timely acts that fall outside the time period." *Id.*, 536 U.S. at 112 (citing *United Air Lines, Inc. v. Evans*, 431 U.S. 553, 558 (1977)). The Court did, however, permit a plaintiff to use the prior acts that fall outside the statute of limitations "as background evidence in support of a timely claim." *Morgan*, 536 U.S. at 113. The Court further held that an exception to this general rule existed with respect to "hostile work environment" claims, holding that a plaintiff need only file a request for relief within the statutory time period after any act that is within the scope of the hostile work environment for the entire claim, which encompasses acts that occurred both inside and outside the statute of limitations, to be timely. *Id.* at 116-18.

The holding by the Supreme Court in *Morgan* has been subsequently applied by a number of circuit courts of appeals in a variety of factual settings. *See, e.g.*, *O'Connor v. City of Newark*, 440 F.3d 125, 128-29 (3d Cir. 2006) ("We find persuasive the reasoning of our sister circuits that the distinction between 'continuing violations' and 'discrete acts' is not an artifact of Title VII, but is rather a generic feature of federal employment law."); *Ledbetter v. Goodyear Tire and Rubber Co.*, 421 F.3d 1169, 1178-80 (11th Cir. 2005); *Shea v. Rice*, 409 F.3d 448, 451 (D.C. Cir. 2005); *Hildebrandt v. Illinois Dep't of Natural Res.*, 347 F.3d 1014, 1026-29 (7th Cir. 2003).

The issue addressed in the Court's first holding in *Morgan*, not the second holding related to a hostile work environment, is analogous to the claim for damages The Dalles puts forward with respect to the government's alleged breach of its contract prior to August 18, 1998. Thus, The Dalles may not seek relief respecting the pre-August 1998 events, even though it may support its post-August 1998 claims by using earlier events as "background evidence." *Morgan*, 431 U.S. at 113.

**CONCLUSION**

For the reasons set forth above, the government's motion to dismiss is DENIED. The government shall file an answer to the complaint on or before July 10, 2006.

IT IS SO ORDERED.

s/ Charles F. Lettow
Charles F. Lettow
Judge