Starting with Page 1, which is your introduction, you state that you're "a consultant in the electrical utility industry with special emphasis on wholesale power transmission markets and rate design."

When you say "emphasis," what exactly do you mean there?

A. If I were to identify all the amounts -- all the time that I've been involved in the electric utility industry, a good portion of that is associated with wholesale power and transmission rate design.

Q. When you say "transition rate design," what about transition markets? Is that -- you list three different -- are these specialties? Are they subjects? How would you characterize these?

A. I characterize them as an emphasis.

Q. As an emphasis?

A. Uh-huh.

Q. Okay. Do you have any other emphases that -- that you follow in your position as a consultant?

A. I think my resume would speak to what other activities I've been involved in.

Ex. A, Def. Mot. In Limine

the rate of $170 per hour --
A. Correct.
Q. -- to arrive at the hourly figure?
A. That's correct.
Q. Do you have any other payment arrangement for this case other than just a straight hourly fee?
A. I also am compensated for mileage or any Federal Express packages, but that's -- that's it; time and materials.
Q. Okay. I take it that when you say it's only time and materials, there's -- you don't have any sort of a contingency agreement.
A. No, I do not.
Q. In your next paragraph you state the purpose of this report.
How did you define the purpose of the report?
A. I'm sorry.
Would you be a little more specific?
Q. Well, you state that the purpose of this report is to provide an estimate.
I'm wondering how you arrived at defining the "purpose for your report."
A. I was asked to prepare a damages

Ex. A, Def. Mot. In Limine

estimate.

Q. Asked by whom?

A. I was asked by Mr. Shenker to prepare a financial damages estimate.

Q. And that was how he phrased it to you, to prepare a "financial damages assessment"?

A. I had the opportunity to review Judge Lettow's Opinion and Order, and reviewed -- as a result of that review prepared a damages calculation.

Q. So you reviewed Judge Lettow's opinion regarding the motion to dismiss that was filed some time ago, correct?

A. I don't know if -- if you're referring to a different motion.

Q. Okay.

A. It was, I think, the summer of 2006 --

Q. Okay.

A. -- Opinion and Order.

Q. Okay. Other than Judge Lettow's opinion, did you review anything else in determining the purpose of your report?

A. Nothing specific comes to mind.

Q. Anything in general?

A. Huh-uh.

Ex. A, Def. Mot. In Limine

Q. Okay. Did you have discussions with Mr. Shenker regarding the purpose of your report?
A. He asked me to prepare a damages calculation.
Q. Understood.
But beyond that, were there any other -- did you receive any other guidance from Mr. Shenker regarding the purpose of your report?
A. No.
Q. Now, you say that it's "to provide an estimate."
Is there a margin of error that's associated with this estimate?
A. Nothing that I can calculate for you.
Q. Okay. Could you generally estimate what the margin of error is?
A. No, because the data that's been provided has not been specific enough for me to make that estimate.
Q. But you'd agree, would you not, that the estimate is less than a hundred-percent certain?
A. Yes.
Q. You further state in that third paragraph that to provide a context for the estimate, you have calculated damages for three

Ex. A, Def. Mot. In Limine

Where would we find that, that term as used by the Corps?

A. I am not a -- I'm not well versed in the -- the data or the collection of data that the Corps has, but those terms have been used in the various materials that I've looked at in the preparation of this report.

Q. Okay. What about, are there specific line-item costs that you can describe for me that are part of these specific costs of O&M?

A. Not off the top of my head. I would have to reference materials. But specifically associated with power generation is what I mean by the term or qualifier "specific."

Q. In that first statement you say -- I'll just read the entire phrase.

"The issue in this case is determining the actual cost of generation from The Dalles Dam, as this should be the basis for the charge for power paid by The Dalles for irrigation pumping."

Why do you use the term "should be"?

A. Because that's my interpretation of the repayment contract between The Dalles Irrigation District and the Bureau of Reclamation.

Q. And when you say "the repayment

contract," are you referring to specific paragraphs or provisions?

A. I'm recalling Section 14, but I would have to consult that to be certain.

But, as I understand, the repayment contract is regarded as the -- the best source for the basis of charges for irrigation districts in the Pacific Northwest.

Q. Okay. And that's based upon your interpretation of that contract clause, correct?

A. What is based on that interpretation?

Q. Your conclusion.

A. The repayment contract language is reflective of Section 14.

My conclusion that the repayment contract is considered the -- the appropriate source for determining the actual cost of generation is based on reviewing other materials in addition to the repayment contract.

Q. So is it your interpretation of the contract that The Dalles is only obligated to pay the actual cost of generation?

A. The actual cost of generation in terms of what should be properly allocated to The Dalles pumping charges.

Ex. A, Def. Mot. In Limine

Q. And that's your interpretation of the contract?

A. That's correct.

Q. Okay. In the next sentence you state something that you've already referenced in your testimony; that is, although you have not been provided with adequate data to be certain about the actual cost of generation.

