IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| THE DALLES IRRIGATION DISTRICT,<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | No. 05-1042C<br>(Judge Lettow) |

**DEFENDANT'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW**

Pursuant to Rule 16 and Appendix A of the Rules of the United States Court of Federal Claims, defendant submits the following contentions of fact and law.

CONTENTIONS OF FACT

Reclamation Law Background

1. The Reclamation Act of June 17, 1902, 32 Stat. 388, and related acts, provide the framework for Federal involvement in irrigation. The act promotes development of arid lands in the western United States by developing and constructing irrigation projects. 43 U.S.C. §§ 372-573.

2. The Reclamation Project Act of 1939 requires that before construction of any Federal irrigation project, the Secretary of the Interior must submit a report to Congress addressing the engineering and financial feasibility of the project. 43 U.S.C. §§ 485 through 485h. The 1939 Act provides that if estimated construction costs of a proposed irrigation project cannot be repaid by the beneficiaries, construction may only commence by an Act of Congress following the Secretary's submission of a feasibility report. 43 U.S.C. § 485h(a).

3. The 1939 Act further provides that no irrigation water may be delivered via an irrigation project "until an organization . . . has entered into a repayment contract with the United

States." 43 U.S.C. § 485h(d). Project construction costs allocated to irrigation "shall be included in a general repayment obligation of the organization" and "shall be spread in annual installments, of the number and amounts fixed by the Secretary, over a period of not more than 40 years, exclusive of any development period fixed under paragraph (1) of this subsection. . . ." Id.

Legislative History Of The Dalles Irrigation Project

4. In June 1959, United States Senator Wayne Morse (D., Oregon) introduced Senate Bill 2195 ("S. 2195") to authorize the Secretary of the Interior to construct, operate, and maintain the western division of The Dalles Federal reclamation project for the purpose of providing an additional source of water to The Dalles Improvement District, the predecessor to The Dalles Irrigation District (collectively referred to as "The District"). Defendant's Exhibit 1 ("Def. Ex.") at 2-3.

5. In November 1959, the United States Department of Interior, Bureau of Reclamation ("Reclamation") completed its feasibility report for The Dalles Irrigation Project (the "Project"), which was submitted in final form to the Secretary of the Interior on May 24, 1960, by the Commissioner of Reclamation and delivered to Congress thereafter. Def. Ex. 2.

6. On June 13, 1960, the United States Senate Subcommittee on Irrigation and Reclamation held a hearing regarding The Dalles Project. Def. Ex. 1. The District was represented by its president, Mr. Don Bailey, the District's lawyer, and several other members. Def. Ex. 1 at III. At this hearing, representatives of the United States Department of Interior and The District discussed both the need for the additional water, and Reclamation's preliminary assessment that The District could pay all operation, maintenance, replacement, and power costs

in addition to approximately $2.5 million of the estimated $6 million construction cost. Id. at 5-6, 10-13, and 15-18.

7. On June 21, 1960, the United States Department of the Interior submitted to Congress "A Report on the Western Division, The Dalles Project, Oregon, Pursuant to Section 9(a) of the Reclamation Project Act of 1939" ("feasibility report"). On June 22, 1960, the feasibility report was forwarded to the House Committee on Interior and Insular Affairs, recommending authorization based on the economic and engineering feasibility as supported by the findings submitted to Congress through the feasibility report. Def. Ex. 2. The feasibility report explains how the The Dalles Irrigation Project ("Project") would — if authorized — be constructed and how the United States would recover costs for construction, operation, and maintenance of the Project.

8. The feasibility report specifically estimated that construction of the Project would cost approximately $5,649,00, and calculated the Project's annual operating costs at $90,700. Def. Ex. 2 at 36.

9. Of the construction estimate, $17,600 was for the construction of fish screens that would not be allocated as an expense to be reimbursed by The District. Id. In addition, the feasibility report estimated an annual operation cost of maintaining the fish screens to be $1,700, which would likewise not be reimbursable. Id.

10. The feasibility report stated that all other costs are specific to the Project and reimbursable by The District. Id.

11. The feasibility report specifically identified the reimbursable Project construction cost as $5,631,400, of which The District would be responsible for repayment of $2,550,000. Id.

The remaining portion of the construction cost would be subsidized by "surplus power revenues from the Federal power plants of the Columbia River System." Id.

12. The proposal that The District would be responsible to pay only $2,550,000 of the estimated $5,631,000 construction costs was based upon its ability to pay, amortized over a 50-year period. Id.

