Expert Report of Carol Close Opatrny

THE DALLES IRRIGATION DISTRICT vs. UNITED STATES
In the United States Court of Federal Claims, No. 05-1042C

## Introduction

I am a consultant in the electric utility industry with special emphasis on wholesale power and transmission markets and rate design. I have been associated with this industry since 1980; I have worked in consulting capacities since 1989 and, in 1996, I incorporated as Opatrny Consulting, Inc. My resume is attached as Exhibit A. Details regarding my recent appearances as an expert witness and publications are contained in Exhibit B.

In 2004, I was retained by the Plaintiff's counsel, Arden E. Shenker, Shenker & Bonaparte, LLP, to meet with representatives of the Bureau of Reclamation ("Bureau") and the Bonneville Power Administration ("BPA") in order to better understand the cost-basis of the cost of generation charged to his client, The Dalles Irrigation District ("The Dalles").

(1) Cost of Generation is Overstated

The Repayment Contract between the Bureau and The Dalles set the cost of generation initially at 1 mill/kWh (this is the equivalent of $1.00/MW-hour). This rate could be modified, if determined appropriate by the Secretary of the Interior, either up or down "if a different rate is applicable," however, the rate was not to be adjusted "more frequently than once in any five-year period."[1] In addition, the contract obligated the Bureau to provide annual estimates of the cost of power supply so that supplemental charges or credits could be applied toward succeeding years' power charges.[2] Although the unit charge has been calculated to be less than 1 mill/kWh rate, i.e., 0.90 mills/kWh in 1977; 0.52 mills/kWh in 1982, this rate has been effectively implemented as a rate floor.[3]

1 Repayment Contract Between The United States of America and The Dalles Irrigation District, Contract No. 14-06-100-2276, Section 14(a), "Repayment Contract."

2 Repayment Contract, Section 14(b).

3 Exhibit C. Also known as Exhibit 4 (Jones) D0401; Exhibit 12 (Jones) BPA 1053.

The charge has been increased steadily since 1990. In fact, the District was notified in October 2006, that effective January 1, 2007, the total unit cost it will be charged will more than double; the charge will be 5.06 mills/kWh.[4] This translates into an average annual rate increase of 110% since 1990.[5]

The cost of generation is overstated because it includes "Joint" costs. The statute that authorized the Secretary of the Interior to construct The Dalles Dam defines the cost of generation:

> "power and energy required for irrigation pumping for the western division of The Dalles Federal reclamation project shall be made available by the Secretary from The Dalles Dam power plant...at rates not to exceed the cost of such power and energy from The Dalles Dam taking into account all costs of the dam, reservoir, and powerplant which are determined by the Secretary under the provisions of the Federal reclamation laws to be properly allocable to such irrigation pumping power and energy."[6]

And the contract that The Dalles and the Bureau entered into identically defines the cost of generation as being based upon:

> "the costs of such power and energy from The Dalles Dam, taking into account all costs of the dam, reservoir and powerplant which are determined by the Secretary under the provisions of the Federal Reclamation Laws to be properly allocable to such irrigation pumping power and energy."[7]

Nonetheless, the one document that has been provided to evaluate the cost of generation that has been charged to The Dalles indicates that the cost of generation has not been limited to the "Specific" costs of the Dalles Dam, but in fact, includes what are called "Joint" O&M and Depreciation Costs.[8] According to the Bureau, "Joint use and depreciation are commonly used in calculating Reclamation reserve power rates...The joint use charge now found in the District's power rate calculation includes those costs of the dam and reservoir which are allocated to power." This explanation again ignores the specific circumstances at hand and the commitments made to The Dalles. According to representatives of the Bureau and BPA, "Specific" costs are those specially associated with the production of power, e.g., power house turbines, generators, etc. while, "Joint" costs are those costs that serve the multi-purpose nature of the

---

4 Exhibit D. Revision No. 4, Exhibit B, Contract No. 14-03-32210, USBR Contract No. 14-06-100-2911, Effective at 2400 hours on December 31, 2006.

5 The mathematical equation is (5.06/1.00) raised to "1/(n-1)" power, where n=18.

6 Public Law No. 86-745, 74 Stat. 82 (1960).

7 Repayment Contract, Section 14(a).

8 Exhibit E. Correspondence between Terrald Kent and Arden Shenker, November 7, 2003.

facilities.[9] The inclusion of "Joint" costs for "jointly used facilities" is in direct conflict with the BPA Administrator's decision in the 1960s not to apply such costs to The Dalles Project.[10] **Data supplied by BPA (1995 – 2001) establish that the inclusion of "joint" O&M and "joint" Depreciation costs has increased the charge to The Dalles by about 35%.**[11]

