Case No. 05-1042 C

Judge Charles F. Lettow

UNITED STATES COURT OF FEDERAL CLAIMS

THE DALLES IRRIGATION DISTRICT

Plaintiff,

v.

THE UNITED STATES,

Defendant

---

# PLAINTIFF'S CLOSING ARGUMENT

---

**Arden E. Shenker,** OSB No. 62082
Shenker & Bonaparte, LLP
1500 SW First Avenue, Suite 630
Portland, OR 97201
Telephone: 503-294-1118
Facsimile: 503-294-0015
Email: ashenker@ashenkeresq.com

Attorneys for Plaintiff:
**THE DALLES IRRIGATION DISTRICT**

January 17th, 2008

# TABLE OF CONTENTS

Introductory Statement .......... 1

A. Breach .......... 1

B. Contract .......... 2

Facts .......... 5

Exhibit 31 .......... 5

Joint Use .......... 6

Actual Costs .......... 7

Depreciation .......... 10

The BPA "true-up" .......... 11

Fish and Wildlife .......... 11

Feasibility/Need .......... 12

The Law .......... 13

Contract Interpretation and the Fair-Dealing Covenant .......... 13

Deference .......... 15

Feasibility .......... 16

Contract Construction .......... 17

Conclusion .......... 19

Appendix A: Bonneville Power Administration Annual Report, 1990

Appendix B: The 19 Bureau of Reclamation Projects in the Remanded FCRPS Biological Opinion

Appendix C: Reclamation Manual, Power Repayment

Appendix D: Reclamation Manual, Water-Related Contract and Repayment Principles and Requirements

**TABLE OF AUTHORITIES**

CASES

*Abercrombie v. Hayden Corp.*,
320 Or. 279 P.2d 845 (1994) .......... 17

*America Online v. US*,
64 Fed. Cl. 571, 580 (2005) .......... 15

*Banks v. U.S.*,
78 Fed. Cl. 603 (2007) .......... 17

*Bowen v. Georgetown Univ. Hosp.*,
488 U.S. 204 (1988) .......... 15

*De La Mota et al. v. US Dept. of Educ. et al.*,
412 F.3d 71, 79, 82 (2d Cir. 2005) .......... 16

*Franconia Assoc. v. US*,
546 U.S. 129 (2002) .......... 15

*Hall v. US Environmental Protection Agency*,
273 F.3d 1146 (9th Cir. 2001) .......... 15

*Ivanhoe Irrigation District et al. v. McCracken et al.*,
357 U.S. 275 (1958) .......... 18

*Mesa Air Group, Inc. v. Dept. of Transportation*,
87 F.3d 498 (D.C. Cir. 1996) .......... 15

*Minidoka Irrigation District v. Dept. of the Interior*,
154 F.3d 924 (9th Cir. 1998) .......... 18

*Nat'l Fuel Gas Supply Corp. v. FERC*,
811 F.2d 1563 (D.C. Cir. 1989) .......... 15

*Orange Cove Irrigation District v. US*,
28 Fed. Cl. 790 (1993) .......... 13, 14

*San Carlos Irrigation & Drainage Dist. v. US*,
23 Cl. Ct. 276 (1991) .......... 18

*Seaboard Lumber Co. v. US*,
308 F.3d. 1283 (Fed. Cir. 2002) .......... 17

*Skidmore v. Swift & Co.*,
323 U.S. 134 (1944) .......... 15

*Statesman Apartments, Inc. v. US*,
66 Fed. Cl. 608, 616 (2005) .......... 15, 18

*System Fuels, Inc,. v. US*,
79 Fed. Cl. 37 (2007) .......... 14

*Teambank v. McClure*,
279 F.3d 614 (8th Cir. 2002) .......... 15

*The Dalles Irrigation Dist. v. US*,
71 Fed. Cl. 344 (2006) .......... 18

*Transohio Savings Bank v. Dir., Office of Thrift Supervision*,
967 F.2d 598 (D.C. Cir. 1992) .......... 15

*Tulelake Irrigation District v. US*,
169 Ct. Cl., 782 (1965), 342 F.2d 447 .......... 17

*US v. Mead Corp*,
533 U.S. 218 (2001) .......... 15

*US v. West*,
670 F.2d. 686 (7th Cir. 1982) .......... 6

*Yankee Atomic Electric Co. v. US*,
73 Fed. Cl. 249 (2006) .......... 15

STATUTES AND OTHER AUTHORITIES

43 U.S.C. § 485 .......... 16

"Authority to Divert," Opinion by the Solicitor, United States Department of the Interior,
85 I.D. 326, 978 I.D. LEXIS 36 (July 31, 1978) .......... 17

Fed. R. Evid. 104(d) .......... 6

UNITED STATES COURT OF FEDERAL CLAIMS

**THE DALLES IRRIGATION DISTRICT**,

Plaintiff,

**v.**

**THE UNITED STATES OF AMERICA,**

Defendant.