Are you able to state what other data you would need to be certain?

A. I would want more specific information than what I've received. And my analysis indicates that I had to create data based on history, and so I needed to apply assumptions. But I'm generally confident that the conclusion is -- is in the ballpark.

Q. You used the term "in the ballpark."

What do you mean by that?

A. I think my conclusions are reasonable.

Q. Okay. Are you able to tell me what sort of margin of error is associated with those conclusions?

A. Not with -- without guessing.

Q. Now, when you say you would need more specific information, are there any particular

Ex. A, Def. Mot. In Limine

high degree of certainty that the -- the data is accurate, that the methodologies are easy to understand. That's what I mean by "transparent."

Q. Anything else that you mean by "not transparent"?

A. Nothing specific comes to mind.

Q. Okay. Let's go back to your first conclusion, "The cost of generation that is charged to the District is overstated."

What part of the contract relates to that conclusion?

A. Would you restate your question, please?

Q. Yeah.

You posit the conclusion that, "The cost of generation that is charged to the district is overstated."

My question is: What part or portions of the contract relate to that conclusion?

A. And what contract are you referring to?

Q. The replacement contract -- not replacement, the repayment contract.

A. The repayment contract language that I recall indicates that the costs that are to be charged for pumping should be those costs that are

Ex. A, Def. Mot. In Limine

properly allocable. And, in my opinion, the costs that The Dalles has been charged exceed those that should be allocated to them.

Q. Are you able to tell me what particular portion or provision in the contract you're relying on in making that particular conclusion?

A. The section of the repayment contract to which I'm referring is Section 14.

Q. Section 14. Okay.

Let's move back to the second conclusion, which relates to the transparency of the cost basis.

Is there a particular part of the contract that relates to that conclusion?

A. I don't recall if it's in the contract or in other pertinent information, but there is an obligation for the Bureau to communicate with The Dalles any kind of changes in cost. That has not been done. So that's been a transparency issue as well.

Q. In your third conclusion you state that, "The escalation of the costs charged to the irrigation loads" -- you mean, charged to The Dalles? Is that what you mean there?

A. The irrigation loads are the pumping

Ex. A, Def. Mot. In Limine

A. As I understand, the rate that is charged to The Dalles is supposed to reflect the actual cost.

Q. And where is that in the contract?

A. Are you referring to the repayment contract?

Q. Correct.

A. That exact language in the contract, as I recall, is "properly allocable costs," and I've interpreted "properly allocable" as the actual cost that should be charged.

Q. So you interpreted the contract's use of the term "properly allocable cost" to reach the conclusion contained in this sentence here?

A. That's correct.

Q. Okay. Page 3.

You state in the first sentence that the -- "The charge has been increased steadily since 1990."

The "charge" being the rate? What charge are you referring to there?

A. The charge for pumping.

Q. For irrigation pumping? Power related to irrigation pumping?

A. Power is required to pump water to

Ex. A, Def. Mot. In Limine

Q. And is there someplace in the contract that makes that distinction?
A. As far as I know, the contract does not use "specific" and "joint" per se.
Q. Is there anywhere else where that distinction is made?
A. Would you --
Q. Any other documents that would reflect this distinction between "specific costs" and "joint costs," as you use them, those terms?
A. There -- there are some documents that refer to "shared facilities," and there are some other documents that use the term "joint."
I'm not referring to the repayment contract. But you'll see in my testimony I refer to the "Definite Report," for example, that excludes joint costs from being allocated to The Dalles Irrigation District, and I believe that's 1962.
Q. Is it your view that the Definite Report is part of the contract?
A. I believe that the Definite Report further illustrates what costs should or should not be allocated to The Dalles.
Q. Is it your view that it's a modification

Ex. A, Def. Mot. In Limine

prospective under- or overcollection of costs, and an interest fee is applied to that, and that then is included as a second rate component in addition to a generation cost component in coming up with a total charge that's applied to The Dalles.

Q. Is it your view that the -- forgive me if I'm kind of repeating myself, but is it your view that the lost revenue component violates the contract?

A. Yes.

Q. What provision?

A. The lost revenue component, in my mind, is effectively putting in place rate adjustments more frequently than every five years.

Q. Understood.

But are you able to point me to a specific provision in the contract that's being violated by the lost revenue component?

A. I would need to look at the contract to tell you exactly which provision, but I'm referring to the revision -- excuse me -- the language that limits the frequency of modifying the charge.

Q. Okay. So that would be based on your interpretation of the contract?

Ex. A, Def. Mot. In Limine