13. The feasibility report also estimated that The District would incur approximately $89,000 annual operating costs, as estimated in 1959, which included $58,200 for cost of salaries, wages, materials, and supplies required for operation and maintenance ("O&M") of project features (less $1,700 for annual O&M for the aforementioned fish screens that were determined to be nonreimbursable); $25,700 to purchase power (based upon a baseline 1-mill per kilowatt hour (kWh) rate); and $6,800 for replacement costs on major items. Id. One mill is the equivalent of $0.001 per kWh of energy used.

14. Power for operating the Project was to be obtained at The Dalles Substation "on the basis of production at The Dalles Dam." The feasibility report states that "this method of service will provide the lowest cost power for the project." Id. at 15, see also id. at 40.

15. Subsequent to the Senate subcommittee hearing and the submission of the feasibility report to Congress, the Senate Committee on Interior and Insular Affairs, in report No. 1752, prepared a report to accompany S. 2195. Def. Ex. 3. The report recommended passage of the bill with minor amendments, and specifically stated that "[a]ll costs except the $17,600 capital cost and $1,700 annual operating cost for the fish screen are allocated to irrigation and are reimbursable [by The District]." Id. at 3.

16. Similarly, the House of Representatives Committee on Interior and Insular Affairs, in report No. 2203, recommended approval of the Project and adopted the proposed repayment plans. Def. Ex. 4 at 5.

17. The legislative history supports the fact that The District would be responsible for reimbursement of all costs, including the cost of power and energy for irrigation pumping generated at The Dalles Dam as determined by the Secretary of the Interior.

The Dalles Irrigation Project Authorizing Legislation

18. On September 18, 1960, Congress enacted Pub. L. No. 86-745, 74 Stat. 882, (1960), authorizing the Secretary of the Interior to construct, operate, and maintain the western division of The Dalles Federal Reclamation Project. The Act provides that the project "shall consist of the following principal works: a main pumping plant to be located at a site on the Columbia River; a booster and relift pumping plant with reregulating reservoirs; and a distribution system." Def. Ex. 5.

19. In Section 2(b), Congress provided that water users [The District] would repay construction costs of the Project consistent with the requirements of section 9(d) of the Reclamation Project Act of 1939, 43 U.S.C. § 485h(d). Congress further determined that the construction costs for the Project "in excess of the amount determined by the Secretary to be within the ability of the irrigators to repay within a fifty-year period" would come from net revenues derived from power marketed by the Bonneville Power Administration.

20. Section 2(c) of the authorizing legislation directed the Secretary to furnish power for irrigation pumping purposes from The Dalles Dam. Section 2(c) in its entirety states:

> Power and energy required for irrigation pumping for the western division of The Dalles Federal reclamation project shall be made available by the Secretary from The Dalles Dam powerplant and other Federal plants interconnected therewith at rates not to exceed

> the costs of such power and energy from The Dalles Dam taking into account all costs of the dam, reservoir, and powerplant which are determined by the Secretary under the provision of the Federal reclamation laws to be properly allocable to such irrigation pumping power and energy.

21. The Dalles Dam is distinct and separate from The Dalles Irrigation Project. The Dalles Dam was authorized by Congress in the Flood Control Act of 1950, Pub. L. No. 81-515 § 204, 64 Stat. 163, 179, (1950), which authorized the United States Army Corps of Engineers ("Corps") to construct and operate the The Dalles Dam as a multi-purpose facility. The Dalles Dam was authorized more than a decade before Congress authorized The Dalles Irrigation Project. Power generated at the facility is transmitted and marketed by Bonneville Power Administration ("BPA"), a Federal agency charged with marketing power from Federal generation facilities operated by the Corps and Reclamation as part of the Federal Columbia River Power System. Bonneville Project Act of August 20, 1937, 16 U.S.C. § 832, as amended, and pursuant to Orders of the Secretary of the Interior No. 2563, dated May 2, 1950, and No. 2860, dated January 19, 1962.

22. In section 2(d) of the Project's legislation, Congress provided that, as determined by the Secretary, costs of constructing "the works authorized by this Act" allocated to fish and wildlife benefits were to be nonreimbursable. Further, operation and maintenance costs for the Project authorized by the Act allocated to fish and wildlife were nonreimbursable. The repayment contract between The District and the United States at article 8(c) identifies fish screens as the portion of authorized Project works for fish and wildlife values.