The cost of generation is overstated due to the inclusion of the Lost Revenue Component. In 1990, the Lost Revenue component was introduced as an additional cost component to the Unit Cost of generation.[12] This rate component was developed by BPA staff, not the Bureau, "to compensate BPA for increases in cost that will occur over those next five years." This component is a rate "true-up" mechanism which attempts to guess at how much the established charge will be different from the actual cost and how much the established charge will be different from a projection of the actual cost. As stated in the charge adjustment correspondence between the Bureau and The Dalles,

> "The lost revenue component is a determination of the annual cost of lost revenue by (1) adjusting the prior rate to reflect the difference between the rate and actual costs for the previous 5-year period, and (2) predicting future cost increases to narrow the difference between the revised rate and actual costs that would not be known until the next rate determination. These increases were estimated at 2 percent."[13]

The Lost Revenue component is poorly constructed, not understood and out-of-control. This component alone has grown from 0.067 mills/kWh in 1990 to 2.21 mills/kWh (January 2007) or 24%/year. **It is noteworthy that the Lost Revenue component starting in 2007 is nearly the same level as the Generation Cost.**[14]

As mentioned above, the Bureau was not allowed to modify rates more often than every five years. The inclusion of a Lost Revenue mechanism is in direct conflict with the Repayment Contract that includes a prohibition against raising The Dalles' rate more often than every five years. The Lost Revenue component is in and of itself a rate adjustment mechanism. This component is clearly unnecessary given the Bureau's continuing obligation to provide The Dalles with annual estimates of charges for the purpose of notifying the need for a supplemental charge or a credit. Interestingly enough, the obligation to provide annual estimates of charges to The Dalles, as far as I know, has never been

---

9 Exhibit F. Meeting notes prepared by Carol Opatrny for Arden Shenker, dated March 9, 2004. (CO0011).

10 Exhibit G. The Definite Report, The Dalles Project, Western Division, August 1962.

11 Exhibit H. Memorandum prepared by Carol Opatrny for Arden Shenker, dated June 20, 2004.

12 Exhibit I. Revision No. 1, Exhibit B, Contract No. 14-03-32210, USBR Contract No. 14-06-100-2911, Effective at 2400 hours on December 31, 1989.

13 Ibid.

14 Op.cit., Exhibit D.

fulfilled. Finally, the Lost Revenue mechanism includes an interest charge which contravenes the no-interest financing afforded The Dalles.[15]

(2) The cost-basis for the cost of generation charged to The Dalles is not transparent.

The technical details for the charge is typically reflected in a multiple page "Revision" memo entitled, "Revised Irrigation Pumping Power Rate" that has been submitted to The Dalles on four occasions.[16] These memos are the communication vehicle that the Bureau, as prepared by the BPA, uses for the purpose of announcing a charge increase. The charge is referred to as the "total unit cost" and since 1990 has been composed of a "Generation Cost" and a "Lost Revenue Component." The Generation Cost is said to be based upon O&M and Depreciation as well as Generation (output) associated with The Dalles Dam. However, the details are claimed to be derived from BPA's Summary Data which have not been provided to The Dalles and do not appear to be available on the BPA website.[17]

The Bureau does not provide The Dalles with annual estimates of charges or any details regarding the need for a supplemental charge or a credit. Not until the fourth Revision memo sent to The Dalles, dated October 18, 2006, did the Bureau offer to "provide an annual update on the actual previous year cost of production, and the over or under amount." Although the offer is promising, it is not certain what will be provided, i.e., the term "cost of production" has not been used before; the terms "over" and "under" amounts are not clear; the basis for these calculations is yet to be disclosed, etc. It is also noteworthy, that recent correspondence between the Bureau and the Ochoco Irrigation District claims that the Bureau "is now changing its notification procedures and will provide an annual update on the actual previous years (sic) cost of production…" As far as I know, there haven't been any notification procedures in place to change.[18]

The cost of generation has historically been overstated due to BPA's decision to "derate" the generation at The Dalles Dam.[19] By derating the output of The

15 Exhibit J. Sue Furst memo regarding BPA Contract No. 14-03032210 (The Dalles): "Also, it appears that the legislative history of June 22, 1960 intended that any financing for reserve power and energy be interest-free. Therefore, the generation costs include costs of O&M and depreciation only."

16 Exhibit K. Revisions No. 2 and 3, Contract No. 14-03-32210, USBR Contract No. 14-06-100-2911. Also, Exhibits D and I.

17 Exhibit L. Search for Summary Financial Data and BPA Publications.

18 Exhibit M. Revision No. 4, Exhibit C, Contract No. 14-73-73152, USBR Contract No. 14-05-100-5999, Effective at 2400 hours on December 31, 2006.

19 Op. Cit., Exhibit E: "The Loss Factor was used in earlier years to account for actual generation delivered to the bus bar. For ease of computation this factor was removed in subsequent years."