Case No. 05-1042 C

Judge Charles F. Lettow

## PLAINTIFF'S CLOSING ARGUMENT

## INTRODUCTORY STATEMENT

### A. Plaintiff's Evidence Established a Breach of the Repayment Contract

The 1961 repayment contract between The Dalles Irrigation District and the Bureau of Reclamation provided that power and energy for irrigation pumping would be made available at rates not to exceed the **actual cost** of such power and energy generated at The Dalles Dam. The Regional Director of the Bureau of Reclamation approved Exhibit 31, Sue Garifo's [1990] report, which concluded that the District was responsible only for operation and maintenance generation costs and **not** transmission, joint uses, depreciation, cost recovery accounting, or lost revenue.

/ / / /

/ / / /

**B. The Background and History Presented by Plaintiff Provided the Context for Plaintiff's Interpretation of the Contract**

How, why, and when did the Bureau of Reclamation go so wrong in its treatment of The Dalles Irrigation District, and its repayment contract?

Recognizing the falling water table in the orchards around The Dalles, the Bureau of Reclamation fought for an affordable irrigation district, to meet the congressional purposes, feed the population, and grow the economy. (Transcript 480, 655.) The Bureau of Reclamation was the advocate for the District for more than twenty years. (Transcript 473, 474, 553.) Beginning in 1962, the Regional Director for the Bureau, H. T. Nelson, filed his report of satisfaction that the Bonneville Power Administration's "recently enunciated policy of cost sharing of the annual operation, maintenance and replacement costs of jointly used facilities *will not apply to this [The Dalles] project*." (Exhibit DX 7/3, emphasis added.) When the Congress enacted Public Law 86-745 it specified that actual costs were a ceiling for the rate the Bureau should charge the District. (Exhibit DX 5/2.) Accordingly, the repayment contract provided that after an initial rate of 1 mil/kwh the actual costs ("sufficient to cover the costs") should control. (Exhibit DX 6/10.) Thereafter, there should be an annual check to make sure that actual costs – and only actual costs – were being paid, with appropriate supplements and surplus credits tied to the actual power charges. (Exhibit DX 6/13–14).

Yet, the Bureau of Reclamation never checked actual costs, to provide that annual information for the Irrigation District. Instead, the Bureau determined that there was no need to review the repayment contract for 28 years. (Transcript 527.) Why then? Enter the Bonneville Power Administration (BPA). In BPA's annual report, 1990 (Appendix A), the BPA administrator reported how BPA had launched, with the US Army Corps of Engineers

and the Bureau of Reclamation (BOR), a comprehensive review of the management of major existing resources, to balance all the uses of the Columbia River. (Appendix A, page 2.) And the report looked forward to the prospect that within a decade, cumulative payments would reach $811 million for irrigation assistance, beyond the ability of irrigation users to repay. (Appendix A, page 30.) That was a hefty bill for power repayers. By now the BPA is ignoring the rate for irrigation payment altogether, and that "reserve power" (Transcript 92) is ignored in Bonneville's definitions of rates and rate schedules, where reserve power refers to an unanticipated load growth for purchasers with fixed supply contracts, with no other rate schedule applicable, and when BPA does not have a "power sales contract in force with a purchaser." (http://www.bpa.gov/corporate/pubs/definitions/)

The BPA knew that fish depletion problems could affect the amount of water allowed to go through the spillways, decreasing actual generation at the dam by as much as one hundred percent. (Transcript 183.) And the BOR knew it too. *See* Appendix B, page B-4, and Table 1.2 at page D-5.

So thanks to the pressure of the BPA, the BOR became an acquiescent adversary to instead of an advocate for the Irrigation District. Al Bolin was in charge; Terry Kent deferred to Bolin (Transcript 369), with the regional directors deferring, in turn, to Kent. (Transcript 563, 564.) With the BPA anxious to maximize revenue and avoid political problems (exhibit 40, page 1), the BOR agreed to allow the BPA to call the shots.