<u>The Repayment Contract</u>

23. The repayment contract ("contract") describes the Project works, incorporates relevant provisions of the enabling legislation, estimates the cost of the Project works to be

$6,000,000, of which $17,600 is estimated to be the cost of fish screens and not allocable to The District. Arts. 8-9 of the contract; see also ¶¶ 11, 12, above; Def. Ex. 6.

24. Specifically, article 9 of the contract provides that The District is obligated to repay $2,550,000 in construction charges for the Project in fifty (50) year successive annual payment.

25. In addition to this obligation, article 14 of the contract addresses Reclamation's obligation to furnish power to The District for use in the operation and maintenance of the Project, The District's corresponding obligation to pay for the power, and identifies the initial power rate charged to The District:

> For the purposes of operating and maintaining the project works, the Secretary will make available to the District that power and energy required for irrigation pumping during the irrigation season from The Dalles Dam powerplant and other Federal powerplants connected therewith. The power and energy will be furnished to the District at the point where the project 12.5-kv electric distribution line is connected to The Dalles substation of the United States or at such other points as are agreed upon between the United States and the District, at rates per kilowatt-hour sufficient to cover <u>the costs of such power and energy from The Dalles Dam, taking into account all costs of the dam, reservoir and powerplant which are determined by the Secretary under the provisions of the Federal Reclamation Laws to be properly allocable to such pumping power and energy</u>. The initial rate shall be one (1) mill per kilowatt-hour. This rate of one (1) mill shall be effective for the first irrigation season and shall continue until such time as the Secretary determines, in accordance with the provisions set forth above, that a different rate is applicable. Such a determination shall not be made more frequently than once in any five-year period.

Art. 14(a) (emphasis added). As stated earlier, the underlined language above is virtually identical to the language contained in § 2(c) of the enabling legislation, which provides:

> [T]he costs of such power and energy from The Dalles Dam, taking into account all costs of the dam, reservoir and powerplant which are determined by the Secretary under the provisions of the

> Federal Reclamation Laws to be properly allocable to such irrigation pumping power and energy.

Pub. L. No. 86-745.

26. As explained in more detail below, until 1990, The District's power rate remained at the initial 1-mill per kilowatt hour rate as set forth in Article 14(a) of the contract.

27. Article 14(b) provides that The District will pay annual power charges in advance based upon an annual estimate by the Secretary. This article also provides that whenever the advance charges paid by The District are inadequate, the Secretary may issue a supplemental notice stating the amount of additional funds required. If The District advanced funds in excess of the actual charge, the surplus shall be credited to the power charge due from The District in succeeding years.

28. In implementing article 14(b), Reclamation bases The District's annual power charges upon the estimated power usage (in kWh) by The District in advance of each irrigation season multiplied by the power rate, as determined under the provisions of article 14(a). Once actual power usage (in kWh) is determined at the end of each irrigation season, actual usage is multiplied by the power rate to determine whether the estimated charges resulted in an over- or under-recovery of charges.

29. Historically, Reclamation has under-recovered power charges, resulting in an upward adjustment of the rate during the next five-year period in order to recuperate the charges.

30. In its Definite Plan Report of August 1962 ("DPR"), Reclamation summarized the contract and explained that, as a result of discussions with BPA, BPA agreed to waive costs incurred in the operation and maintenance of substation and transmission facilities used in the transmission of power to The District. Def. Ex. 10 at 2, 5. This agreement was later

memorialized in the Memorandum of Understanding ("MOU") between Reclamation and BPA of March 26, 1963. Def. Ex. 11 at 6-7. The DPR also explained that:

> A rate of 1 mill per kilowatt-hour shall be effective for the first irrigation season and shall continue until such time as the Secretary determines, but not more frequently than once in any five-year period, that a different rate is applicable. If the rate is modified by the Secretary after the first irrigation season, the contract provides for such revisions and for changes in payment of the District's charges for power.

Def. Ex. 7 at 2.

31. The MOU between Reclamation and BPA provides "for the transmission, transformation, and delivery of electric energy and other special arrangements for electric service to the irrigation pumping loads of the Western Division of The Dalles Project, Oregon." Id. at 2.

32. To date, The District has not been charged for the costs associated with power transmission from The Dalles Dam to the Project.

The Dalles Dam Project operated by the Corps of Engineers

33. In 1967, the Corps prepared for Congress its Cost Allocation Report, which allocated costs at The Dalles Dam between authorized purposes, including power generation, based upon the total benefits received by each purpose. Def. Ex. 9.