Dalles Dam, assuming a "Loss Factor," the unit cost of generation was increased. In other words, mathematically, the denominator was reduced which directly increased the unit charge. This adjustment appears to have been used historically, until 1994, and caused about a 3% increase in the charge. The Dalles should not be charged for adjustments such as the application of Loss Factors.

In the 1980s, the Bureau tried to change the cost of generation to include transmission-related costs. Eventually, the Bureau's representative agreed to maintain the 1 mill/kWh charge after The Dalles raised issue with being charged costs that were to be specifically excluded, based upon the history of the issue.[20] As should be clear by now, The Dalles should not be charged transmission-related costs.

<u>(3) The escalation of the costs charged to the Irrigation loads is out of line with the general escalation of the cost of wholesale power (power costs have been dropping for four years).</u>

Since 1990, the charge applied to The Dalles has increased over 500%. In fact, the actual rate of increase exceeds 500% due to the fact the 1 mill/kWh charge to The Dalles has exceeded the actual cost of generation.[21] During this same period of time, the general wholesale power rate that BPA charges its "preference" customers has increased less than 121%.[22]

BPA does not have rate-making authority for irrigation customers. BPA has authority to develop firm and nonfirm wholesale power rates and transmission rates and these rates are reviewed by the Federal Energy Regulatory Commission (FERC).[23] The cost of generation charges for irrigation customers such as The Dalles, are established by contract. And, in the case of The Dalles, the cost of generation was established as a result of The Reclamation Act of 1902 that authorized construction of dams for irrigation and land settlement;[24] the Congressional authorization for the Secretary of the Interior to construct The Dalles Federal reclamation project;[25] and, the "Repayment Contract Between The United States of America and The Dalles Irrigation District."[26]

---

20 Exhibit N. Also known as Exhibit 8 (Jones).

21 Op. cit., Exhibit C.

22 Exhibit O. The cost of wholesale power that BPA has charged to its customers since 1962 has ranged between 3.1 mills/kWh (Historical Wholesale Power Rates 1939 – 1990, November 1991, Table 8), 22.6 mills/kWh (1990) and 27.33 mills/kWh, again, in nominal terms. http://www.bpa.gov/power/psp/rates/current.shtml.

23 Exhibit P. BPA Annual Financial Report, Fiscal Year 2006. http://www.bpa.gov/corporate/Finance/a--report/06/AR2006_financials.pdf.

24 Public Law No. 57-161, 32 Stat. 388 (1902).

25 Public Law No. 86-745, 74 Stat. 82 (1960).

26 Op. cit., Repayment Contract.

Nevertheless, it appears that the federal agencies have challenged specific terms and conditions associated with irrigation customers almost since the beginning. Examples from the 1960s, the 1980s and the 1990s evidence the interest in ignoring the particulars of any given arrangement and adopting a uniform charge.[27] It is noteworthy that in 1990, BPA staff was given the task of answering the question: "What is the correct charge for reserve power and energy provided by BPA" for the various Memoranda of Understanding between the BPA and the Bureau of Reclamation. This review appears to have been developed for the purpose of rate negotiations between the two federal parties.[28]

Besides the goal of uniformity of charges, BPA has also identified irrigation customers, as a class, as being one of three "Unrealized Opportunities" and specifically, a "Revenue Enhancement" opportunity for the agency. This conclusion was reached in 2004, by a Sounding Board, composed of customers and stakeholders with input from entities such as the Corps of Engineers and the Bureau of Reclamation.

> "...Analysis presented to the Sounding Board suggests that BPA/irrigation partnerships may be leaving significant potential economic benefits on the table (for example, in FY2002, BPA had 25 irrigation contracts covering approximately 1.2 billion kWh of annual energy at an average rate of 2 mills per kWh). The aim here should be to advance both irrigation and power interests by looking for ways to energize the agricultural economy while improving BPA revenues."[29]

It is noteworthy that The Dalles has a contract **with the Bureau;** it is not party to a BPA/irrigation partnership. Moreover, The Dalles' contract spells out the cost-basis for the charge and that contract does not allow BPA to enhance its revenues by way of its financial relationship with the Bureau.

Industry Context

The Dalles holds one of 25 irrigation contracts, which in the aggregate, represent a load of approximately 1.2 billion kWh.[30] These customers purchase power produced by federal hydroelectric facilities owned and operated by the US Army Corps of Engineers and the US Department of the Interior, Bureau of Reclamation. The output of these federal facilities, for commercial use, is priced

---

27 Exhibit Q. Luce letter (1966); Secretarial MBO Objective IV, Task J, is to develop an acceptable policy to properly assess project use power rates charged for irrigation pumping (1980s); Memorandum from the Commissioner to the Assistant Secretary – Water and Science.