> Q: So what you are telling us, Mr. Bolin, is if the annual kilowatt-hourly usage was, say 5 million just for ease of mathematics, and the rate that had been charged was 1.0 then you'd tell the District that the actual charge was 1.0 for the 5 million actual kilowatt-hours used; right?
>
> A: Yes. We never used a reference to any different rate than the one that was currently in effect.

Q: Sure. You would not, therefore, tell the District, for example in 1982 when you wrote Exhibit Number 40, that the actual cost was 0.52 and multiply that times the actual usage, would you?
A: I'm sorry, could you repeat that question?
Q: Sure. If the actual cost, as you said in Exhibit Number 40, was 0.52 for the generation you would not tell the District that that was the actual cost and multiply that out for the usage of kilowatt hours, would you?
A: That's correct.
Q: That was never done?
A: Not to my knowledge.

And all along, Bonneville in fact "periodically" was informing the BOR that the costs were less than the rate being charged. (Plaintiff's exhibits 12, 40; Transcript 325)

Q: Okay. Take a look at the third guideline if you would, please. It provides that "the water users on any project would pay an irrigation pumping power charge sufficient to pay the annual costs of power"; right?
A: Yes.
Q: Yeah. But in the period of time from 1978 to the year 2004 you never knew what the annual costs of power were from Bureau records, did you?
A: Are you addressing The Dalles?
Q: Yes, sir.
A: No, we did not.
Q: What you know was what Bonneville Power Administration furnished to you?
A: We knew that they informed us periodically that the costs were less than 1 mill.

Now in litigation, the BOR seeks to hide its tracks some. Therefore, in the fall of 2006, the Bureau of Reclamation admitted that it was changing its notification procedures in order to provide annual updates on actual previous year's costs of production, with over- or under-payments. But that was only in letters to irrigation districts other than The Dalles (exhibit 83, page 2). The letter in the fall of 2006 to The Dalles, by contrast, simply stated that there would be an annual update for the Irrigation District. (Plaintiff's Exhibit 77.)

Would that it were true that BOR was prepared to provide actual previous year's costs of production, which still have not been seen by the Irrigation District in The Dalles.

(Transcript 580.) Instead, in October of 2006, when the Bureau sent to The Dalles Irrigation District a copy of the revision of BOR's memorandum of understanding with the Bonneville Power Administration, there intentionally was erased from The Dalles' copy of that document not only the entire fourth page, but the footnotes on page 3 that describe how interest was provided to the BPA, through the BOR. (Exhibit 87, pages 3–4). Clearly the defendant in our case knew that it was not supposed to be charging interest!

The defendant's witness Eberle knew that once the power plant was running, actual costs needed to be recorded. (Transcript 785.) But that did not happen. The rate was wrong every single year (Transcript 653), because the components of the rate were wrong and because the rates were in excess of actual costs. But the actual annual cost data never were provided to The Dalles Irrigation District (Transcript 653), although those data were available.

So what happened in 1989–1990 was that the Bureau of Reclamation acquiesced to the pressures of the Bonneville Power Administration to ignore the repayment contract with The Dalles Irrigation District, notwithstanding the congressional mandate, and the language of the repayment contract pursuant to that congressional enactment.

## FACTS

**<u>Exhibit 31</u>**

What was Sue Garifo doing for a year and a half over 1989 and 1990, preparing the definitive study of Bonneville's proposals to raise rates impacting irrigation districts? Bonneville had no agreements with those irrigation districts. However, BPA had problems: they needed to raise the rates. The Bureau of Reclamation needed a comfort level from BPA, necessitating Ms. Garifo examining reams of documents, boxes of them, to determine the

history of each project. It was massive work. (Transcript 56.) At the end of the day, she reached her conclusions, with which the Bureau of Reclamation agreed. (Transcript 60.) The Regional Director, later the overall Commissioner of Reclamation, signed off on Exhibit 31. (Transcript 543.) This adoption of the BPA report is a binding admission. Fed. R. Evid. 104(d). *See US v. West*, 670 F.2d. 686 (7th Cir. 1982).

And the conclusion was: The Dalles Irrigation District was responsible only for generation costs; only those could be passed along to the District. (Transcript 485.) Ms. Garifo actually had obtained cost data through BPA (Transcript 43, 99), though she recognized that some of the projects were operated on a "best guess." Indeed, the costs at The Dalles Dam needed to be determined, but that had never been done. *See* Exhibit 27; Transcript 339.