34. The 1967 Cost Allocation Report remains in effect today and allocates annual operation and maintenance costs ("O&M") costs and capital costs. Capital costs at The Dalles Dam are recovered through depreciation. Id. at 26.

35. Costs of "joint purpose" features of The Dalles Dam, such as the dam and reservoir, are allocated between power and navigation based upon the proportional benefit derived by each function. Annual O&M costs for "joint-use" features are allocated 28 percent to navigation and 72 percent to power; capital costs, in the form of depreciation, are allocated 26

percent to navigation and 74 percent to power. Id. In comparison, costs of "specific" features at The Dalles Dam are allocated 100 percent to that feature. For example, turbines used in generating power were determined to be a power specific cost and therefore 100 percent of the turbine costs are allocated to power. Id. at 24.

36. The Cost Allocation Report also provides that "no project costs have been allocated to irrigation, inasmuch as the benefit of $13,000, representing a decrease in pumping costs to adjacent lands, is purely incidental to the operation of the project in the interest of power and generation." Id. at 7. The irrigation benefit is limited to a reduction in "the pumping lift" of "about 80 feet" and is not related to the cost of power production at The Dalles Dam for any power user, including The District. Id. at 20.

The District's Rates

37. The District's power rate remained at the initial 1 mill per kWh until 1990. At that time, it was determined that costs at The Dalles Dam exceeded the historic 1 mill per kWh rate. In response to this determination, Reclamation applied a new power rate formula to determine the appropriate cost of The District's power from The Dalles Dam. The Department of the Interior's Assistant Secretary of Water and Science approved this new rate formula and it has been in effect since that time. Def. Ex. 10.

38. To meet increased costs, between 1990 and 2007, Reclamation revised the rate four times pursuant to the 1990 methodology. Def. Ex. 8 at 18, 25, 29, 33.

39. Article 14(a) of the contract provides that the rate can only be changed "once in any five-year period." The 1990 through 1995 rate was 1.227 mills per kWh. The rate has been increased to the current rate of 5.06 mills per kWh. Def. Ex. 8. The plaintiff's rate remains one of the lowest rates for Reclamation's Pacific Northwest Region.

40. Although The District's power costs may be revised every five years, the power rate formula used to determine those costs has not changed since 1990. Def. Ex. 10.

41. The power rate for The District contains two components: (1) O&M and depreciation costs at The Dalles Dam (divided by power generation at The Dalles Dam to determine a per-unit cost in mills per kWh); and (2) the Lost Revenue Component.

42. The O&M and depreciation components are further distinguished between The Dalles Dam costs associated solely with power generation (single-purpose costs) and "joint" or "multi-purpose" costs that are shared by the two purposes of The Dalles Dam Project, power generation and navigation. Costs associated solely with navigation at The Dalles Dam are allocated 100 percent to navigation and are not included in the power rate formula. Costs associated solely with power generation, such as The Dalles Dam pumping plant, are allocated 100 percent to power. See ¶ 35, above.

43. Costs associated with "joint" or "multi-purpose" facilities benefitting both power generation and navigation, including the dam and its reservoir, are allocated on the following basis, consistent with the Corps of Engineers' 1967 Cost Allocation Report: 72 percent of O&M to power generation, and 28 percent to navigation; and 74 percent of capital costs, in the form of depreciation (including those for the dam and reservoir), to power generation and 26 percent to navigation. See ¶ 35, above.

44. Consistent with Project's authorizing legislation and the contract between Reclamation and The District, the power rate reflects all costs of The Dalles Dam powerplant, dam, and reservoir properly allocable to The District.

45. As stated earlier, though also properly allocable to plaintiff under the contract and enabling legislation, The District is not charged for transmission of the power from The Dalles Dam to the Project.

46. The "Lost Revenue Component" methodology adopted by Reclamation for The District's power rate was fully described in the 1990 revision to the MOU between Reclamation and BPA as follows:

> The method used to adjust the historical costs is called the "Lost Revenue Component Method." This method provides a means by which the financial interests of both parties are protected. The term "lost revenue" refers to something different for each five year period: for the previous period, the lost revenue represents the difference between the actual cost of service and the revenue collected from the charge in effect for that period. For the upcoming five year period, the term "lost revenue" refers to the project inflation (i.e., the difference between the historical cost of service and the projected cost of service in a given year).
>
> Once the lost revenue for each year has been calculated, its effect upon the historical cost can be determined. The "Lost Revenue Component Method" is used to determined the annual cost of the lost revenue. It is a more accurate way of figuring the amount which should be charged that the more straightforward method of simply dividing the total lost revenue by the number of years in the charge period. To implement the "Lost Revenue Component Method," the actual long-term interest rate for each of the past five years and the project cost for the next five years is determined. That cost is applied to the lost revenue to get a "lost revenue plus interest" figure for each of the five past and five upcoming years. That total is then discounted to get an annual cost. The cost which is charged is equal to the historical cost plus the annual cost of the lost revenue.
>
> In general, the power cost will be greater than the cost of providing service in the first few years and less than the cost of service in the later years. On average, however, the rate should closely approximate the actual cost of service.

Def. Ex. 10 at 3.

47. The Dalles Dam costs for power are based upon cost and production data provided by the Corps to BPA. Power generation differs from year to year due to weather conditions and other variables. During periods of drought, for example, less available stream flow results in lower power generation, and costs per unit of generation is greater than years of average or above-average stream flows.

48. Consistent with the Project's authorizing legislation and the contract between the United States and The District, the power rate reflects all costs of The Dalles Dam powerplant, dam, and reservoir properly allocable to The District. See ¶¶ 20, 25, above. Reclamation has consistently asserted "all costs" to include all O&M and depreciation costs associated with power generation at The Dalles Dam properly allocated to the power generation function. See ¶ 37, above.

## CONTENTIONS OF APPLICABLE LAW

### Introduction

The District, in its Contentions of Law and Fact, suggests that there are nine different issues for the Court to resolve at trial. Plaintiff's Contentions of Law and Fact ("Pl. Cont.") at 11. We disagree.

The two claims in the complaint filed with this Court allege a breach of contract and request a declaration that The District not be charged for any costs of power and energy "other than those provided by the contract between the parties." Pl. Compl. at 4. This necessarily distils the issue before this Court to an interpretation of the authorizing statute and conforming contract term – section 14(a). In fact, when asked about the specific language in the contract upon which The District relies to support its claim that the Government breached the contract, it stated that paragraph 14(a) provided the limits to The District's costs. See Plaintiff's Response

to Federal Defendant's First Set of Interrogatories and Request for Production of Documents to Plaintiff at 6.

The Government rejects the inclusion of additional issues for the Court at this late hour.

## I. The Authorizing Legislation For The Dalles Irrigation Project Requires Reclamation To Collect "All" Costs As Determined By The Secretary Of The Interior

The legislation authorizing The Dalles Irrigation Project states:

> Power and energy required for irrigation pumping for the western division of The Dalles Federal reclamation project shall be made available by the Secretary from The Dalles Dam powerplant and other Federal plants interconnected therewith at rates not to exceed the costs of such power and energy from The Dalles Dam taking into account all costs of the dam, reservoir, and powerplant which are determined by the Secretary under the provision of the Federal reclamation laws to be properly allocable to such irrigation pumping power and energy.

Pub. L. No. 86-754, §2(c) (emphasis added). Article 14(a) of the contract states:

> For the purposes of operating and maintaining the project works, the Secretary will make available to the District that power and energy required for irrigation pumping during the irrigation season from The Dalles Dam powerplant and other federal powerplants connected therewith. The power and energy will be furnished to the District at the point where the project 12.5-kv electric distribution line is connected to The Dalles substation of the United States or at such other points as are agreed upon between the United States and the District, at rates per kilowatt-hour sufficient to cover the costs of such power and energy from The Dalles Dam, taking into account all costs of the dam, reservoir and powerplant which are determined by the Secretary under the provisions of the Federal Reclamation Laws to be properly allocable to such pumping power and energy.

(emphasis added).

Thus, the authorizing legislation states that The District is to pay "all costs . . . properly allocable to such irrigation pumping power and energy" as "determined by the Secretary." And, section 14(a) of contract reiterates the statutory command that costs "which are determined by

the Secretary" as "properly allocable" are to be paid by The District. All means all. Seville Constr. v. United States, 35 Fed. Cl. 242, 246 (1996) ("all means all and and not substantially all") (emphasis added) (citations omitted). This language is clear and unambiguous, and it specifically provides that the Secretary's determination of allocable costs is within his sole discretion.

Article 14(a) of the repayment contract is taken practically verbatim from the statute and statutory construction principles apply. Sys. Fuels v. United States, __ Fed. Cl. __, 2007 U.S. Claims LEXIS 328 (2007) (where a contract implements or fulfills a statutory requirement, the interpretation of the contract will be guided by the underlying statute).