28 Op. cit., Exhibit J.

29 Exhibit R. Report of the Bonneville Power Administration's Power Net Revenue Improvement Sounding Board, July 1, 2004. http://www.bpa.gov/power/pl/pnrisb/07-01-2004_final_report.pdf

30 Ibid. Note that this approximates 137 average MW.

and marketed by the BPA. The output of these federal facilities for irrigation use is called "reserved power" and is supposed to be priced in accordance with the applicable statutes and contracts.

To put this issue in perspective, the annual load of The Dalles is approximately 18,000 MW-hours or about 2 average MW. Its annual payment to the Bureau has ranged between $18,000/year (when the charge is 1 mill/kWh) and will approximate $91,000 starting in January 2007 (when the charge is 5.059 mills/kWh). The average load serving responsibility of BPA (2006-07 fiscal year) is approximately 8,500 average MW of which 160 average MW is associated with the total load obligation for the US Bureau of Reclamation (total irrigation load).[31] BPA's annual revenue requirement (2006-07 fiscal year) for Power Services is over $2.6 billion.[32]

While the cost of generation that has been charged to The Dalles is projected to increase 100% between now and January 2007, BPA's commercial customers will experience the "fourth year in a row that BPA has reduced its rates."[33] The cost-basis of BPA's commercial customers and irrigation loads that purchase reserved power from the Bureau are derived from the same hydroelectric facilities.

Irrigation Customers

There is a special relationship that the federal agencies (i.e., the Bureau, the Corps of Engineers and the BPA) have with irrigation customers. In general terms, the Bureau has contracted with irrigation customers to make available power for irrigation pumping; the Corps of Engineers or the Bureau owns and operates the federal hydroelectric facilities; and, BPA transmits power to the customers.

The BPA is also obligated to pay the U.S. Treasury for the original construction costs of irrigation projects "that have been determined to be beyond the irrigators' ability to pay," such as The Dalles Dam.[34] In addition, BPA is required by Public Law 89-448 to demonstrate to the Treasury that it will timely make irrigation assistance payments (the maximum repayment schedule is 66 years), which are beyond that ability of the irrigation water users to repay.[35]

31 Exhibit S. https://secure.bpa.gov/RateCase/Uploads/Exhibit/WP-07-FS-BPA-01_and_01A.pdf.
32 Exhibit T. https://secure.bpa.gov/RateCase/Uploads/Exhibit/WP-07-FS-BPA-02.pdf.
33 Exhibit U. BPA Press Release, October 2, 2006.
34 Op. cit. Exhibit P, page 28.
35 Ibid.

The Dalles Irrigation District

In the case of The Dalles, the financial relationship with the Bureau has a number of elements.

The Congressional Authorization for The Dalles Federal reclamation project set the cost of generation "at rates not to exceed the cost of such power and energy from The Dalles Dam taking into account all costs of the dam, reservoir, and powerplant which are determined by the Secretary under the provisions of the Federal reclamation laws to be properly allocable to such irrigation pumping power and energy."

The Definite Plan Report excluded The Dalles from the BPA Administrator's "recently enunciated policy of cost sharing of the annual operation, maintenance, and replacement costs of jointly used facilities…"[36]

The Repayment Contract obligated The Dalles to repay construction costs of the irrigation facilities, set at $2,550,000, to be paid for in fifty successive annual installments, starting the first year following the 10-year development period.[37]

As a result of a decision by the BPA Administrator, the cost of generation charged to The Dalles was not to include transmission-related costs.[38]

A contract between BPA, the Bureau and The Dalles, sets forth compensation for the land that was acquired in order to site the Big Eddy substation. This three-way agreement resulted in a payment of $30,816 by the BPA to the Bureau which translates into a credit of $774/year to account for reduced O&M associated with the land transfer.[39]

A credit of $1,700/year is applied to the construction charge installment of the irrigation facilities for the operation and maintenance of fish screens performed by The Dalles Irrigation District.[40]

Given these various obligations, it is noteworthy that The Dalles has consistently made timely payments for the construction loan on the pumping facilities and has not challenged the O&M credits for the land transfer or the O&M credits for the fish screens. Only the cost of generation, as priced by BPA and passed through the Bureau, has been subject to revision and change.

36 Op. cit., Exhibit G.
37 Repayment Contract, Section 9.
38 Op. cit., Exhibit N.
39 Contract No. 14-03-57685, Contract No. 14-06-100-5311 (September 28, 1965).
40 Op. cit., Exhibit G.

The Cost of Generation Charged to The Dalles

While the underlying components of the cost of generation have changed over time, the individual components have also changed.

Below is an illustration of the cost of generation charged to The Dalles over approximately 40 years of history.[41] The Actual Cost illustrates the known time periods when the 1 mill/kWh charge was in excess of the actual cost of generation. The Generation Cost Charge illustrates the charge applied to The Dalles, irrespective of the actual cost. The Lost Revenue illustrates that additional component that has been charged to The Dalles since 1990. And, the Total Unit Cost is the charge that The Dalles has been paying for irrigation pumping power.