The February, 1967 guidelines (exhibit 29) were used by the Bureau of Reclamation, which should have set a ceiling on charges to The Dalles Irrigation District at no more than the actual costs. (Transcript 51.) That resulted from the BOR solicitor's opinion that there could be no continuing annual financial adjustment, for operating, maintenance or replacement of generating facilities. (Exhibit 64, Transcript 68, 543.) And those facilities were the ones used for Bureau services, that is, for joint use. (Transcript 190.) Nevertheless, BPA always billed for joint costs, and BOR simply passed the costs along. (Transcript 225.)

**Joint Use**

Indeed, the joint use figures are one third of the rate, approximately, after the power plant, the pumping plant, dams and reservoirs. *See* Exhibit 23. The joint costs are worked into the BPA system by the Corps of Engineers (Transcript 272), for example, as fish and wildlife problems, as part of operation and maintenance. *See also* Exhibit 7: cost sharing, that

is, joint use of operation, maintenance and replacement on jointly used facilities should not have applied to The Dalles project. (Transcript 358.) But it did, for the Bureau charged to The Dalles Irrigation District both joint use and depreciation. (Transcript 670.) And, of course, the Bureau also passed along to the Irrigation District a plug number, for a lost revenue computation. (Transcript 670.) It is noteworthy that the conclusions of the plaintiff's expert led to no cross-examination and no rebuttal on these fundamental issues that are case dispositive. Indeed, Mr. Eberle was not even able to defend, for he was not asked to defend, anything about lost revenue computations.

**Actual Costs**

The man who actually prepared the cost data for Mark Jones to send along to the Bureau of Reclamation was Bill Leonard. Where was he as a witness for the defendant?

It was the general view of both Bonneville and Corps of Engineer witnesses at trial that the Corps put together the underlying financial data, to submit to BPA. And there was a representative of BPA who was the liaison with the Corps, knowledgeable about the Corps' underlying fundamental data. The BPA representative (Bergen/Todd) never appeared at the trial. (Transcript 185–186; 187.)

Between the five year settings of the rates, "actual costs" were ignored by BPA, and, in turn, by the Bureau of Reclamation. (Transcript 156.) Indeed, those costs were ignored forever by Al Bolin (Transcript 317–321), who didn't need them; when they came from BPA "periodically" (Transcript 325), they were of no moment to the BOR.

Even at five-year intervals, when the rates were escalated, the actual costs were still below 1 mil/kwh (exhibit 6, interrogatory 13, page 4). (Transcript 156.)

The data were available. The BPA could break apart the operation and maintenance numbers to check for BPA's large "under-recoveries" from the Bureau of Reclamation (Transcript 140), in the same fashion as the BPA did by the same percentage as fixing commercial rates. (Transcript 147.)

There is no gainsaying that the generation cost is the operation and maintenance. Sue Garifo knew that was the case, when she wrote the report (exhibit 31); and exhibit DX 7/3 reconfirmed the same point, decades before Ms. Garifo undertook the corroboration. (Transcript 158.) Mark Jones spoke for the United States, even signing for the United States on the most recent BPA/BOR Memorandum of Understanding Revision. (Transcript 194.) And the defendant knew, therefore, that operating cost data were available from the Corps of Engineers. (Transcript 140, 216, 229, 232–235.)

Nevertheless, the annual statement from the Bureau of Reclamation to the Irrigation District never adjusted for actual costs, as the contract commanded. Instead, the annual advice to the District from the BOR was of energy usage only. (Transcript 374.)

We know that in 1977 the actual cost was 0.31 mil/kwh. (Exhibit 12.) But there remained another 0.59 mil/kwh which curiously was described as the capital cost, not a "replacement" number. (Transcript 479.) Why "curious"? Because if the 0.59 was a capital cost, then it was actually an interest-bearing investment. (Transcript 306.) Therefore, as early as 1977, the Bureau knew, because the BPA told the Bureau, that the actual return on the capital cost investment exceeded the amount that the District was paying annually as a capital repayment. And in face of that boon to the US Treasury, the Irrigation District remained on the billing end of an operational charge, which actually came from a capital cost. (Transcript 378.)

We know that this capital item (Transcript 477, 531) should not be recovered in the rates (*see* Plaintiff's exhibit 13, page BPA 0952). We know that the 0.59 calculation from Exhibit 77 resulted in dollars going to the Treasury (Transcript 477), and there was never any remission of overcharges. Nevertheless, we are told that the guidelines were followed. (Transcript 529.) And at the same time the defendant has admitted (exhibit 63) by its answer to interrogatory 17 that actually there was no determination of the power cost at The Dalles Dam, ever. (Transcript 557.)