To interpret a statute, courts must first look to the statutory language and then to the legislative history only if the statutory language is unclear. Allen v. Principi, 237 F.3d 1368, 1375 (Fed. Cir. 2001); Rigsbee v. United States, 226 F.3d 1376, 1378-79 (Fed. Cir. 2000); Madison Galleries, Ltd. v. United States, 870 F.2d 627, 629 (Fed.Cir.1989). If the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case, the court must give effect to the statutory language. Robinson v. Shell Oil Co., 519 U.S. 337, 340 (1997); Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837 (1984).

As stated in ¶¶ 1-17 our contentions of fact, the legislative history of the Project supports Reclamation's interpretation requiring The District to pay for "all" costs and does not support The District's narrow interpretation that it is only required to pay for specific power charges, which it has yet to adequately identify.

Even if statutory language is open to more than one interpretation, the court may not substitute its interpretation for the agency's unless it is unreasonable – this is called Chevron deference. As our Supreme Court noted in a recent case,

> In Chevron, this Court held that ambiguities in statutes within an agency's jurisdiction to administer are delegations of authority to the agency to fill the statutory gap in reasonable fashion. Filling these gaps, the Court explained, involves difficult policy choices that agencies are better equipped to make than courts. . . . If a statute is ambiguous, and if the implementing agency's construction is reasonable, Chevron requires a federal court to accept the agency's construction of the statute, even if the agency's reading differs from what the court believes is the best statutory interpretation.

Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs., 545 U.S. 967, 980 (2005) (internal citations omitted). Nor is Chevron deference predicated upon an agency's formal rulemaking. Id. at 1004 (Breyer, J., concurring).

Federal reclamation law directs the Secretary to charge users of water from Federal irrigation projects rates that recover "the total cost of operation and maintenance of the project." 43 U.S.C. § 492, Act of Aug. 13, 1914, ch. 247, § 5, 38 Stat. 687. Article 14(a) of the repayment contract plainly provides that the Secretary will make power available to The District "[f]or the purposes of operating and maintain the project works." The Secretary has determined that "all costs" for furnishing power includes O&M and depreciation costs at The Dalles Dam, including the dam, powerhouse, and reservoir, that have been allocated to the power generation function.

Since Congress entrusted the Secretary of the Interior with implementing Reclamation, these rules of statutory construction require that the Court grant the Secretary broad deference in determining what The District's power rate should be.

## II. The Repayment Contract Requires Reclamation To Collect "All" Costs As Determined By The Secretary Of The Interior

Notwithstanding the previous section, if the Court determines that resolving this dispute rests upon contractual — not statutory — rules of construction, the repayment contract clearly speaks to The District's repayment obligations.

In questions of contract interpretation, the inquiry begins "with the language of the written agreement." NVT Technologies, Inc. v. United States, 370 F.3d 1153, 1159 (Fed. Cir. 2004); Stockton E. Water Dist. v. United States, 75 Fed. Cl. 321, 352-53 (2007); United States v. Westlands Water Dist., 134 F.Supp.2d 1111, 1134-35 (E.D. Cal. 2001). The language of the contract must be given its plain meaning, and the contract "must be considered as a whole and interpreted so as to harmonize and give reasonable meaning to all of its parts." Coast Fed. Bank, FSB v. United States, 323 F.3d 1035, 1038 (Fed. Cir. 2003) (en banc). "[T]he plain and unambiguous meaning of a written agreement controls." Hercules Incorporated v. United States, 292 F.3d 1378, 1380-81 (Fed. Cir. 2002). "When the contract language is unambiguous on its face, [the Court's] inquiry ends, and the plain language of the contract controls." The Hunt Construction Group, Inc. v. United States, 281 F.3d 1369. 1372 (Fed. Cir. 2002).

"Principles of government contract interpretation: '. . . compel a construction somewhat more liberal toward the government than might be appropriate were the contract a purely private transaction.'" Westlands Water Dist. v. United States Dept. of Interior, 850 F.Supp. 1388, 1402 (E.D. Calif. 1994) (quoting Madera Irrigation District v. Hancock, 985 F.2d 1397, 1401 (9th Cir.)). And, finally, "governmental contracts should be interpreted against the backdrop of the legislative scheme that authorized them, and [the] interpretation of ambiguous terms or implied covenants can only be made in light of the policies underlying the controlling legislation." Peterson v. United States Dept of the Interior, 899 F.2d 799, 807 (9th Cir.). See, e.g., United States v. Swanson, 618 F.Supp. 1231, 1239 (D.C. Mich. 1985) (a contract that contained the language "if the Secretary determines that the extension is consistent with the needs of the National Health Scholarship Corps" meant that the determination "is within the sole discretion of the Secretary.").