[41] Exhibit V.

**Carol Close Opatrny**
Electric Power Industry Consultant

Ms. Opatrny is an economist who has served the electric power industry since 1980 with special emphasis on wholesale power and transmission rate design, wholesale markets and power services, ancillary services and operations, retail rate design for industrial customers and strategic issues. Ms. Opatrny has worked directly on policy issues involving the Pacific Northwest Conservation and Electric Power Planning Act, the National Energy Policy Act, the Endangered Species Act, the Federal Power Act, the Energy Policy Acts of 1992 and 2005, and the Federal Energy Regulatory Commission's open access orders and policies. She has worked with utilities, marketers, industrial customers and resource developers in the Pacific Northwest and Northern Atlantic regions of the United States and Canada.

**Opatrny Consulting, Inc.** (President) 1996-present
As OCI, Ms. Opatrny has worked with a number of clients, including the following:

**Avista Corporation (formally the Washington Water Power Company)**

- Prepared Supply Margin Assessment studies for Avista Corporation, Avista Energy, and Avista Utilities for the purpose of securing Power Marketing Authorization from FERC.
- Developed Market Power Study for Rathdrum, L.L.C., a limited liability corporation composed of Avista Power and Cogentrix, for the purpose of certifying a 270 MW combined cycle combustion turbine as an exempt wholesale generator and enabling output to be sold at market-based rates.
- Project Manager for Avista Corporation's Market Power Study prepared for the purpose of obtaining market-rate authority from FERC for ancillary services.
- Developed and evaluated Requests for Proposals (with Avista Advantage) on behalf of large commercial customers in the state of California seeking third-party power supplies.

**British Columbia Hydro and Power Authority/British Columbia Transmission Corporation**

- Advisor to B.C. Hydro on unbundled cost-of-service, retail rate design and cost-of-service methods. Consultant on deregulation in the U.S. and implications to B. C. Hydro.
- Advisor to British Columbia Transmission Corporation on the Regional Transmission Organization under consideration in the Pacific Northwest U.S., Grid West; representative on the Pricing, Market Design and Cost/Benefit workgroups for Grid West; Regional Representatives Group member for BCTC; Membership Advisory Committee member for Grid West, the corporation.
- Advisor to British Columbia Hydro on the structure and development of the British Columbia Transmission Corporation, as a result of corporate restructuring.

**Business Owners and Managers Association (BOMA)**

- Project Manager for BOMA's evaluation of Seattle City Light's retail rates with a focus on the subsegmentation of the Distribution system and resulting retail rates.

**Energy and Environmental Economics, Inc.**

- Co-authored an article with Energy and Environmental Economics, Inc. on "Market Power Mitigation and Energy-Limited Resources" (March 2003).

**Equapac**

- **Developed and evaluated Requests for Proposals for wholesale power supply.**
- **Advised client regarding wheeling arrangements, and ancillary services options.**

**GenEnergy**

- Advised on the development of an internet-based, reverse auction market for wholesale power and load for in the Pacific Northwest United States.

**Grant Public Utility District**

- Project manager for Grant PUD's unbundled Cost-of-Service project; project manager of an operational assessment of ancillary service opportunities.

**Helsell Fetterman, LLP**

- Provided litigation support and expert testimony for a class action suit filed against the City of Seattle for inappropriately allocating costs to the city utility, Seattle City Light.

**Northwest Power Planning Council**

- Support the Northwest Power Planning Council during the Bonneville Cost Review effort.

**Power Resource Managers, LLC**

- Forecast Bonneville Power Administration wholesale power rates (FY2002-2006); analyze usability and comparability of various federal wholesale power products.

**Powerex (wholly-owned electricity trade subsidiary to British Columbia Hydro)**

- Advisor to Powerex on U.S. policies associated with deregulation, wholesale and retail open access, wholesale power marketing, and transmission pricing and access issues.
- Expert witness before the Alberta Energy and Utilities Board regarding import and export policies within Canada; in an arbitration hearing executed pursuant to the Northwest Regional Transmission Association Governing Agreement; and, before the Bonneville Power Administration in its 2000 Transmission Rates, Terms and Conditions rate filing.
- Advisor to Powerex on various BPA Transmission Business Line processes including Contract Lock, Transmission Business Line Business Practice Forum, Transmission Rate Case Settlement (2005-06).
- Provide litigation support for Powerex in Docket PA02-2-005 (Fact-Finding Investigation into Possible Manipulation of Electric and Natural Gas Prices).
- Prepare technical analyses that support Powerex's Power Market Authorization triennial applications to FERC for continued market-based pricing authority.

**The Public Power Council (PPC)**

- Advisor to the Public Power Council on various regional policies issues (e.g., regional adequacy and reliability) as well as issues directly associated with Bonneville Power Administration's Subscription Strategy and renegotiation of new long-term power sales contracts (e.g., federal product design, form of long-term federal power sales contracts, terms and conditions).
- Expert witness before the BPA (1999) on wholesale power rate issues.