The BPA did calculate and advise the BOR of actual cost figures when the BPA determined to raise the rates, in 1982. (Transcript 306.) That was the occasion of a determination that the actual cost was 0.52 mil/kwh, which was not going to stand in the way of the political embarrassment of charging The Dalles Irrigation District too little. (Exhibit 40.) And again, in 1989, after both the Bureau and the BPA suffered the earlier embarrassment, the actual costs had been less than 1 mil/kwh, although that higher than actual cost was the rate billed to and paid by The District. (Transcript 342–343, 370, 372.)

The standard method for rate review for The Dalles Irrigation District was the same as Bonneville's method for commercial customers. (Transcript 323.) So how then could the Bureau of Reclamation use the guidelines to which it was bound, to charge the Irrigation District only for the annual costs of power? (Exhibit 6, page 2, number 3.)

Of course the BOR could not have charged The Dalles Irrigation District for actual costs, for those were never known by the BOR, according to their most knowledgeable source, upon whom everyone else relied "to this day" (Transcript 327).[1] Mr. Bolin's

[1] The BOR's own Reclamation Manual (Appendix C) required the Bureau to establish actual costs, at least as of January 20, 2006. *See* App. C, p. 4.

successor Robert Ralph, presumably could have corrected the record and its legitimate inference, but he did not appear as a witness in the case, so there was no correction to make.

Instead, whatever the BPA passed along to the BOR it always billed to The Dalles Irrigation District. (Transcript 339.) Despite the fact that generation operation and maintenance (exhibit 40) is the "only" amount that should be charged under the repayment contract. (Transcript 370.) Don Bailey, for The Dalles Irrigation District, was right about that, as the BOR Regional Directors Lloyd and Keys needed to concede. (Transcript 485, 545, 549.)

**Depreciation**

Aside from the inclusion of the lost revenue computation, which does not belong in the rate in any event, and aside from the inclusion of joint use items in the operation and maintenance of generational costs, the other large inappropriate charge made by the Bureau to the District was for depreciation. Indeed, the "R" for replacement in OM&R became irrelevant as depreciation was set out separately as an item to be included in the annual (quintennial) rate charged to the District. (Transcript 138; *see* exhibit 12, page 2.)

Since 1992, the BPA has funded the Corps of Engineers and the Bureau of Revenue investments, replacing capital assets to maintain generation "at appropriate levels" and then the BPA bills the BOR, so that it can bill The Irrigation District. (Transcript 203.)

While depreciation may be an operating cost for ratemaking (Transcript 221), rates should not recover the capital costs, for recovery of "R" only should be "where feasible." (Transcript 419.) Arguably, that feasibility explains why the BPA supplied the BOR with "O&M" separately from depreciation. "R" equals depreciation, for the BPA's supplier of figures to the BOR. (Transcript 361.)

**The BPA "true-up"**

It was for BPA to determine that it needed to "true-up" its "irrigation rate" for purposes of the BPA/BOR relationship. That, of course, had nothing to do with the BOR repayment contract obligations to the Irrigation District in The Dalles. (Transcript 227.) The BOR reports to the BPA what the Irrigation District pays to the BOR because that amount is credited to the BPA's treasury account. (Transcript 244.) It is, to say the least, an "active participant" status that describes BPA in its determining the rate The Dalles Irrigation District actually pays. (*See* Exhibit 13, attachment A, page 3; Transcript 244.) The BPA actually seized "reserved power" for irrigation districts, as a revenue source. (Transcript 682.) Therefore it is no surprise that the BPA obtains from the Corps of Engineers data and assigns useful lives (exhibit 23) to such items as land and damages (Transcript 252) and passes those along to the BOR to pass along to The Dalles Irrigation District.

The Corps of Engineers' 1967 study is an interesting historical footnote on capital cost construction perhaps, but it is of no particular viability for our case. The Corps, of course, has a mandate to collect all costs, including depreciation. (Transcript 269.) The Corps has water supply, flood control, recreation, navigation, and fish and wildlife purposes. (Transcript 267.) They have no role in determining the actual cost of providing pumping power from the generation resources at The Dalles Dam. And the BOR has no authority with respect to the Corps of Engineer activities, evidently including accounting. (Transcript 396)

**Fish and Wildlife**

There can be no dispute that Fish and Wildlife charges are included according to the BPA (Transcript 331), but that was not true before 1990 (exhibit 18 to the contrary notwithstanding). (*See* Transcript 388.) And the cost increases as the power decreases.