Because the terms of the repayment contract are unambiguous, the Secretary is to exercise his discretion in determining what costs are "properly allocable" to The District. See also Bostwick Irrigation District v. United States, 900 F.2d 1285, 1290 (8th Cir. 1990).

III. The Court May Not Consider Post-Formation Extrinsic Evidence Because The Secretary Is Entitled To Broad Deference In Interpreting The Authorizing Statute And The Contract Terms Are Clear And Unambiguous

Consideration of extrinsic evidence for the purpose of construing the contract and authorizing legislation is not warranted in this case because, as stated above, the Secretary is entitled to broad deference in construing the authorizing legislation that became a contract term. Moreover, the contract terms themselves are clear and unambiguous; thereby requiring the Court to give effect to the contract's plain meaning. Coast Fed. Bank, FSB, 323 F.3d at 1040 (if contract provisions are clear and unambiguous, they must be given their plain and ordinary meaning, and a court may not resort to extrinsic evidence to interpret them.

The plain language of article 14(a) of the contract is not reasonably susceptible to more than one meaning so as to render it ambiguous. "All means all" and the clause commits to the Secretary the authority to determine The District's rate. The fact that The District may have its own interpretation of the contract does not necessarily render the terms ambiguous. Thermal Elec., Inc. v. United States, 25 Cl. Ct. 671, 673 (1992) (the mere fact that the parties involved do not agree upon the meaning of the language in a contract does not necessarily render the language ambiguous).

IV. Evidence Of The Post-Formation Conduct Of The Parties Is Not Admissible, But To The Extent That The Court Admits Such Evidence, It is Unhelpful In Resolving The Case

Even in cases where, unlike this case, courts do find an ambiguity in a term, the parties conduct during performance may be illustrative. Sys. Fuels, 2007 U.S. Claims LEXIS 328 at *46-48. Since the inception of the rate formulation in 1990, The District has disagreed with the

Secretary's requirement that it should pay a higher power rate. This is not a case where the Government acted one way and then another that would make resorting to the parties' conduct instructive. Id.

The District's new interpretation of what is included in its power rate, in light of the plain language of the contract and The District's own acquiescence in the rate methodology since 1990 is conclusive.

V. The District's Assertion That It Should Not Have To Pay Any Increased Power Costs Resulting From Compliance With Federal Law Must Be Rejected

To the extent that The District argues in its contentions, for the first time, that the Government's compliance with the Endangered Species Act ("ESA"), 16 U.S.C. § 1536, and Federal court decisions, has improperly increased its power rate, Pl. Cont. at 5 (¶¶ 14-17), ESA compliance is recognized as a public or general act that invokes the sovereign acts doctrine. Klamath Irrigation Dist. v. United States, 75 Fed. Cl. 677, 683, 690-91 (2007) ("If the violation of a contract occurs owing to the need to preserve the common good and the general welfare, rather than to relieve the United States of its contractual or financial responsibilities, the action should be viewed as sovereign in nature and covered by the implied contractual right of the government to meet its responsibilities to the citizenry at large, unless waived in unmistakable terms."); see also, Casitas Mun. Water Dist. v. United States, 72 Fed. Cl. 746, 753-55 (2006).

The ESA compels all Federal agencies, including the Bureau of Reclamation, BPA, and the Corps, to ensure that operation of Federal facilities is not likely to jeopardize the continued existence of any endangered species. 16 U.S.C. § 1536(a)(2).

The United States when sued as a contractor cannot be held liable for an obstruction to the performance of the particular contract resulting from its public and general acts as a sovereign. Horowitz v. United States, 267 U.S. 458, 461 (1925)("It has long been held by the

Court of Claims that the United States when sued as a contractor cannot be held liable for an obstruction to the performance of the particular contract resulting from its public and general acts as a sovereign"). The sovereign acts doctrine is a part of every contract with the government, whether the contract explicitly provides for it or not. Hughes Communications Galaxy, Inc. v. United States, 998 F.2d 953, 958 (Fed. Cir. 1993).