**Shenker Bonaparte, LLP**

- Evaluated wholesale power costs and rates applied to The Dalles Irrigation District.
- Provided expert statements in preparation of litigation.

**Reed Consulting Group** (Managing Consultant) 1995

Member of the RCG Management Committee; presented expert testimony on behalf of Powerex in the 1996 BPA wholesale power and transmission rate hearing; advised Powerex on FERC transmission pricing policies; advised Commonwealth Electric on corporate and functional restructuring and service unbundling; developed a curtailment rate for industrial customers of New Brunswick Power (Canada); for Pennsylvania Power & Light, identified "special" rates and contracts for industrial customers; performed a North American market assessment for mobile combustion turbine technologies and gas supply; before the Electric Council of New England,

presented materials on open access and new product and service opportunities in the power industry; Chair of the International Institute for Research's retail access seminar.

**Opatrny Consulting** (Principal) 1994

Advised BPA in its development of the 1995 Business Plan and unbundling power and transmission services; for Chelan PUD, evaluated the economic viability of expanding the capacity projects on the mid-Columbia River; negotiated terms for the Centralia coal project between BPA and the Pacific Northwest Generating Company; represented Public Generating Pool in the comprehensive review of BPA transmission services; advised the Boston Edison Company on restructuring issues before the Massachusetts Department of Public Utilities.

**Merrill Schultz & Associates** (Associate) 1989-1993

Sponsored expert testimony in Bonneville Power Administration wholesale power and transmission rate hearings on behalf of the Public Generating Pool and the Generating Utilities of the Northwest; on behalf of Tanner Electric Cooperative, presented damages testimony before the Superior Court in Seattle, Washington; advised the Public Generating Pool on technical, operational and political issues; evaluated financing alternatives to the BPA for the Public Generating Pool; industry advocate on the National Marine Fisheries Service Endangered Species Act Economic Technical Committee; for the Northwest Irrigation Utilities, analyzed the long-term viability of rate discounts for irrigation loads; evaluated financing alternatives for down-stream benefits obligations on behalf of the Mid-Columbia Participants; evaluated the need for power in the Pacific Northwest as well as the cost of removing existing generation (Glines Canyon dam); evaluated opportunities for new industrial loads in the Pacific Northwest; prepared for the Direct Service Industrial customers, an evaluation of the impact that such load has on BPA's system.

**City of Seattle, Lighting Department** (Senior Economist) 1980-1989

Senior Economist to the Deputy Superintendent; developed the utility's forecast of BPA's wholesale power rates; evaluated the value to the utility of renegotiating new long-term power sales contracts with BPA; expert witness on behalf of Seattle City Light, the Public Generating Pool and the Northwest parties before BPA, the FERC (EF-1, EF-2, EF85) and the U.S. Senate Committee on Insular Affairs; chair of the Pacific Northwest Utilities Conference Committee's Cost-effectiveness Committee; represented Seattle City Light in settlement negotiations of WPPSS-3 Cost-sharing litigation; Co-chair of the Public Power Council's Revenue Requirements Committee; resource economist for the development of 133 MW of hydroelectric power and 4 MW of cogeneration.

**Education**

| | |
|---|---|
| Graduate Studies in Economics (University of Washington) | 1980-82 |
| Bachelor of Science, Economics (Claremont McKenna College) | 1978 |
| Bachelor of Arts, Psychology (Scripps College) | 1978 |

**Regarding: Joint Preliminary Status Report**

(1) Expert Witness/Depositions over the past 4 years:

- 2006 – United States Court of Federal Claims

The Dalles Irrigation District, Plaintiff
vs.
The United States of America, Defendant

Case No. 05-1042 C

**Prepared a Declaration**

- 2004 – United States District Court for the District of Idaho

Powerex Corp., a Canadian corporation, Plaintiff,
vs.
Idacorp Energy, L.P. d/b/a Idacorp Energy, a Delaware limited partnership and a wholly-owned subsidiary of Idacorp, Inc. and an affiliate of Idaho Power Company; and Idacorp, Inc. an Idaho corporation and parent company to Idacorp Energy, Defendants.

Case No. 04-CN-441-S-EJL

**Provided an Expert Report – this case settled.**

- 2003 – Superior Court of the State of Washington for King County (Class Action)

Rud Okeson, Doris Burns, Walter L. Williams and Arthur T. Lane; individually and on behalf of the class of all persons similarly situated, Plaintiffs,
vs.
The City of Seattle, Defendant.

No. 02-2-05664-8SEA

**Prepared Expert Statements; Deposed; Testified in Court**

- 2002 – United States District Court Western District of Washington at Tacoma

Northwest Pipeline Corporation, a Delaware Corporation, Plaintiff,
vs.
Richard S. McCallum et al.