(Transcript 669.) Therefore as the fish and wildlife problems increased, so did costs. When spills for anadromous fish are not available for generating power (Transcript 463), it is not the Irrigation District that should be paying for that cost. (Transcript 434.) Indeed the fish and wildlife problems are prominent reasons for the increased costs. (Transcript 446.) And those problems should not be laid at the feet of the Irrigation District under a repayment contract that limits the District's feasible obligations to generation costs from The Dalles Dam.

**Feasibility/Need**

No ability-to-pay assessment on annual operating charges had been made before any of the rate increases was put into place. (Transcript 329, 458.) However, that should have been done. *See* exhibit 13, attachment D, page 3. The government concedes that it was not done. *See* exhibit 24, interrogatory 3, pages 6–7.

The costs allocated to the Irrigation District beyond its ability to pay are picked up by Bonneville's power revenues. (Transcript 411.) But those rates should not recover from the Irrigation District further capital reimbursement, according to the Bureau of Reclamation manual. (Transcript 420.) While ability to pay is over the life of the perpetual contract (Transcript 412), who can say what the ability of the Irrigation District is to pay, perpetually, for perpetually increasing operating costs, now five times the level at which they began. (Transcript 415.) The initial one millage rate was premised on the costs allocable to pumping the power and energy. (Transcript 422.) And even then, the repayment contract §14b would have shown a surplus on those actual costs.

No doubt the Bureau of Reclamation would be embarrassed at having to revisit the ability of the District to repay, because that revisitation would require a return report to the Congress. (Transcript 427.) But the Secretary's discretion on rate increases is limited to the

District's ability to pay. (Transcript 457.) And the original feasibility study determined both annual cost and construction cost repayment abilities of the Irrigation District. (Transcript 480.) It is no surprise that significant increases of annual operating costs billed will increase the burden on and decrease the ability of the District to pay capital costs. (Transcript 704.)

For the Bureau of Reclamation the ability to pay is governing. "That's the law." (Transcript 483.) The Bureau's Solicitor so lectured everyone, throughout the Regions. (Transcript 483, 535.) And the Solicitor recognized that a report to the Congress regarding the new inability to pay is a "pretty big stick." (Transcript 484.) That was one of the reasons why the 1984 Bonneville/Bureau Memorandum of Understanding should have passed along only generation costs, according to Regional Director Lloyd (Transcript 486), to whom his successor, Regional Director Keys, deferred as the one with the expertise. (Transcript 547.)

A feasibility determination of the District's ability to pay having been made both when the contract was entered into and later (Transcript 532) on the renegotiation of rates, according to Regional Director/Commissioner Keys, made sure that O&M expenses could be maintained. (Transcript 534.) It was in 1989, according to Keys, that the contract with The Dalles Irrigation District was "renegotiated for a long term," and, Keys continued, "we both signed it." (Transcript 534.) Thus did the Bureau respond to Bonneville's need to renegotiate "all of their power service rates." (Transcript 552.)

## THE LAW

### <u>Contract Interpretation and the Fair-Dealing Covenant</u>

Every contract, including those in which the government is a party, contains an implied covenant of good faith and fair dealing. *Orange Cove Irrigation District v. US*, 28 Fed. Cl. 790, 800 (1993). That is especially true when the government has the authority to

exercise discretion to determine an essential term of the contract; the implied covenant requires that that exercise of discretion be reasonable. *Id*. And that discretionary exercise must be done honestly to effectuate the object and purpose of the power exercise, pursuant to the contract, lest there be an egregious, unfair or unreasonable result. *Ibid*. 801.

Fair dealing requires the application of still another contract principle: when a contract implements or fulfills a statutory requirement, the interpretation of the contract should be guided by the underlying statute. *System Fuels, Inc,. v. US*, 79 Fed. Cl. 37, 46, (2007). Therefore, looking at the report which accompanied the Senate bill enacted as No. 2195, the statute that authorized The Dalles project (DX 3/3), we learn that the assumption on which the entire legislation depended was that the power and energy for irrigation pumping would be made available at "rates not to exceed the cost of such power and energy generated at The Dalles Dam." The rate should not include transmission. The rate should not include joint uses. The rate should not include depreciation. The rate should not include cost recovery accounting tricks. The rate should not include "replacement" as a dodge for depreciation. The rate should not include lost revenue components.