The District's assertion that it should not have to pay the increased costs of compliance with Federal law is unsupported.

## VI. The United States Is Not Required Revisit The District's Ability To Pay Irrigation Project Construction Costs When Setting Power Rates

Another new contention raised by The District in its Contentions of Fact and Law is that the Government was required to consider The District's ability to repay its portion of the construction obligation. Pl. Cont. at 11. This claim was not raised in The District's complaint, and it is unsupported.

There is no requirement in the repayment contract or in Reclamation law mandating that the Secretary revisit The District's "ability to pay" construction repayment obligations as set by the contract and considered by Congress prior to enactment of the authorizing statute. Rather, the Secretary is authorized to defer repayment of construction obligations "as he deems necessary" when the Secretary finds that timely repayment of construction obligations creates an "undue burden" upon water users that "in the Secretary's judgment" bears upon the water users' ability to pay the construction repayment obligation. 43 U.S.C. § 485b-1(b). The Secretary may choose to defer repayment obligations upon a limited basis, and deferment is "subject to such conditions and provisions relating to the operation and maintenance of the project involved as [the Secretary] deems in the interest of the United States." Id.

The District, on the other hand, has not asked the Secretary defer its repayment obligation. It solely challenges having to pay the power rates Reclamation has established in furtherance of reimburseable operation and maintenance costs for The Dalles Irrigation Project.

## VII. Reclamation Provides Interest-Free Financing On The Project Construction Costs To Be Paid By The District, But The Secretary Has No Obligation To Provide Interest-Free Financing To The Other Benefits

Section 9(d) of the Reclamation Project Act authorizes the Secretary to enter into repayment contracts that fix a construction repayment obligation to be paid in annual installments over a fixed number of years with interest-free financing. 43 U.S.C. § 485h(d)(3).

Reclamation law does not preclude the Secretary, however, from recovering interest in the form of the time value of money associated with other services provided to water users. For example, as noted in the previous section, Congress distinguishes "construction charges" that comprise repayment obligations from other charges payable by water users, including power charges, O&M, and interest. 43 U.S.C. § 485a(d). Further, Congress directs the Secretary to base O&M charges "upon the total cost of operation and maintenance of the project." 43 U.S.C. § 492.

The "Lost Revenue Component" of The District's power rate includes a mechanism to protect either party in the event that the estimated rate results in either under- or over-payment, by considering the present value of the under- or over-payment. As such, the credit or recovery of the present value of money is not the same as the "interest-free financing" available to The District under Reclamation law and its contract for the amortized repayment of its construction obligations connected with The Dalles Irrigation Project. The lost revenue component is merely the mechanism by which the Government determines power cost adjustments resulting from over- or under-collection.

In addition, Congress directs the U.S. Army Corps of Engineers to recover depreciation costs for its projects. See 33 U.S.C. § 576. Because The Dalles Dam power generation facilities are under the control of the Corps, and not part of the Project, The District pays no share of the capital costs associated with power facilities as part of its repayment of capital obligation to the United States. When Reclamation constructs power facilities as part of a Federal irrigation project, those costs are passed on to irrigation districts as part of their capital repayment obligations. In other words, when Reclamation relies upon its own power generation facilities, capital costs for those facilities are included in repayment obligations. In this case, Congress directed the Secretary to furnish power from the previously authorized The Dalles Dam constructed and operated by the Corps. The depreciation costs included in the power rate are, thus, properly allocated to The District's power rate as a requirement for operating and maintaining the Project.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

JEANNE E. DAVIDSON
Director

s/ Franklin E. White, Jr.
FRANKLIN E. WHITE, JR.
Assistant Director

OF COUNSEL
CLARK MILLER
U.S. Department of the Interior
Attorney-Advisor
Field Solicitor's Office
960 Broadway Ave., Suite 400
Boise, ID 83706
Tel: (208) 334-1906
Fax: (208) 334-1918

/s/ Armando A. Rodriguez-Feo
ARMANDO A. RODRIGUEZ-FEO
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor
1100 L Street, N.W.
Washington, D.C. 20530
Tel: (202) 307-3390
Fax: (202) 514-8624

Attorneys for Defendant

October 22, 2007

CERTIFICATE OF FILING

I hereby certify that on this 22nd day of October, 2007, a copy of the foregoing “DEFENDANT’S MEMORANDUM OF CONTENTIONS OF FACT AND LAW” was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court’s electronic filing system. The parties may access this filing through the Court’s system.

s/ Armando Rodriguez-Feo