No. CV02 5187 RJB

**Deposed**

(2) Articles published over the past 8 years:

- Market Power Mitigation and Energy-limited Resources, Elsevier Science Inc., March 2003

Joint publication by Ren Orans, Arne Olson and Carol Opatrny

H1

UNITED STATES DEPARTMENT OF THE INTERIOR
Stewart L. Udall, Secretary

BUREAU OF RECLAMATION
Floyd E. Dominy, Commissioner

REGION 1
H. T. Nelson, Regional Director

# DEFINITE PLAN REPORT

THE DALLES PROJECT, WESTERN DIVISION

OREGON

August 1962
Boise - Idaho

11

UNITED STATES
DEPARTMENT OF THE INTERIOR
BUREAU OF RECLAMATION
REGIONAL OFFICE, REGION 1
BOX 937, BOISE, IDAHO

IN REPLY REFER TO:

August 23, 1962

To: Commissioner, Bureau of Reclamation

From: Acting Regional Director, Region 1, Boise, Idaho

Subject: Definite Plan Report -- The Dalles Project, Western Division, Oregon

We have reviewed the presently estimated requirements and potential accomplishments of The Dalles Project, Western Division, Oregon, in light of the Authorizing Act of September 13, 1960, 74 Stat. 882, and House Document No. 431, 86th Congress, 2d Session, on which the authorization was based.

This letter report is submitted to advise you of the findings of our review; to report on several actions that have been consummated subsequent to project authorization; and to recommend that the feasibility report as modified by revisions contained herein constitute the Definite Plan Report.

One important occurrence following project authorization was the loss to the project of several hundred acres of land when the owners elected to remain out of the project at the time of District formation. With the cooperation and financial assistance of the District the Bureau was able to perform land classification studies and related work to provide replacement acres. On the basis of present estimates the inclusion of the substitute acreage will not adversely affect project cost or repayment.

Land classification of a total of 13,346 acres has now been completed, of which 7,504 acres were found suitable for development and declared arable and 5,417 acres are determined to be irrigable and will be developed under present plans. All of the documents required for certification by the Secretary as to adequacy of soil survey and land classification, as required by the 1954 Appropriation Act, have been prepared and sent to your office for further handling. Secretarial certification was made January 18, 1962.

The Sprinkler Land Classification map included in House Document No. 431 has been outdated and a revised map, reflecting the location of the present project acreage, is attached.

The principal project works remain substantially in accordance with the general plan as set out in House Document No. 431. Location of the principal project works have been printed in red on the revised Sprinkler

Land Classification map. The revisions in acreage have necessitated relocation of certain laterals, reservoir, tanks, and pumping plants. The Assistant Commissioner and Chief Engineer has prepared a feasibility cost estimate for an alternative distribution system beginning at pumping plant A. The Construction Engineer has estimated new costs for lands and rights, relocations of property, clearing, access facilities, and general property. Prospective annual District costs have been reexamined and appear to be within the original estimate.

A repayment contract between the United States of America and The Dalles Irrigation District was executed October 19, 1961 and confirmed by the Court January 10, 1962. The District's construction charge obligation under Article 9 of the repayment contract is established at $2,550,000, to be paid in 50 successive annual installments exclusive of a 10-year development period, together with the amount of funded cost of operation and maintenance, if any, which may occur as provided for in Article 11 of the contract and as authorized by Section 2(b) of the Act of September 13, 1960. The District has contracted to maintain and operate the fish screens with the understanding that so long as the fish screens are properly operated and maintained by the District the sum of $1,700 will be annually credited during the development period to development period charges owing to the United States and thereafter annually credited to the construction charge installment owing to the United States.

The repayment contract provides that power and energy will be furnished to the District at the point where the project's 12.5-kv. electric distribution line is connected to The Dalles substation of the United States [or at such other points as are agreed upon between the United States and the District.] A rate of 1 mill per kilowatt-hour shall be effective for the first irrigation season and shall continue until such time as the Secretary determines, but not more frequently than once in any five-year period, that a different rate is applicable. If the rate is modified by the Secretary after the first irrigation season, the contract provides for such revisions and for changes in payment of the District's charges for power.

We have been advised by the Administrator, Bonneville Power Administration, that his recently enunciated policy of cost sharing of the annual operation, maintenance, and replacement costs of jointly used facilities will not apply to this project. The Administrator has further advised that an agreement between the Bureau and Bonneville for service to The Dalles Project, Western Division, is being prepared and will be submitted for our consideration.

The conclusion reached from our review is that there are no revisions in the plan of development which would materially affect the engineering or economic conclusion previously drawn or the legislative requirements and limitations now in being.

H4

Because of the foregoing considerations, it is recommended that this letter and attachments be bound ahead of the summary of the feasibility report to constitute the Definite Plan Report.