Applying the original statute to the subsequent contract, therefore, makes clear that what the Bureau of Reclamation obediently has done for the Bonneville Power Administration is to do violence to the contract between the Bureau of Reclamation and The Dalles Irrigation District, and to do violence to the contract principle of interpretation from the underlying statute. Moreover, the conduct of the parties is a practical interpretation of the agreement, and that conduct should be entitled to great weight. *Ibid.* 79 Fed. Cl. at 46.

The Repayment Contract here is read by the defendant as making it superfluous, as if the United States was not bound by the contract. That is not the law. *See Statesman Apartments, Inc. v. US*, 66 Fed. Cl. 608, 616 (2005).

**<u>Deference</u>**

Not even the lesser standard of *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944) applies here to give weight to the defendant's litigation stance on contract interpretation. The government's inconsistent interpretations of the repayment contract did not derive from administrative or adjudicative proceedings. *See Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 212 (1988); *Franconia Assoc. v. US*, 546 U.S. 129, 141 (2002).

Agency self-interest does not breed judicial deference; agency interpretations of its own contracts do not require judicial deference. *See Teambank v. McClure*, 279 F.3d 614, 619 (8th Cir. 2002); *Nat'l Fuel Gas Supply Corp. v. FERC*, 811 F.2d 1563 (D.C. Cir. 1989); *Mesa Air Group, Inc. v. Dept. of Transportation*, 87 F.3d 498 (D.C. Cir. 1996).

Whether the government is trying to escape from its contracts or to seek contractual advantage, agency interpretations are not entitled to deference. *Transohio Savings Bank v. Dir., Office of Thrift Supervision*, 967 F.2d 598 (D.C. Cir. 1992); *Yankee Atomic Electric Co. v. US*, 73 Fed. Cl. 249, 306 (2006). *See also America Online v. US*, 64 Fed. Cl. 571, 580 (2005).

Finally, the government here cannot stand on non-precedential documents, seeking deference, *see US v. Mead Corp*, 533 U.S. 218, 233 (2001), when there is no record pretense in this case that the contracting party defendant, the Bureau of Reclamation, drew on, or even possessed, any special expertise for asserting defendant's current litigation position. *Hall v. US Environmental Protection Agency*, 273 F.3d 1146, 1156 (9th Cir. 2001). The government

cannot stand on *ad hoc* unwritten interpretations of a staff employee (Al Bolin here) and correspondence of informal provenance. *De La Mota et al. v. US Dept. of Educ. et al.,* 412 F.3d 71, 79, 82 (2d Cir. 2005).[2]

**Feasibility**

The defendant's Interior Department Solicitor in our case knew the law and the facts: feasibility is not determined by sleight of hand. No doubt Solicitor Bielefeld had in mind 43 U.S.C. § 485(f). Repayment feasibility problems are mandated to be assuaged by the defendant. *Ibid*, subsection (a). But those revisitations, by contract amendment, require a mutual agreement of the parties, and a submittal to the Congress. *Ibid*, subsection (c).

We know that no feasibility determination was made, and none submitted to the Congress, for any proposed rate increase. We know that less than half of the original construction cost feasibly could have been imposed on the Irrigation District, at a time that the operational rates for power costs were a fraction of the annual capital repayment obligations. But now, the Bureau of Reclamation would impose an operational responsibility on the Irrigation District, as a multiple of both the capital cost repayment as well as the original annual operational cost for power. So now we have moved to sums assessed for operations increasingly dwarfing the annual capital expense repayment. Such activity undertaken by the Bureau of Reclamation is contrary to what the Solicitor had taught, counseled and correctly concluded under the law.

Dealing with a need for construing a feasibility report, for the Fryingpan Act, the Solicitor for the Department of the Interior concluded that the Bureau of Reclamation could

[2] The government's most recent written statement of Repayment Principles and Requirements, the Reclamation Manual Directives and Standards, September 12, 2006, requires annual actual cost adjustments. *See* App. D, page 5, paragraph 3.L.

not carry out proposed operating plans until further affirmative authority were received from the Congress. "Authority to Divert," Opinion by the Solicitor, United States Department of the Interior, 85 I.D. 326, 978 I.D. LEXIS 36 (July 31, 1978).