M. Boyd Austin

M. Boyd Austin

Attachments


Cost of Generation - The Dalles
mills/kWh
0
1
2
3
4
5
6
1
5
9
13
17
21
25
29
33
37
41
45
1965 - 2007
Actual Cost
Generation Cost Charge
Lost Revenue
Total Unit Cost

The Dalles Irrigation District
Unit Cost History
Damages for 1965 - 1989

| Year | Generation Cost Actual mills/kWh | Generation Cost Charged mills/kWh | Lost Revenue Charged mills/kWh | Total Unit Cost Charged mills/kWh | Assumed Load KW-hour | Over payment mills/kWh |
|---|---|---|---|---|---|---|
| 1965 | 1 | 1.00 | 0 | 1 | 18,104,373 | |
| 1966 | 1 | 1.00 | 0 | 1 | 18,104,373 | |
| 1967 | 1 | 1.00 | 0 | 1 | 18,104,373 | |
| 1968 | 1 | 1.00 | 0 | 1 | 18,104,373 | |
| 1969 | 1 | 1.00 | 0 | 1 | 18,104,373 | |
| 1970 | 1 | 1.00 | 0 | 1 | 18,104,373 | |
| 1971 | 1 | 1.00 | 0 | 1 | 18,104,373 | |
| 1972 | 1 | 1.00 | 0 | 1 | 18,104,373 | |
| 1973 | 1 | 1.00 | 0 | 1 | 18,104,373 | |
| 1974 | 1 | 1.00 | 0 | 1 | 18,104,373 | |
| 1975 | 1 | 1.00 | 0 | 1 | 18,104,373 | |
| 1976 | 1 | 1.00 | 0 | 1 | 18,104,373 | |
| 1977 | 0.9 | 1.00 | 0 | 1 | 18,104,373 | 1,810 |
| 1978 | 0.9 | 1.00 | 0 | 1 | 18,104,373 | 1,810 |
| 1979 | 0.9 | 1.00 | 0 | 1 | 18,104,373 | 1,810 |
| 1980 | 0.9 | 1.00 | 0 | 1 | 18,104,373 | 1,810 |
| 1981 | 0.9 | 1.00 | 0 | 1 | 18,104,373 | 1,810 |
| 1982 | 0.52 | 1.00 | 0 | 1.52 | 18,104,373 | 8,690 |
| 1983 | 0.52 | 1.00 | 0 | 1.52 | 18,104,373 | 8,690 |
| 1984 | 0.52 | 1.00 | 0 | 1.52 | 18,104,373 | 8,690 |
| 1985 | 0.52 | 1.00 | 0 | 1.52 | 18,104,373 | 8,690 |
| 1986 | 0.52 | 1.00 | 0 | 1.52 | 18,104,373 | 8,690 |
| 1987 | 0.52 | 1.00 | 0 | 1.52 | 18,104,373 | 8,690 |
| 1988 | 0.52 | 1.00 | 0 | 1.52 | 18,104,373 | 8,690 |
| 1989 | 0.52 | 1.00 | 0 | 1.52 | 18,104,373 | 8,690 |
| 1990 | | 1.16 | 0.067 | 1.227 | | |
| 1991 | | 1.16 | 0.067 | 1.227 | | |
| 1992 | | 1.16 | 0.067 | 1.227 | | |
| 1993 | | 1.16 | 0.067 | 1.227 | | |
| 1994 | | 1.16 | 0.067 | 1.227 | | |
| 1995 | | 1.226 | 0.086 | 1.312 | | |
| 1996 | | 1.226 | 0.086 | 1.312 | | |
| 1997 | | 1.226 | 0.086 | 1.312 | | |
| 1998 | | 1.226 | 0.086 | 1.312 | | |
| 1999 | | 1.226 | 0.086 | 1.312 | | |
| 2000 | | 1.226 | 0.086 | 1.312 | | |
| 2001 | | 1.226 | 0.086 | 1.312 | | |
| 2002 | | 1.846 | 0.748 | 2.594 | | |
| 2003 | | 1.846 | 0.748 | 2.594 | | |
| 2004 | | 1.846 | 0.748 | 2.594 | | |
| 2005 | | 1.846 | 0.748 | 2.594 | | |
| 2006 | | 1.846 | 0.748 | 2.594 | | |
| 2007 | | 2.849 | 2.210 | 5.059 | | |
| 2008 | | 2.849 | 2.210 | 5.059 | | |
| 2009 | | 2.849 | 2.210 | 5.059 | | |
| 2010 | | 2.849 | 2.210 | 5.059 | | |
| 2011 | | 2.849 | 2.210 | 5.059 | | |
| Total | | | | | | 78,573 |

Exhibit A, page 21 of 21
to Motion to Exclude

Ex V, page 2 of 2