**Contract Construction**

Taking the general contractual mandate for a substantive provision, drawn by the government, to be interpreted as it fairly would be susceptible of construction by the other party, *Tulelake Irrigation District v. US*, 169 Ct. Cl., 782, 792 (1965), 342 F.2d 447, the reasonable construction is the interpretation to be adopted. If there were no general canon of interpretation, then the method of computation most reasonable should be adopted. With divergent views of the parties, the plaintiff's construction becomes the more reasonable, as here. *Ibid.*, pp. 793–794, 453–454.

The parol evidence of the defendant's own witnesses, from Sue Garifo through John Keys, establishes that the defendant has breached the repayment contract, year after year, and that declaration is called for at this time. The parol evidence quite properly was presented to establish the meanings of the writings, from the repayment contract, through the underlying legislation. *See Abercrombie v. Hayden Corp.*, 320 Or. 279, 291, 883 P.2d 845 (1994).

The expert opinions of Carol Opatrny in this case conclusively determined the interpretation of the repayment contract: the government was in breach, each year, in § 14(b) as well as § 14(a) in rate construction. And that testimony was quite properly received by this Court pursuant to *Banks v. US*, 78 Fed. Cl. 603, (2007). *See also Seaboard Lumber Co. v. US*, 308 F.3d 1283, 302 (Fed. Cir. 2002).

The Bonneville Power Administration's problems with accounting for irrigation districts are not unique to our case. In *Minidoka Irrigation District v. Dept. of the Interior*, 154 F.3d 924 (9th Cir. 1998), the Court reviewed the congressional reports authorizing repayment arrangements for the Bureau of Reclamation and irrigation districts. If the irrigation district did not approve some amendment to the original contract, the government was not entitled to make that amendment unilaterally. Even the BPA accounting should not be permitted to make performance of the original contract impossible. *Ibid.,* 929.

The scope of the Irrigation District in The Dalles may be considerably smaller than that of the Central Valley in California, but the general purpose was the same: far-seeing legislators recognized that bringing water supply to parched acres would transform them into veritable gardens for the benefit of mankind. *See Ivanhoe Irrigation District et al. v. McCracken et al.,* 357 U.S. 275, 280 (1958). Endorsing the project in 1947, Senator Gore (then Representative) could not conceive of a government who would spend hundreds of millions of dollars building a great reclamation-irrigation project and then turning the governmental back on the people who had benefited by the production of foodstuffs and wealth, "because some evil agent of government had gotten into a Bureau." *Ibid.,* 357 U.S. 330.

The defendant breached the repayment contract each year that the plaintiff was charged more than the actual power charges. *See San Carlos Irrigation & Drainage Dist. v. US*, 23 Cl. Ct. 276 (1991). *See also Statesman Apartments,* supra, 66 Fed. Cl. at 627. The defendant breached the repayment contract each year that the plaintiff was not provided actual cost data. *The Dalles Irrigation Dist. v. US,* 71 Fed. Cl. 344, 352 (2006). In this case, "each year" is every year from the beginning of the repayment contract.

## CONCLUSION

The plaintiff asks this Court to declare that defendant breached the Repayment Contract every year by charging rates with improper components instead of applying actual costs of generation, and that the defendant breached that contract every year by failing to provide plaintiff with actual cost data. Future compliance with the contract, therefore, will require omitting the improper rate components, restricting charges to actual generation costs and providing annual actual cost data to plaintiff.

DATED this 17th day of January, 2008

SHENKER & BONAPARTE, LLP

/s/ Arden E. Shenker
By:______________________________

**Arden E. Shenker**
OSB No. 62082
ashenker@ashenkeresq.com
Shenker & Bonaparte, LLP
1500 SW First Avenue, Suite 630
Portland, OR 97201
Telephone: 503-294-1118
Facsimile: 503-294-0015

Attorneys for Plaintiff:
**THE DALLES**
**IRRIGATION DISTRICT**

**Certificate of Filing**

I hereby certify that on the 17th day of January, 2008, a copy of the foregoing "Plaintiff's Closing Argument" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the court's electronic filing system. Parties may access this filing through the Court's system.

SHENKER & BONAPARTE, LLP

/s/ Arden E. Shenker

**Arden E. Shenker,** OSB No. 62082
Shenker & Bonaparte, LLP
1500 SW First Avenue, Suite 630
Portland, OR 97201
Telephone: 503-294-1118
Facsimile: 503-294-0015
Email: ashenker@ashenkeresq.com

Attorneys for Plaintiff:
**THE DALLES**
**IRRIGATION DISTRICT**