05-1042C
Judge Lettow

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

THE DALLES IRRIGATION DISTRICT,

Plaintiff,
v.
THE UNITED STATES,

Defendant.

# DEFENDANT'S POST-TRIAL BRIEF

JEFFREY S. BUCHOLTZ
Acting Assistant Attorney General

JEANNE E. DAVIDSON
Director

FRANKLIN E. WHITE, JR.
Assistant Director

ARMANDO A. RODRIGUEZ-FEO
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor
1100 L Street, N.W.
Washington, D.C. 20530
Tel: (202) 307 3390
Fax: (202) 514-8624

Attorneys for Defendant

OF COUNSEL

CLARK MILLER
U.S. Department of the Interior
Attorney-Advisor
Field Solicitor's Office
960 Broadway Ave., Suite 400
Boise, ID 83706
Tel: (208) 334-1906
Fax: (208) 334-1918

February 29, 2008

# TABLE OF CONTENTS


TABLE OF CONTENTS . . . . . . . . . . i

TABLE OF AUTHORITIES . . . . . . . . . . iii

DEFENDANT'S POST-TRIAL BRIEF . . . . . . . . . . 1

STATEMENT OF FACTS . . . . . . . . . . 3

1. Reclamation Law . . . . . . . . . . 3

2. Legislative History Of The Dalles Irrigation Project . . . . . . . . . . 5

3. The Dalles Irrigation Project Authorizing Legislation . . . . . . . . . 7

4. The Repayment Contract . . . . . . . . . . 9

5. Reclamation's Definite Plan Report . . . . . . . . . . 12

6. The Corps' Cost Allocation Report . . . . . . . . . . 14

7. The District's Power Rate . . . . . . . . . . 15

ARGUMENT . . . . . . . . . . 20

I. The Statute Unequivocally Commits To The Secretary Of The Interior The Determination Of What Costs Are Allocable To The District And That Determination Is Beyond Ordinary Judicial Review . . . . . . . . . . 20

II. Reclamation Is Required To Collect "All" Costs As Determined By The Secretary Of The Interior And The Meaning of "All" Is Plain . . . . . . . . . . 21

A. Applicable Principles of Statutory and Contract Interpretation . . . . . . . 21

B. The Plain Language of The Statute and The Repayment Contract Requires That The District Pay All Costs As Determined By The Secretary . . . . 23

III. Should The Court Determine That Either The Statute And/Or The Repayment Contract Are Ambiguous, The Court Should Defer To The Secretary's Interpretation . . . . . . . . . . 24

IV. The District's Contentions . . . . . . . . . . 27

A. The District's Power Rate Has Never Contained Transmission Costs For BPA Facilities . . . . . . . . . . 28

B. O&M "Joint-Use" Costs Are Part Of The Costs Of Furnishing Power From The Dalles Dam That Are Appropriately Charged to the District . . . . . 28

C. Depreciation Costs Are Part Of The Costs Of Furnishing Power From The Dalles Dam That Are Appropriately Charged To The District . . . . 31

D. The Lost Revenue Component Is A Power Cost Adjustment Necessitated By The Contract's Limit On Revisiting Rates Not More Than Once In Any Five-Year Period . . . . . 35

E. Fish And Wildlife Costs Incurred In Operating The Dalles Dam Are Part Of The Costs Of Furnishing Power From The Dalles Dam That Are Properly Charged To The District . . . . . 36

CONCLUSION . . . . . 38

TABLE OF AUTHORITIES

CASES

Allen v. Principi,
237 F.3d 1368 (Fed. Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Arizona Power Authority v. Morton,
549 F.2d 1231 (9th Cir. 1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Bostwick Irr. Dist. v. United States,
900 F.2d 1285 (8th Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

Casitas Mun. Water Dist. v. United States,
72 Fed. Cl. 746 (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,
467 U.S. 837 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Coast Fed. Bank, FSB v. United States,
323 F.3d 1035 (Fed. Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Flint v. United States,
906 F.2d 471 (9th Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Hercules Incorporated v. United States,
292 F.3d 1378 (Fed. Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Horowitz v. United States,
267 U.S. 458 (1925) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

Hughes Communications Galaxy, Inc. v. United States,
998 F.2d 953 (Fed. Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

Klamath Irrigation Dist. v. United States,
75 Fed. Cl. 677 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

Madison Galleries, Ltd. v. United States,
870 F.2d 627 (Fed.Cir.1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

NVT Technologies, Inc. v. United States,
370 F.3d 1153 (Fed. Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.,
545 U.S. 967 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25, 26

Peterson v. United States Dept of the Interior,
899 F.2d 799 (9th Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Rigsbee v. United States,
226 F.3d 1376 (Fed. Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Robinson v. Shell Oil Co.,
519 U.S. 337 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Seville Constr. v. United States,
35 Fed. Cl. 242 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Skidmore v. Swift & Co,,
323 U.S. 134 (1944) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

Stockton E. Water Dist. v. United States,
75 Fed. Cl. 321 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Sys. Fuels v. United States,
79 Fed. Cl. 37 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

The Hunt Construction Group, Inc. v. United States,
281 F.3d 1369 (Fed. Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Thermal Elec., Inc. v. United States, 25 Cl. Ct. 671 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

United States v. Mead Corp.,
533 U.S. 218 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25, 26

United States v. Swanson,
618 F.Supp. 1231 (E.D. Mich. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

United States v. Westlands Water Dist.,
134 F.Supp.2d 1111 (E.D. Cal. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

STATUTES AND REGULATIONS

Act of Aug. 13, 1914, ch. 247, § 5, 38 Stat. 687 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

Pub. L. No. 81-515, § 204, 64 Stat. 163, 179 (1950) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Pub. L. No. 86-745, 74 Stat. 882 (1960) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

16 U.S.C. § 832 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

16 U.S.C. § 1536(a)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

28 U.S.C. § 1491(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27, 29

33 U.S.C. § 576 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

43 U.S.C. §§ 372-573 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 26

43 U.S.C. § 485h . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

43 U.S.C. § 492 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| THE DALLES IRRIGATION DISTRICT, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 05-1042C |
| | ) | (Judge Lettow) |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT'S POST-TRIAL BRIEF**

Pursuant to the Court's April 30, 2007 scheduling order, defendant respectfully submits its post-trial brief in this case.

The Court must determine in this breach of contract case whether the Secretary of the Interior (the "Secretary"), through the Bureau of Reclamation ("Reclamation"), has properly set rates to recover its costs to furnish power to the plaintiff from The Dalles Dam, its reservoir, and powerplant. Congress expressly directed the Secretary to furnish power from The Dalles Dam for irrigation pumping and to set rates to recover from beneficiaries "all costs" associated with furnishing that power. This statutory language is repeated in the resulting "repayment contract" between the United States and the plaintiff, The Dalles Irrigation District (the "District"), which is the subject of the present litigation. Congress granted the Secretary the discretion to set the rate to recover power costs, requiring only that the rate not exceed "all" costs required to furnish the power from The Dalles Dam as properly allocable under Reclamation law.

That is precisely what has happened. We demonstrated at trial that the District's power rate is based upon two components: (1) O&M and depreciation costs at The Dalles Dam (divided by power generation at The Dalles Dam to determine a per-unit cost in mills per kWh); and (2) an adjustment which corrects under- or overpayment from the prior rate period, while

estimating future increases during the rate period to lessen the adjustment of under- or overpayment. The former is calculated by the U.S. Army Corps of Engineers (the "Corps") based upon its own statutory and regulatory mandates, while the latter is calculated by the Bonneville Power Administration ("BPA"). The components are reviewed for acceptance by Reclamation, which sets the rate and provides notice of the estimated usage and power charges to the District prior to the next annual billing cycle, as required by article 14(b) of the repayment contract. Def. Ex. 17 and 24.

Despite the plain language of the enabling statute and the resulting repayment contract, the District alleges that it should pay less than "all costs" for power furnished to it from The Dalles Dam. Specifically, the District alleges that the rate it pays for the power to pump irrigation water to approximately 6,000 acres of cherry orchards above the Columbia River should not include significant operation and maintenance ("O&M") costs allocated to power generation at The Dalles Dam, including the costs for operating and maintaining the dam and its reservoir. The District also alleges its power rate should not include depreciation costs of Federal property allocated to power generation at The Dalles Dam. The District further alleges that the multi-year power rate (which, pursuant to the repayment contract, may not be adjusted more than once in any five-year period) cannot be adjusted to reflect over- or under-payment of the actual cost of furnishing power to the District. Finally, the District alleges that costs of generating power at The Dalles Dam as a result of compliance with the Endangered Species Act should be passed to others. In sum, the District seeks to avoid statutory and contractual duties relating to its power costs by asking the Court to allow it to pay considerably less than the cost of furnishing it power from The Dalles Dam, thereby shifting the District's costs to other

regional power customers.[1]

Each of the District's claims are refuted by the plain language of the legislation authorizing construction and operation of The Dalles Irrigation Project and the resulting repayment contract executed between the United States and the District. The District's efforts to distort the record are insufficient to alter the express intent of Congress and the plain contractual requirements pertaining to the District's power rate.

## STATEMENT OF FACTS

### 1. Reclamation Law

To understand the District's breach of contract claim, an understanding of the repayment contract at issue is informative. As explained below, "repayment contracts" are the result of congressional desire to develop water resources in the arid West, primarily through socio-economic policies to support irrigated agricultural endeavors. The Reclamation Act of June 17, 1902, and related acts, provide the framework for much of the Federal involvement in irrigation. Congress committed broad discretion to the Secretary of the Interior in promoting the development of arid lands in the western United States by developing and constructing Federal irrigation projects. 43 U.S.C. §§ 372-573.

The Reclamation Project Act of 1939 requires that before construction of any Federal irrigation project, the Secretary of the Interior must submit a report to Congress addressing the engineering and financial feasibility of the project. 43 U.S.C. §§ 485 through 485h. The 1939

[1] For perspective, the District's actual power charge for 2003, the year it initiated the present lawsuit, was $50,963. Def. Ex. 17 at 11. Dividing this charge by the 6,000 assessed acres within the District (see testimony of District Manager Michael Richardson, Trial Transcript at 611) shows that the District paid just over $8.49 per acre to lift irrigation water hundreds of feet from the Columbia River to the orchard lands on the plateaus above the river. By comparison, the Feasibility Report estimated that, in 1959 dollars, power costs would be $25,700 annually, or $4.28 per acre if using the 6,000 acre figure. See Def. Ex. 2 at 18. In other words, between 1961 and 2004, on a per-acre basis, the District's power rate has increased from $4.28 per acre to $8.49 per accessed acre.

Act provides that if estimated construction costs of a proposed Reclamation project cannot be repaid by the beneficiaries in proportion to the benefits received, construction may only commence by an Act of Congress following the Secretary's submission of a feasibility report. 43 U.S.C. § 485h(a). Section 9(d) of the 1939 Act further provides that no irrigation water may be delivered via an irrigation project "until an organization . . . has entered into a repayment contract with the United States." 43 U.S.C. § 485h(d). Project construction costs allocated to irrigation "shall be included in a general repayment obligation of the organization" and "shall be spread in annual installments, of the number and amounts fixed by the Secretary. . . ." Id. In sum, the Federal Government incurred the capital costs for constructing irrigation projects, and then permitted the beneficiaries (irrigation districts and their patrons) to repay the capital costs of the irrigation project over time without interest.

A second cost associated with Federal irrigation project, separate and distinct from the capital costs for constructing a project, are those costs incurred in the operation and maintenance of the Federal project. Under reclamation law, when drafting and executing repayment contracts, the Secretary is directed by Congress to "require advanced payment of adequate operation and maintenance charges." 43 U.S.C. § 485e.[2] Reclamation law also requires that recipients of project water shall pay "an operation and maintenance charge based upon the total cost of operation and maintenance of the project or each separate unit thereof. . . ." 43 U.S.C. § 492. There are no general reclamation law provisions specific to recouping annual pumping power

[2] For an overview of Reclamation law as it pertains to O&M costs, see generally Forging a New Federal Reclamation Water Pricing Policy: Legal and Policy Considerations, Duane Mecham and Benjamin M. Simon, Summer, 1995, 27 Ariz. St. L.J. 507, at 513.

costs, which are viewed by the agency simply as part of project operation and maintenance costs when power is necessary for project operation.[3]

2. Legislative History Of The Dalles Irrigation Project

On June 1959, United States Senator Wayne Morse (D., Oregon) introduced Senate Bill 2195 ("S. 2195") to authorize the Secretary of the Interior to construct, operate, and maintain the western division of The Dalles Federal Reclamation Project (the "Project") for the purpose of providing an additional source of water to The Dalles Improvement District, the predecessor to the District . Defendant's Exhibit 1 ("Def. Ex.") at 2-3. In November 1959, Reclamation completed its feasibility report for the Project, which was submitted in final form to the Secretary of the Interior on May 24, 1960, by the Commissioner of Reclamation and delivered to Congress thereafter. Def. Ex. 2.

On June 13, 1960, the United States Senate Subcommittee on Irrigation and Reclamation held a hearing regarding the Project. Def. Ex. 1. The District was represented by its president, Mr. Don Bailey, its lawyer, and several other members. Def. Ex. 1 at III. At this hearing, representatives of the United States Department of Interior and the District discussed both the need for the additional water, and Reclamation's preliminary assessment, which stated that the District could pay all operation, maintenance, replacement, and power costs, in addition to approximately $2.5 million of the estimated $6 million construction cost. Id. at 5-6, 10-13, and 15-18.

On June 21, 1960, the United States Department of the Interior submitted to Congress "A Report on the Western Division, The Dalles Project, Oregon, Pursuant to Section 9(a) of the Reclamation Project Act of 1939" ("feasibility report"). On June 22, 1960, the feasibility report

[3] The repayment contract at issue specifically provides in article 14(a) that the project power supply is for the "purposes of operating and maintaining the project works." Def. Ex. 6 at 12.

was forwarded to the House Committee on Interior and Insular Affairs, recommending authorization based upon the economic and engineering feasibility as supported by the findings submitted to Congress through the feasibility report. Def. Ex. 2. The feasibility report explains how the Project would — if authorized — be constructed and how the United States would recover costs for construction, operation, and maintenance of the Project. The feasibility report specifically estimated that construction of the Project would cost approximately $5,649,00. Def. Ex. 2 at 36. Of the construction estimate, $17,600 was for the construction of fish screens that would not be allocated as an expense to be reimbursed by the District. Id. The feasibility report stated that all other costs would be specific to the Project and reimbursable by the District. Id. The feasibility report specifically identified the reimbursable Project construction cost as $5,631,400, of which the District would be responsible for repayment of $2,550,000. Id.[4] The remaining portion of the Project's construction cost would be subsidized by "surplus power revenues from the Federal power plants of the Columbia River System." Id. The proposal that the District would be responsible to pay only $2,550,000 of the estimated $5,631,000 construction costs was based upon its ability to pay, amortized over a 50-year period. Id.

The feasibility report also estimated that the District would incur approximately $89,000 in annual operating costs, as estimated in 1959, which included $58,200 for cost of salaries, wages, materials, and supplies required for operation and maintenance of Project features (less $1,700 for annual cost for the aforementioned fish screens that were determined to be nonreimbursable); $25,700 to purchase power (based upon a baseline 1-mill per kilowatt hour (kWh) rate); and $6,800 for replacement costs on major items. Id. One mill is the equivalent of $0.001 per kWh of energy used.

[4] "Project" facilities comprising the $5,649,000 construction costs are specific to the irrigation project, and represent no construction costs associated with The Dalles Dam. See, e.g., Def. Ex. 2 at XI, 13-17.

Power for operating the Project was to be obtained at The Dalles Substation "on the basis of production at The Dalles Dam." The feasibility report states that "this method of service will provide the lowest cost power for the project." Id. at 15, see also id. at 40 ("Results from these studies indicated that the lowest annual power cost would be obtained by adopting a plan in which power would be purchased from the Bonneville Power Administration at cost of generation at The Dalles Dam"). Subsequent to the Senate subcommittee hearing and the submission of the feasibility report to Congress, the Senate Committee on Interior and Insular Affairs, in Report No. 1752, prepared a report to accompany S. 2195. Def. Ex. 3. The report recommended passage of the bill with minor amendments, and specifically stated that "[a]ll costs except the $17,600 capital cost and $1,700 annual operating cost for the fish screen are allocated to irrigation and are reimbursable [by the District]." Id. at 3. Similarly, the House of Representatives Committee on Interior and Insular Affairs, in Report No. 2203, recommended approval of the Project and adopted the proposed repayment plans. Def. Ex. 4 at 3. The legislative history supports the fact that the District would be responsible for reimbursement of all costs, including the cost of power and energy for irrigation pumping generated at The Dalles Dam as determined by the Secretary of the Interior.

3. The Dalles Irrigation Project Authorizing Legislation

On September 18, 1960, Congress enacted Pub. L. No. 86-745, 74 Stat. 882, (1960), which authorized the Secretary of the Interior to construct, operate, and maintain the Project. The Act provides that the Project "shall consist of the following principal works: a main pumping plant to be located at a site on the Columbia River; a booster and relift pumping plant with reregulating reservoirs; and a distribution system." Def. Ex. 5. In Section 2(b), Congress provided that water users (i.e. the District) would repay construction costs of the Project

consistent with the requirements of section 9(d) of the Reclamation Project Act of 1939, 43 U.S.C. § 485h(d). Congress further determined that the construction costs for the Project "in excess of the amount determined by the Secretary to be within the ability of the irrigators to repay within a fifty-year period" would come from net revenues derived from power marketed by BPA. Def. Ex. 5 at 1.

Section 2(c) of the authorizing legislation directed the Secretary to furnish power for irrigation pumping purposes from The Dalles Dam. Section 2(c) in its entirety states:

> Power and energy required for irrigation pumping for the western division of The Dalles Federal reclamation project shall be made available by the Secretary from The Dalles Dam powerplant and other Federal plants interconnected therewith at rates not to exceed the costs of such power and energy from The Dalles Dam taking into account all costs of the dam, reservoir, and powerplant which are determined by the Secretary under the provision of the Federal reclamation laws to be properly allocable to such irrigation pumping power and energy.

The Dalles Dam is distinct and separate from The Dalles Irrigation Project. The Dalles Dam was authorized by Congress in the Flood Control Act of 1950, Pub. L. No. 81-515, § 204, 64 Stat. 163, 179, (1950), which authorized the Corps to construct and operate The Dalles Dam as a multi-purpose facility. In fact, Congress authorized The Dalles Dam more than a decade before authorizing The Dalles Irrigation Project. Power generated at the The Dalles Dam is transmitted and marketed by BPA, a Federal agency charged with marketing and transmitting power in excess of that reserved for direct project requirements from Federal generation facilities operated by both the Corps and Reclamation as part of the Federal Columbia River Power System. Bonneville Project Act of August 20, 1937, 16 U.S.C. § 832, as amended, and pursuant to Orders of the Secretary of the Interior No. 2563, dated May 2, 1950, and No. 2860, dated January 19, 1962. As the power marketing agency for Pacific Northwest Federal hydroelectric

projects, including The Dalles Dam, BPA receives accounting statements from each of the hydro-electric projects. In addition, BPA administers and operates the Federal transmission lines used to deliver power from The Dalles Dam to the Project. This is important, because it explains why Reclamation must work with BPA to furnish power for use by the District, and why the tally of costs incurred by the Corps at The Dalles Dam is necessary to determine the District's power rate.

In section 2(d) of the Project's legislation, Congress provided that, as determined by the Secretary, costs of constructing "the works authorized by this Act" allocated to fish and wildlife benefits were to be nonreimbursable. Def. Ex. 5 at 2. The only nonreimbursable costs for the Project allocated to fish and wildlife where the fish screens identified in article 8(c) of the repayment contract. See Def. Ex. 6 at 4.

4. The Repayment Contract

On October 19, 1961, the District and the United States entered into a repayment contract. Def. Ex. 6. The contract describes the Project works, incorporates relevant provisions of the enabling legislation, and estimates the cost of the Project works to be $6,000,000, excluding the $17,600 estimated to be the cost of fish screens and not allocable to the District. Def. Ex. 6 at Arts. 8-9.[5] Article 9 provides that the District is obligated to repay $2,550,000 in construction charges for the Project in fifty (50) successive annual payments. The Project works are specifically defined in the repayment contract as the facilities constructed to pump and

[5] When the District complains about allegedly having to pay for fish and wildlife costs, it is referring to the increased costs of production of power at The Dalles Dam due to Federal mandates, which require spilling a certain portion of water for the benefit of anadromous fish listed under the Endangered Species Act. To the extent such spillage reduces the amount of power generated without a commensurate reduction in the Corps' operation and maintenance expenses, it could tend to increase the cost per kilowatt hour. The cost of the fish screens referenced in both the legislation and repayment contract are associated with costs at the Project, rather than The Dalles Dam, and have never been an issue in this case.

deliver water to the District. Def. Ex. 6 at 3-4 (Art. 8(a)). The District does not dispute its construction repayment obligation. Tr. at 610:6-14 (Richardson).

In addition to this construction repayment obligation, article 14 of the contract addresses Reclamation's obligation to furnish power to the District for use in the operation and maintenance of the Project, the District's corresponding obligation to pay for the power, and identifies the initial power rate charged to the District:

> For the purposes of operating and maintaining the project works, the Secretary will make available to the District that power and energy required for irrigation pumping during the irrigation season from The Dalles Dam powerplant and other Federal powerplants connected therewith. The power and energy will be furnished to the District at the point where the project 12.5-kv electric distribution line is connected to The Dalles substation of the United States or at such other points as are agreed upon between the United States and the District, at rates per kilowatt-hour sufficient to cover <u>the costs of such power and energy from The Dalles Dam, taking into account all costs of the dam, reservoir and powerplant which are determined by the Secretary under the provisions of the Federal Reclamation Laws to be properly allocable to such pumping power and energy</u>. The initial rate shall be one (1) mill per kilowatt-hour. This rate of one (1) mill shall be effective for the first irrigation season and shall continue until such time as the Secretary determines, in accordance with the provisions set forth above, that a different rate is applicable. Such a determination shall not be made more frequently than once in any five-year period.

Def. Ex. 6 at 13 (emphasis added). As stated earlier, the underlined language above is virtually identical to the language contained in § 2(c) of the enabling legislation, Pub. Law No. 86-745, which provides that the rate will be based upon:

> [T]he costs of such power and energy from The Dalles Dam, taking into account all costs of the dam, reservoir and powerplant which are determined by the Secretary under the provisions of the Federal Reclamation Laws to be properly allocable to such irrigation pumping power and energy.

Def. Ex. 5 at 2. As explained in more detail below, until 1990, the District's power rate remained at the initial 1-mill per kWh rate as set forth in Article 14(a) of the contract. The District has acknowledged that the 1-mill rate was the effective "floor" for the power rate. See Def. Ex. 15 at 2 ("Prior to 1989 TDID was charged at the rate of 1 mil per kWh. That was the original contemplation in the agreement with you.").

While article 14(a) sets forth the basis for determining the power rate, article 14(b) sets forth the procedure for annual power charges. Article 14(b) provides that the District will pay annual power charges in advance based upon an annual estimate by the Secretary. This article also provides that whenever the advance charges paid by the District are inadequate to cover the actual costs of furnishing power, the Secretary may issue a supplemental notice stating the amount of additional funds required. If the District advanced funds in excess of the actual charges, the surplus shall be credited to the power charge due from the District in succeeding years. Def. Ex. 6 at 14.

In implementing article 14(b), Reclamation bases the District's annual power charges upon the estimated power usage (in kWh) by the District in advance of each irrigation season multiplied by the power rate, as determined under the provisions of article 14(a). These advance notices of power charges dating from 1990 are provided in Defendant's Exhibits 17 and 24. Once actual power usage (in kWh) is determined at the end of each irrigation season, actual usage is multiplied by the power rate to determine whether the estimated charges resulted in an over- or under-recovery of charges, as demonstrated in the annual notice of power charges issued to the District. See Def. Exs. 17 and 24.[6]

---

[6] For example, the notice of pumping power charges for 1999 contains a line showing the District's actual charges for 1998 (14,662,384 kwh of usage at the rate of 1.31. mills, or $19,208)

5. Reclamation's Definite Plan Report

Following execution of the repayment contract, Reclamation prepared its Definite Plan Report of August 1962 ("DPR") for The Dalles Irrigation Project, a report that summarized the contract and set forth the construction plan. The DPR, among other things, explained that, as a result of discussions with BPA, BPA agreed to waive costs incurred in the operation and maintenance of substation and transmission facilities used in the transmission of power to the District. Def. Ex. 7 at 3, 9. The District attaches significance to the DPR as support for its claim that it is precluded from "cost sharing . . . jointly used facilities." Pl. Closing Argument at 2, 7; see also Compl. ¶ 5 ("The costs of such power and energy from The Dalles Dam excluded cost sharing for other projects and usages").

The DPR states that Reclamation had been advised by BPA's administrator "that his recently enunciated policy of cost share of the annual operation, maintenance, and replacement costs of jointly used facilities will not apply to this project." Id. at 3. The DPR explains that BPA will make to Reclamation a "nonappropriation transfer" of the cost of transmission facilities constructed by BPA to provide power to the Project. Id. at 9. This transfer included $32,230 "representing the Bureau's proportionate investment in the jointly used transmission facilities." Id. at 7 (emphasis added). Thus, the "jointly used" facilities referenced in the DPR are BPA transmission facilities, and the DPR is silent as to the power generation facilities at The Dalles Dam, which is administered and operated by the Corps.

The "recently enunciated policy" referenced in the 1962 DPR only applied to jointly used transmission facilities, a fact that is even more obvious when viewed in context with a series of letters exchanged between Reclamation and BPA the prior year. BPA first articulated the

---

along with the estimated charge that the District has paid the previous year ($20,308). In that year, the District received a credit of $1,100 for overpayment of charges based upon actual usage. Def. Ex. 17 at 3.

"recently enunciated policy" in a September 1961 letter to Reclamation. Def. Ex. 20. In this letter, a BPA manager describes the power transmission facilities that will be required to furnish power to the Project, and then advises that Reclamation would compensate BPA for both transmission facilities used solely by Reclamation for service to project irrigators, as well as a proportionate share for "joint use facilities." Id. at 2. "Joint use" facilities in this context would be transmission facilities used by BPA to transmit power to Reclamation for the Project, as well as to transmit power to other BPA customers. See, e.g., Tr. 177:5-10 (Jones).

Previously, BPA had not charged Reclamation costs associated with jointly used transmission facilities. Therefore, the September 1 letter prompted Reclamation's Regional Director, H.T. Nelson, to issue a December 1, 1961 letter to BPA's administrator asking BPA to "withhold the application of your new policy" relating to cost-sharing of BPA transmission facilities as it applied to the Project. Def. Ex. 21. On December 13, BPA's administrator, Charles Luce, responded to Nelson, agreeing to "waive the annual costs of the facilities used for Bureau service with the understanding that the capital investments mentioned in Mr. Mangan's letter for September 1, 1961, will be transferred to the Bureau's books." Def. Ex. 22.

Thus, BPA would provide power transmission services to Reclamation while waiving its recently enunciated policy of charging Reclamation projects a proportionate share of costs for jointly used transmission facilities. In return, BPA, which at that time was an agency within the Department of the Interior, would transfer capital costs for the transmission facilities to Reclamation. See Tr. 352-53 (Bolin). The Reclamation-BPA agreement effectively insulated The Dalles Irrigation Project from transmission costs, and thus alleviated the need to pass those costs on to the District. The District has never been charged transmission O&M costs. Tr. 178:3-13 (Jones), 341:14-25 to 342:1-8 (Bolin). While it is true that in the early 1980s, Reclamation

contemplated including transmission O&M costs when determining the District's power rate, the District protested and Reclamation ultimately determined that because of the language contained in the DPR and the 1962 letters between BPA and Reclamation, Reclamation would not seek to include transmission O&M costs for jointly used facilities. Id.; Pl. Ex. 40.

6. The Corps' Cost Allocation Report

In 1967, the Corps prepared for Congress its Cost Allocation Report, which allocated costs at The Dalles Dam between the authorized purposes of power generation and navigation, based upon the total benefits received by each purpose. Def. Ex. 9. The 1967 Cost Allocation Report remains in effect today. The costs allocated in the report include both "specific" costs and "joint" costs at The Dalles Dam. "Specific" costs are assigned among power, navigation, and recreation. Any cost determined in the report to be "specific" is recoverable only from that specific purpose. For example, the navigation locks at The Dalles Dam benefit only one feature of the dam – navigation – and therefore any cost incurred for navigation locks is allocated solely to navigation, and not to power generation.

"Joint" costs are those that benefit both power generation and navigation at The Dalles Dam. The Cost Allocation Report specifies that all "joint costs" are to be allocated between power generation and navigation.

Both "specific" costs and "joint" costs are further divided between "capital costs," those incurred in building The Dalles Dam and any major upgrades, and "operation and maintenance expenses." Capital costs are recovered through depreciation of those various assets, while O&M cost are recovered as they occur. Def. Ex. 9 at 30-31; Tr. at 260:305, 270-275 (Miller) and 742-748 (Dinan), Def. Demonstrative Exhibits 2, 3. Annual O&M costs for "joint-use" features are allocated 28 percent to navigation and 72 percent to power; capital costs, in the form of

depreciation, are allocated 26 percent to navigation and 74 percent to power. Def. Ex. 9 at 26; Def. Demonstrative Ex. 2. In comparison, costs of "specific" features at The Dalles Dam are allocated 100 percent to that feature. Id. at 24; Tr. at 271 (Miller). Reclamation relies upon the Corps' cost allocations for The Dalles Dam to determine costs of furnishing power from that facility to the Project. Tr. 243: 11-22 (Kaiser).

The District suggests that the Corps's Cost Allocation Report is merely "an interesting historical footnote." Pl. Closing Argument at 11. The District fails to appreciate that the report provides the framework for how the costs at The Dalles Dam are allocated and that the allocations are binding upon the Corps. Tr. 270-276 (Miller).

In sum, the Federal irrigation facility is The Dalles Irrigation Project, see Def. Ex. 5, and the Federal power generation facility is The Dalles Dam, see Def. Ex. 9. The District's power rate exclusively addresses costs for furnishing power from The Dalles Dam, as so provided in article 14 of the repayment contact, while capital costs and O&M costs for delivery of irrigation water are provided in articles 8-9 and 12-13 of the repayment contract. Def. Ex. 6.

7. The District's Power Rate

The District's power rate remained at the initial 1 mill per kWh from the time the repayment contract was executed in 1961 until 1990. The 1 mill rate was recognized by both parties as the "floor" for the power rate. See Def. Ex. 15 at 2 (providing written assertion of the District's attorney that: "It is possible, of course, that the actual rates . . . are below 1 mil per kilowatt hour, but my client believes that it is obliged to maintain that 1 mil per kilowatt hour rate, under its agreement with you."); see also, Tr. 610:2-5 (Richardson).[7]

[7] The District appears to have reversed its view on this matter and, in fact, devotes substantial portions of its closing argument discussing power costs in the 1970s and 1980s. The reality is that both parties treated the 1 mill rate in section 14(a) of the repayment contract as the

In 1990, the Department of the Interior's Assistant Secretary for Water and Power determined the cost for furnishing power to the District exceeded the 1 mill rate, and approved a new power rate formula to determine the appropriate cost of the District's power from The Dalles Dam. Pl. Ex. 7. When advised at this time of the rate increase and adoption of the new rate formula, the District initially questioned the rate increase and new formula. Pl. Ex. 62. The District ultimately accepted, or at a minimum acquiesced to, the new power rate and new formula for more than a decade before raising the issue again in 2001. See Pl. Ex. 19.

Between 1990 and 2007, Reclamation revised the rate four times pursuant to the 1990 formula. Def. Ex. 8 at 18, 25, 29, 33. The rate has been revised approximately once every five years pursuant to article 14(a) of the repayment contract, which provides that the rate can only be changed "once in any five-year period." Def. Ex. 6 at 13. The District's rate was 1.227 mills per kWh for 1990-1994; 1.31 mill for the 1995-2000; 2.58 mill for 2001-2006; and presently 5.07 mill. Def. Ex. 8 at 18-36.[8] The District's rate remains one of the lowest rates for Reclamation's

---

applicable rate until the Secretary determined a higher rate would apply. Def. Ex. 15. Furthermore, the District's complaint also expressly seeks damages only from 1998.

[8] In its closing argument, the District inappropriately accuses Federal officials of "intentionally" tampering with a Federal record sent by Reclamation to the District in 2006. The District claims that Reclamation "erased" the footnotes on page three and the entire fourth page of the 2006 rate revision document. Pl. Closing Argument at 5. The District's claim is not only baseless, but absurd. The "evidence" cited by the District, Plaintiff's Exhibit 77, is not the document that Reclamation sent to the District. Rather, it is a copy of that document that was sent via facsimile at least two times – once on October 2003, 2006, presumably from the District's office in The Dalles to its attorney's office in Portland and again from the law firm of Shenker & Bonaparte to, presumably, Carol Opatrny, the District's expert witness. At page five of Plaintiff's Exhibit 77, the document essentially ends after the first line of footnote 1, begging the question: if Reclamation intentionally tampered with this document, why did it not "erase" all the footnotes, instead of leaving an interrupted sentence? If Reclamation actually tampered with the document before sending it to the District, then it was incumbent upon the District to produce the original document, rather than a copy of the original that had been transmitted via facsimile at least twice. The District might also have considered that the footnotes at the bottom of page three of Plaintiff's Exhibit 77 and the missing fourth page are identical in all material aspects to the previous rate revisions which the District had received since 1990. See Def. Ex. 8

Pacific Northwest Region.[9] Each time the rate was revised, the District received notice of the change to Exhibit B of the Memorandum of Understanding ("MOU") between Reclamation and BPA that enabled Reclamation to furnish power from The Dalles Dam to the District. See, e.g., Pl. Ex. 56, 57A.

The power rate for the District contains two components: (1) O&M and depreciation costs at The Dalles Dam (divided by power generation at The Dalles Dam to determine a per-unit cost in mills per kWh); and (2) the lost revenue component. O&M and depreciation costs are further separated between "specific" and "joint" or "multi-purpose" costs, as discussed previously. Consistent with the Project's authorizing legislation and the repayment contract between Reclamation and the District, the power rate reflects "all costs" of The Dalles Dam powerplant, dam, and reservoir "properly allocable" to the District.[10]

---

at 18-32. In sum, the only reasonable explanation is that the absence of the bottom portion of page three and all of page four of Plaintiff's Exhibit 77 occurred after receipt by the District and during copying and/or facsimile transmissions among the District, its attorney, and its expert witness. The District's baseless accusation that Reclamation intentionally tampered with a Federal record is irresponsible. The District's own manager refused to testify under oath that he accepted the "intentional tampering" theory raised in the District's closing argument. See Tr. at 607-608 (Richardson).

[9] For example, the wholesale power rate for BPA preference customers is about 30 mil per kWh. See, e.g., Tr. at 751:14-19 (Dinan). Compare also the power rate for the Ochoco Irrigation District, part of Reclamation's Crooked River Project in Oregon, as illustrated in Plaintiff's Exhibit 83 at 3. That project's power rate for 2006 was revised to 14.49 mill, compared to The Dalles Irrigation Project's rate of 5.06 mill. See Def. Ex. 8 at 33. While the rate formulas for these two projects are nearly identical, the cost data is different. Nonetheless, the District's costs certainly do not suffer when compared to similarly situated districts.

[10] As stated earlier, though also properly allocable to the District under the repayment contract and enabling legislation, the District is not charged for transmission of the power from The Dalles Dam to the Project.

The "lost revenue component" adopted by Reclamation for the District's power rate was fully described in the 1990 revision to the MOU between Reclamation and BPA, and in all revisions thereafter.[11] Def. Ex. 8 at 18-19, 25-26, 29-30, 33-34. Simply put, the District's power rate by contract may not be revised more than once in any five-year period. But between rate periods, costs do not remain stagnant, and thus must be adjusted when the next rate is established.

The lost revenue component serves two functions. First, it serves as a "true-up" for the prior rate period by accounting for the difference between the prior rate and actual costs incurred at The Dalles Dam for the previous five year period. This "backward-looking" part of the lost revenue component includes a calculation to reflect the time-value of money. In other words, if the previous rate was lower than the actual power generation costs, the United States would recover that difference based upon the present-day value of money. In the event that the previous rate was higher than actual costs over the previous five years, the District would be credited with the present-day value of money. See Def. Ex. 8 at 18-19; Tr. at 749:3-21, 752 (Dinan).

Second, the lost revenue component is designed to anticipate future cost increases to narrow the difference between the power rate and actual power generation costs. Any rate-setting formula must take into account future cost increases. This "forward-looking" part of the lost revenue component must confront variables such as weather, inflation, and anticipated repairs, among other costs. While the "forward-looking" part of the lost revenue component has

[11] Admittedly, the lost revenue component is poorly named, for it does not recoup any revenue at all. It merely serves as a tool to recover "all costs" in any given year since the rate cannot be changed more than once every five years but the cost of power production changes annually.

generally underestimated actual power generation costs at The Dalles Dam in the past, the "backward-looking" part of the component corrects past under-estimations. Tr. at 752:2-16 (Dinan). But the end result is the same. Over time, the District is responsible only for the actual cost of power generated at The Dalles Dam. The lost revenue component will credit the District if a prior rate is over-estimated, just as it allows the United States to collect the difference between the rate and actual costs when the rate is under-estimated. This result is precisely what the repayment contract and the authorizing legislation require.

Another way to understand the power rate is that its ultimate result is to recover all costs for furnishing power to the District from The Dalles Dam. The actual cost of furnishing power is not static, and can change from moment to moment. The intent of the rate is to charge the District, over time, the exact cost of power production at The Dalles Dam. See Tr. at 752:25 to 753:2 (Dinan).

In sum, the power rate formula adopted in 1990, and used since that time, was designed to better ensure that the District pay its proper share of "all" costs allocated to power generation at The Dalles Dam, and, thus effectuates both the enabling legislation and the repayment contract.

ARGUMENT

I. The Statute Unequivocally Commits To The Secretary Of The Interior The Determination Of What Costs Are Allocable To The District And That Determination Is Beyond Ordinary Judicial Review

The legislation authorizing The Dalles Irrigation Project states:

> Power and energy required for irrigation pumping for the western division of The Dalles Federal reclamation project shall be made available by the Secretary from The Dalles Dam powerplant and other Federal plants interconnected therewith at rates not to exceed the costs of such power and energy from The Dalles Dam taking into account all costs of the dam, reservoir, and powerplant which are determined by the Secretary under the provision of the Federal reclamation laws to be properly allocable to such irrigation pumping power and energy.

Pub. L. No. 86-745, § 2(c) (emphasis added) (Def. Ex. 5). Article 14(a) of the contract states:

> For the purposes of operating and maintaining the project works, the Secretary will make available to the District that power and energy required for irrigation pumping during the irrigation season from The Dalles Dam powerplant and other federal powerplants connected therewith. The power and energy will be furnished to the District at the point where the project 12.5-kv electric distribution line is connected to The Dalles substation of the United States or at such other points as are agreed upon between the United States and the District, at rates per kilowatt-hour sufficient to cover the costs of such power and energy from The Dalles Dam, taking into account all costs of the dam, reservoir and powerplant which are determined by the Secretary under the provisions of the Federal Reclamation Laws to be properly allocable to such pumping power and energy.

(emphasis added). Def. Ex. 6.

Both the statute and the contract commit to the discretion of the Secretary the determination of what costs are allocable to the District. Congress' intentionally broad grant of authority to the Secretary does not provide any meaningful guidelines for judicial review, which, absent a showing of bad faith, counsels against second-guessing agency action unless clearly unreasonable. See, e.g., Flint v. United States, 906 F.2d 471 (9th Cir. 1990) (in construing the

provision of 43 U.S.C. § 485h(e), the court held that pursuant to 5 U.S.C. § 701(a)(2) (the Administrative Procedure Act), judicial review of the secretary's discretionary determination of a maximum charge was not available); Arizona Power Authority v. Morton, 549 F.2d 1231 (9th Cir. 1977) (holding the 43 U.S.C. § 485h(c) precluded judicial review of the Secretary's discretion in terms of selecting geographic preference for customers).

The authority of the Secretary to enter into repayment contracts pursuant to section 9(d) of the Reclamation Act of 1939 was codified between the two previously cited sections at 43 U.S.C. 485h(d). Given that courts have declined to review the Secretary's discretionary determinations under sections 9(c) and 9(e) of the 1939 Act, codified at 43 U.S.C. § 485h(c) and (e), respectively, it would also be proper to conclude, similarly, that for actions taken pursuant to section 485h(d), judicial review is limited to whether the secretary acted unreasonably. Moreover, section 485h(d) only specifies obligations involving the capital construction requirements of a project, which are not at issue in this case, those enumerated obligations are not exhaustive and the only requirement is that the Secretary enter into repayment contracts that are "satisfactory in form and powers [to the Secretary]." Given the legislative design of section 485h as a whole, and other court decisions construing that judicial review is not available for sections 485h(c) and (e), this Court should find as a matter of law that this broad grant of authority to the Secretary precludes judicial review of the Secretary's determination of the proper costs charged to the District.

## II. Reclamation Is Required To Collect "All" Costs As Determined By The Secretary Of The Interior And The Meaning of "All" Is Plain

### A. Applicable Principles of Statutory and Contract Interpretation

Assuming that this Court finds that judicial review of the Secretary's exercise of discretion is available, the plain language of both the statute and article 14(a) of the repayment

contract are not reasonably susceptible to more than one meaning so as to render them ambiguous.

In questions of contract interpretation, the inquiry begins "with the language of the written agreement." NVT Technologies, Inc. v. United States, 370 F.3d 1153, 1159 (Fed. Cir. 2004); Stockton E. Water Dist. v. United States, 75 Fed. Cl. 321, 352-53 (2007); United States v. Westlands Water Dist., 134 F.Supp.2d 1111, 1134-35 (E.D. Cal. 2001). The language of the contract must be given its plain meaning, and the contract "must be considered as a whole and interpreted so as to harmonize and give reasonable meaning to all of its parts." Coast Fed. Bank, FSB v. United States, 323 F.3d 1035, 1038 (Fed. Cir. 2003) (en banc). "[T]he plain and unambiguous meaning of a written agreement controls." Hercules Incorporated v. United States, 292 F.3d 1378, 1380-81 (Fed. Cir. 2002). "When the contract language is unambiguous on its face, [the Court's] inquiry ends, and the plain language of the contract controls." The Hunt Construction Group, Inc. v. United States, 281 F.3d 1369. 1372 (Fed. Cir. 2002).

In a contract, all means all. Seville Constr. v. United States, 35 Fed. Cl. 242, 246 (1996) ("all means all and not substantially all") (emphasis added) (citations omitted); see, e.g., United States v. Swanson, 618 F.Supp. 1231, 1239 (E.D. Mich. 1985) (a contract that contained the language "if the Secretary determines that the extension is consistent with the needs of the National Health Scholarship Corps" meant that the determination "is within the sole discretion of the Secretary.").

Moreover, "governmental contracts should be interpreted against the backdrop of the legislative scheme that authorized them, and [the] interpretation of ambiguous terms or implied covenants can only be made in light of the policies underlying the controlling legislation." Peterson v. United States Dept of the Interior, 899 F.2d 799, 807 (9th Cir. 1990).

As stated earlier, the provision of the repayment contract at issue, Section 14(a) is practically taken verbatim from the statute, which necessarily entails that this Court apply principles of statutory construction. Sys. Fuels v. United States, 79 Fed. Cl. 37 (2007) (where a contract implements or fulfills a statutory requirement, the interpretation of the contract will be guided by the underlying statute).

To interpret a statute, courts must first look to the statutory language and then to the legislative history only if the statutory language is unclear. Allen v. Principi, 237 F.3d 1368, 1375 (Fed. Cir. 2001); Rigsbee v. United States, 226 F.3d 1376, 1378-79 (Fed. Cir. 2000); Madison Galleries, Ltd. v. United States, 870 F.2d 627, 629 (Fed.Cir.1989). If the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case, the court must give effect to the statutory language. Robinson v. Shell Oil Co., 519 U.S. 337, 340 (1997); Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837 (1984).

B. The Plain Language of The Statute and The Repayment Contract Requires That The District Pay All Costs As Determined By The Secretary

As shown earlier, the authorizing legislation in this case states that the District is to pay "all costs . . . properly allocable to such irrigation pumping power and energy" as "determined by the Secretary." And, article 14(a) of the repayment contract reiterates the statutory command that costs "which are determined by the Secretary" as "properly allocable" are to be paid by the District. This language is clear and unambiguous, and it specifically provides that the Secretary's determination of allocable costs is within his sole discretion and commits to him the authority to determine the District's rate. The fact that the District may have its own interpretation of the contract does not necessarily render the terms ambiguous. Thermal Elec., Inc. v. United States, 25 Cl. Ct. 671, 673 (1992) (the mere fact that the parties involved do not

agree upon the meaning of the language in a contract does not necessarily render the language ambiguous).

Because the terms of the enabling legislation and conforming repayment contract are unambiguous as a matter of law, the Secretary is to exercise his discretion in determining what costs are properly allocable to the District.

The conduct of the parties, since at least 1990, does not contradict the plain meaning of the language requiring the collection of all costs. Nor does anything in the repayment contract itself serve to relieve the District of paying its fair share for the power generated at The Dalles Dam.

III. Should The Court Determine That Either The Statute And/Or The Repayment Contract Are Ambiguous, The Court Should Defer To The Secretary's Interpretation

We demonstrated above that the plain language of the statute and the repayment contract requires that the District's rate be based upon "all" allocable costs (as determined by the Secretary). Should this Court find that the words "taking into account all costs of the dam, reservoir, and powerplant which are determined by the Secretary under the provision of the Federal reclamation laws to be properly allocable to such irrigation pumping power and energy," are susceptible to more than one meaning, then the Court should hold that the Secretary's reasonable interpretation is controlling.

This is called Chevron deference. As our Supreme Court noted in a recent case,

> In Chevron, this Court held that ambiguities in statutes within an agency's jurisdiction to administer are delegations of authority to the agency to fill the statutory gap in reasonable fashion. Filling these gaps, the Court explained, involves difficult policy choices that agencies are better equipped to make than courts. . . . If a statute is ambiguous, and if the implementing agency's construction is reasonable, Chevron requires a Federal court to accept the agency's construction of the statute, even if the agency's

> reading differs from what the court believes is the best statutory interpretation.

Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs., 545 U.S. 967, 980 (2005) (internal citations omitted).

Federal reclamation law directs the Secretary to charge users of water from Federal irrigation projects rates that recover "the total cost of operation and maintenance of the project." 43 U.S.C. § 492, Act of Aug. 13, 1914, ch. 247, § 5, 38 Stat. 687. The repayment contract plainly provides that "power" is an operation and maintenance cost. Def. Ex. 6 at 12 ("For the purposes of operation and maintaining the project works, the Secretary will make available to the District that power and energy required for irrigation pumping . . ."). The Secretary has determined that "all costs" for furnishing power includes O&M and depreciation costs at The Dalles Dam, including the dam, powerhouse, and reservoir, that have been allocated to the power generation function. Pl. Ex. 7; Def. Ex. 8 at 18.

Since Congress entrusted the Secretary of the Interior with implementing reclamation, these rules of statutory construction require that the Court grant the Secretary broad deference in determining what the District's power rate should be.

When raised at trial, the Court questioned whether Chevron deference was appropriate since there was no formal rulemaking involved in this case, suggesting that perhaps another type of deference was warranted. Tr. 731: 5-21. The District, of course, claims that the Secretary should be given no deference. Pl. Br. at 15.

There is no requirement that an agency make formal rules, after notice-and-comment, as a predicate to Chevron deference. The Supreme Court's decision in United States v. Mead Corp., 533 U.S. 218 (2001), did not create such a requirement. Rather, the Court in Mead identified notice-and-comment rulemaking as one way where Congress evinces its desire for an

agency to make rules carrying the force of law and that the agency interpretation claiming deference was promulgated in the exercise of that authority. Mead, 533 U.S. at 230-231 (while "the overwhelming number of our cases applying Chevron deference have reviewed the fruits of notice-and-comment rulemaking or formal adjudication," the absence "of that procedure here does not decide the case, for we have sometimes found reasons for Chevron deference even when no such administrative formality was required and none was afforded."). In other words, delegation of such authority may be shown in a variety of ways, including an agency's power to engage in adjudication or notice-and-comment rulemaking, or by some other indication of a comparable congressional intent. See also Nat'l Cable & Telecomms. Ass'n, 545 U.S. at 1004 (Breyer, J., concurring) (Chevron deference not predicated upon an agency's formal rulemaking).

In few other areas outside of reclamation law, does Congress so clearly speak to the Secretary of the Interior's authority to act with respect to fulfilling its mandate. Starting with passage of the 1902 act, Congress has committed broad discretion to the Secretary of the Interior in promoting the development of arid lands in the western United States by developing and constructing irrigation projects. 43 U.S.C. §§ 372-573.

Just as Congress may direct the Secretary to promulgate rules which may later enjoy Chevron deference, Congress, here, directed the Secretary of the Interior to enter into repayment contracts "in a form satisfactory to the Secretary." 43 U.S.C. § 485h(d)(1).

Clearly Congress' intent was to commit to the Secretary, in very broad terms, discretion over the provision of power to irrigation districts.[12]

[12] Even if the Court determines that Chevron deference is not warranted, it should nonetheless defer to the Secretary's determination of what components go into the rate under the lesser deferential standard set forth in Skidmore v. Swift & Co,, 323 U.S. 134 (1944), which was left intact even after Mead, 533 U.S. 218.

Once it is established that Congress entrusted the agency to act in its stead, the Court must determine whether the Secretary's interpretation of what components go into the rate constitute a reasonable choice by the Secretary. The components are simply the unadulterated costs of production at The Dalles Dam plus a power cost adjustment (the lost revenue component). This question is easily answered in the affirmative given that the Corps facility produces the power and passes its cost information on to BPA which, in turn, passes that information, along with the power cost adjustment, to Reclamation for review and to ultimately set the District's power rate.

IV. The District's Contentions

The two claims in the complaint filed with this Court allege a breach of contract and request a declaration that the District not be charged for any costs of power and energy "other than those provided by the contract between the parties." Pl. Compl. at 4.[13] This necessarily distils the issue before this Court to an interpretation of the authorizing statute and conforming contract term – section 14(a).

The District raises a number of allegations in its disjointed, often stream-of-consciousness, Closing Argument, which bear noting here. The District at least implies that the following costs should not be included in its rate: (1) O&M transmission costs for jointly used facilities furnishing power from The Dalles Dam to the Project; (2) O&M costs for jointly-used facilities at The Dalles Dam; (3) costs for capital expenses, in the form of depreciation, allocated to power generation at The Dalles Dam; (4) the lost revenue component that serves to "true-up" over- or underpayment of charges incurred during each five-year rate period; and (5) "fish and wildlife" costs resulting from the operation of The Dalles Dam for power generation purposes.

[13] Subject to narrow exceptions, this Court does not have jurisdiction to award declaratory relief in Tucker Act cases. 28 U.S.C. § 1491(a).

Every cost contained within the District's power rate reflects a cost properly allocated under reclamation law to furnish power from The Dalles Dam. Thus, the District's arguments should be rejected.

A. The District's Power Rate Has Never Contained Transmission Costs For BPA Facilities

To the extent that the District asserts the contrary, this contention is wholly without merit. As demonstrated above, the District has never been required to pay for the operation and maintenance costs of the transmission facilities used to deliver power to the Project.

B. O&M "Joint-Use" Costs Are Part Of The Costs Of Furnishing Power From The Dalles Dam That Are Appropriately Charged to the District

As demonstrated above, The Dalles Dam is a multiple-purpose project authorized to generate power and facilitate navigation upon the Columbia River, and certain facilities at The Dalles Dam serve a specific purpose. For example, the locks benefit the navigation function but provide no benefit to power generation, and therefore no O&M costs for those navigation locks are allocated to power. The powerplant benefits power generation but provides no benefits to navigation, and no O&M costs are allocated to navigation. Conversely, other features and functions benefit both navigation and power generation – the so-called "joint-use" facilities. See Def. Ex 9. An example of a "joint" cost is the reservoir. The reservoir benefits both power generation and navigation – without the reservoir there would be no power generation nor would there be any navigation benefit. Because both of these purposes require the reservoir, the costs associated with the reservoir allocated to each of these uses as a "joint" cost. Indeed, in the Project's authorizing legislation, Congress stated that the power rate is not to exceed the cost of furnishing power from The Dalles Dam "taking into account all costs of the dam, reservoir, and power plant which are determined by the Secretary under the provisions of the Federal reclamation laws to be properly allocable to such irrigation pumping power and energy." Def.

Ex. 5 at 2. The resulting repayment contract repeats this same language. In the face of the plain language of the statute and the contract, the District now argues that it has not agreed to pay O&M costs allocated to power generation from the dam, reservoir, and any other "joint-use" feature.

The District's argument that joint-use O&M generation costs ought to be excluded from its power rate is premised upon its misunderstanding of language in Reclamation's Definite Plan Report. Def. Ex. 7 at 3. As explained at trial, the portion of the DPR which states "[the] recently enunciated policy of cost sharing . . . of jointly used facilities" (the language upon which the District relies to make its case for nonpayment of joint-use O&M generation costs), referred only to transmission costs. Def. Ex. 7 at 9. The District and its expert fail to explain why the second to last paragraph on page 9 of the DPR mentions only transmission facilities. Id. Similarly, the 1962 letters, when read together, explain that the policy being referred to dealt with transmission costs. See ante at 12-14.

The District also attempts to imbue with authority a BPA-generated document identified as "USBR Reserved Power and Energy: Brief History of Five Memoranda of Understanding." Pl. Ex. 31. The District's reliance upon the document is misplaced because it is nothing more than a recitation of issues and a brief history based upon the understanding of Ms. Sue Garifo, the BPA employee tasked with compiling historic documents and identifying issues to raise with Reclamation when the two Federal agencies discussed reserve power charges for five Federal irrigation projects, including The Dalles Irrigation Project. Tr. 56-57 (Garifo).

The District erroneously contends that the "Regional Director of the Bureau of Reclamation approved Exhibit 31, Sue Garifo's [1990] report." Pl. Closing Argument at 1

(brackets in original).[14] This is at odds with the plain language of the transmittal letter that appears on the first page of Plaintiff's Exhibit 31. The letter is a response to a BPA district manager by Reclamation's Regional Director who agrees that there are issues the two agencies need to discuss and negotiate relating to the MOUs. Nowhere in the letter does the Regional Director "approve" the attached document. Indeed, Ms. Garifo also testified that the transmittal letter was "an agreement to proceed to negotiate" between the two agencies. Tr. at 59:12-15; see also 61:18-23 (Garifo). Of course, the brief history Ms. Garifo prepared cannot bind the Government or trump the plain language of the authorizing legislation and repayment contract associated with The Dalles Irrigation District.[15]

The District's expert witness, Ms. Carol Opatrny, offers an even more disconnected rationale for excluding "joint-use" O&M costs from the power rate. Ms. Opatrny testified that it was her opinion that generation O&M costs should be excluded because "irrigation" was only an "incidental benefit" of the Corps's The Dalles Dam. Tr. at 665:19-25 to 666:3. While Ms. Opatrny may be correct that irrigation is an "incidental benefit" and not an authorized purpose of The Dalles Dam, she fails to appreciate that irrigation is the authorized purpose of The Dalles Irrigation Project. She also fails to appreciate that the Corps' report allocates certain costs to

---

[14] The District compounds its misstatement by claiming that the "adoption of the BPA report is a binding admission." Pl.'s Closing Argument at 6. As already shown, there was no "adoption" by Reclamation of Plaintiff's Exhibit 31, merely an acknowledgment that it raised issues that BPA and Reclamation would need to discuss at a later time.

[15] The District's reliance upon the August 3, 1961 letter cited in Plaintiff's Exhibit 31 (which appears as Plaintiff's Exhibit 64) is further misplaced. A full reading of that document shows that the cited text refers specifically to Reclamation's Chief Joseph Project, and discusses The Dalles Irrigation Project secondarily. Exhibit 64 further represents an early position taken by Reclamation's legal counsel that pre-dates the repayment contract as well as the ultimate agreement between BPA and Reclamation later that same year regarding costs associated with reserve power furnished to The Dalles Irrigation Project. In sum, Plaintiff's Exhibit 64 is primarily directed toward a different project and further is not consistent with the agreement reached in the repayment contract at issue.

power generation, and those are the costs that are pertinent to the cost of furnishing power to the District.

Both the authorizing legislation and the repayment contract unambiguously include allocated costs for facilities and functions that serve power generation purposes. The District's argument is contrary to the plain language of the statute and contract, and is contrary to the power rate that the District has accepted since 1990. See Bostwick Irr. Dist. v. United States, 900 F.2d 1285 (8th Cir. 1990) (in the context of an irrigation repayment contract, O&M expenses of the Corps were properly charged to the irrigation district).

C. Depreciation Costs Are Part Of The Costs Of Furnishing Power From The Dalles Dam That Are Appropriately Charged To The District

Depreciation costs included in the District's power rate represent capital costs allocated to power generation at The Dalles Dam. These costs represent a proportionate share of the original investment in constructing The Dalles Dam, along with major capital investments including those that would be categorized as "replacement" costs at an irrigation project operated by Reclamation. See Tr. 753:3-17 & 761:2 to 762:19 (Dinan). Of course, The Dalles Dam is not a Reclamation project, but a hydropower power and navigation project owned and operated by the Corps. This is important for two reasons. First, the statute and the repayment contract provide that the Secretary determines the power rate for the District taking into account "all" costs of furnishing power from The Dalles Dam as properly allocable under reclamation law. Capital costs at The Dalles Dam are part of the costs of furnishing power from that facility, and these costs are allocated consistent with the Corps' Cost Allocation Report without that allocation being contrary to any part of reclamation law. Second, Congress directs the Corps to recover depreciation costs for its projects. See 33 U.S.C. § 576 (stating that the Corps' revolving fund "shall be credited with reimbursements or advances for the cost of equipment, facilities, and

services furnished, at rates which shall include charges for overhead and related expenses, depreciation of plant and equipment, and accrued leave. . . ."). Depreciation is an appropriate cost to include in a power rate. Tr. at 220: 24 to 221:21(Kaiser).

In other words, some Reclamation projects include their own power generating facilities, such as the Grand Coulee Dam. When Reclamation constructs power facilities as part of a Federal irrigation project, those costs are passed on to irrigation districts as part of their capital repayment obligations. Here, though, Congress directed the Secretary to furnish power from the previously authorized The Dalles Dam, constructed and operated by the Corps. Congress could have, but did not, authorize the Secretary of the Interior to allocate capital costs of power generation facilities to the District's capital repayment obligation related to the Project. Put another way, the Secretary of the Interior lacks the authority to transfer the Corps's capital costs at The Dalles Dam to Reclamation's books.[16] Therefore, the depreciation costs included in the power rate are properly (and necessarily) allocated to the District's power rate as a requirement for operating and maintaining the Project.

The statute and the repayment contract both contemplate that the District's obligation to repay capital costs of the irrigation project is limited by the irrigator's "ability to pay." This limitation does not extend to power generation costs at The Dalles Dam. Tr. 429:6-11 (Patterson). It does not bear at all on the question of what the appropriate power rate for usage should be. The authorizing legislation at § 2(b) is plain on this: "Costs allocated to irrigation in excess of the amount determined by the Secretary to be within the ability of the irrigators to

[16] The Secretary would have the authority to sub-allocate capital costs for irrigation pumping power from a Reclamation project that included power generation as a congressionally authorized function. Here, though, Congress specified that power be obtained from a preexisting Corps project. Also, until 1977, before it was transferred to the Department of Energy, BPA was a Department of the Interior agency, which provided the Secretary of the Interior authority in 1963 to transfer capital costs associated with transmission facilities from BPA to Reclamation.

repay within a fifty-year period . . . from net revenues derived . . . from the disposition of power marketed through the Bonneville Power Administration." Def. Ex. 5 at 2 (emphasis added). The authorizing legislation at § 2(a) expressly identifies the "principal works" of the Project to include the pumping plant, booster and relift pumping plants, and a distribution system. Id. at 1. Congress did not include any works associated with The Dalles Dam as those works to be allocated to irrigation. This is consistent with the resulting repayment contract, which defines Project works as the pumping plant and distribution system (and transmission facilities from The Dalles substation). Def. Ex. 6 at 3.

Since at least 1990, the generation costs for furnishing power from The Dalles Dam have included depreciation costs, along with O&M costs, at The Dalles Dam. Tr. at 756:8 to 757:5 (Dinan). The depreciation costs relevant to this case include those capital costs deemed "replacement" in Reclamation parlance, as well as an allocated portion of original investment costs at The Dalles Dam. See Tr. at 761-762 (Dinan); see also Tr. at 270:23 to 271:3, 373-274 (Miller). This is entirely consistent with Plaintiff's Exhibit 12 at 2. This Reclamation-generated document identifies "total" costs in 1977 for furnishing power at The Dalles Dam to be .90 mill per kWh – .31 mill for "OM&R" and .59 mill for the "Investment Repayment." Although terminology as used by Reclamation, BPA, and the Corps may differ – for example, Reclamation distinguishes between original capital (those capital costs incurred in the initial construction of a project) and "replacement" capital (those capital costs incurred after a project has been put into service), while neither the Corps or BPA distinguishes between original capital investment and replacement capital – the concept is the same. In other words, while replacement costs at a Reclamation power generation facility are considered part of the OM&R costs, replacement costs at a Corps power generation facility are considered "capital" costs (and are recovered through

depreciation, like all of its capital costs), and they are both costs associated with power production and must be recovered, regardless of the label. See Tr. 738-739 (Dinan).

Finally, the District's own expert acknowledges the validity of the concept of establishing a power rate that includes original investment costs. Plaintiff's Exhibit 26, was introduced by the District for the proposition that as of March 18, 1966, there was "a wide range of irrigation pumping power charges in the area served by the Pacific Northwest Federal Power System." Tr. 536:6-16 (Keys). This document, among other things, states the following – "Maximum charge: payment of annual operation, maintenance, and replacement costs, plus the return of the non-interest bearing irrigation power allocation within the irrigator's repayment period." Pl. Ex. 26. Plaintiff's expert witness, Ms. Opatrny, testified that this passage could include original investment as a power rate depreciation component. Tr. at 710:2-12. While Ms. Opatrny does not believe this "maximum" rate applies to the District, her rationale for this belief requires a leap in logic. Ms. Opatrny appears to interpret page 4 of Plaintiff's Exhibit 26 to excuse the District from paying capital costs, because the capital costs referenced in the document are limited to "transmission and substation" facilities of BPA. Tr. at 710:21 to 711:5. But the paragraph devoted to The Dalles is addressing the "transfer of capital costs" of transmission services, and is silent concerning power generation costs or services. Pl. Ex. 26 at 4. In short, the District attempts to extrapolate silence on the matter of power generation capital costs into something contrary to the plain language of the statue and the repayment contract.

In sum, there is simply no requirement in Reclamation law or the repayment contract that original capital investment costs at The Dalles Dam be covered by the repayment obligation for

original capital costs at The Dalles Irrigation Project that are eligible for "irrigation assistance."[17] Rather, these costs are properly part of "all costs" of furnishing power to the District.

### D. The Lost Revenue Component Is A Power Cost Adjustment Necessitated By The Contract's Limit On Revisiting Rates Not More Than Once In Any Five-Year Period

The lost revenue component is fully discussed ante at 18-19. The District appears to put weight in the fact that Reclamation has proposed to eliminate the use of the lost revenue component by offering to "true-up" costs on an annual basis, rather than waiting the five years required by the repayment contract for the start of the next rate period. Reclamation has viewed article 14(a) as limiting its ability to apply an annual true-up of the power cost without concurrence from irrigation districts. With that view, in 2002 Reclamation offered to annually true up the District's power cost to avoid application of the lost revenue component. But the District never responded to this offer. See Pl. Ex. 19 at 2; Def. Ex. 16 at 3; see also Tr. 602-603, 605 (Richardson). The District therefore has had the opportunity to eliminate application of the component prior to initiating litigation. In any event, simply because the District dislikes the component does not change the fact that its result is to protect both parties from a rate set either too high or too low for a five year period, and instead insures that the power rate will reflect actual costs for furnishing power. This is consistent with the authorizing legislation and resulting contract.

[17] "Irrigation assistance," the portion of an irrigation project paid for by Federal power customers, already covers approximately $5,982,400 of the capital costs associated with constructing the pumping plant and water distribution system associated with Reclamation's The Dalles Irrigation Project, while the District is obligated to pay $2,550,000 of the capital cost of the project works defined in the repayment contract. See Def. Ex. 6 at 4-5; see also Tr. at 737:3 to 739:24 (Dinan).

E. Fish And Wildlife Costs Incurred In Operating The Dalles Dam Are Part Of The Costs Of Furnishing Power From The Dalles Dam That Are Properly Charged To The District

In order to comply with the Endangered Species Act, ("ESA"), 16 U.S.C. § 1536, the Corps must operate The Dalles Dam in such a manner as to avoid causing harm to certain "listed" fish species. See Tr. at 439-441 (Stocks). This can affect generation costs through direct operating costs, such as maintaining fish ladders that allow adult salmon to advance upriver, and indirect costs, through the lost generation opportunity associated with "spilling" water to assist fingerling salmon on their seaward journey. There is simply no basis for excluding any power generation costs incurred by the Corps at The Dalles Dam associated with fish and wildlife protection.

The District confuses congressional instruction to exclude fish and wildlife costs at The Dalles Irrigation Project from repayment with those dissimilar costs at The Dalles Dam. The authorizing legislation at, §2(d), provided that, as determined by the Secretary, costs of constructing "the works authorized by this Act" allocated to fish and wildlife benefits were to be nonreimbursable. Def. Ex. 5 at 2. Plainly, "the works authorized by this Act" are facilities at The Dalles Irrigation Project and not The Dalles Dam. The repayment contract between the District and the United States at article 8(c) identifies fish screens as the portion of authorized Project works for fish and wildlife values. Def. Ex. 6. The repayment contract plainly refers to works associated with the Project, and is limited to the capital as well as O&M costs of a fish screen at the Mill Creek pumping plant. Id. at 4, 10. The ESA did not even exist at the time Congress authorized The Dalles Irrigation Project. Congress therefore could not have intended to exempt the Project from subsequent ESA compliance requirements.

The ESA compels all Federal agencies, including Reclamation, BPA, and the Corps, to ensure that operation of Federal facilities is not likely to jeopardize the continued existence of any endangered species. 16 U.S.C. § 1536(a)(2). To the extent that the Government's compliance with the ESA and Federal court decisions has increased the cost of producing power at The Dalles Dam, that additional cost is recoverable pursuant to the plain language of the contract. The District's assertion that it should not have to pay the increased costs of compliance with Federal law is unsupported. To argue that additional "fish" costs incurred at The Dalles Dam are should be excluded plainly deviates from the plain instructions provided to the Secretary of the Interior by Congress to collect all costs.

Moreover, ESA compliance is recognized as a public or general act that invokes the sovereign acts doctrine. Klamath Irrigation Dist. v. United States, 75 Fed. Cl. 677, 683, 690-91 (2007) ("If the violation of a contract occurs owing to the need to preserve the common good and the general welfare, rather than to relieve the United States of its contractual or financial responsibilities, the action should be viewed as sovereign in nature and covered by the implied contractual right of the government to meet its responsibilities to the citizenry at large, unless waived in unmistakable terms."); see also, Casitas Mun. Water Dist. v. United States, 72 Fed. Cl. 746, 753-55 (2006). The United States when sued as a contracting party cannot be held liable for an obstruction to the performance of the particular contract resulting from its unrelated or independent acts as a sovereign. Horowitz v. United States, 267 U.S. 458, 461 (1925)("It has long been held by the Court of Claims that the United States when sued as a contractor cannot be held liable for an obstruction to the performance of the particular contract resulting from its public and general acts as a sovereign"). The sovereign acts doctrine is a part of every contract

with the government, whether the contract explicitly provides for it or not. Hughes Communications Galaxy, Inc. v. United States, 998 F.2d 953, 958 (Fed. Cir. 1993).

## CONCLUSION

The authorizing legislation for The Dalles Irrigation Project and the resulting repayment contract plainly provide that the rate for furnishing power to the District is left to the discretion of the Secretary of the Interior, with authority to include "all costs" properly allocable under Reclamation law. So long as the Secretary does not establish a rate that exceeds the costs of furnishing power to the District, and so long as the Secretary determines that these costs are properly allocable under reclamation law, the United States has satisfied fully the statutory and contractual requirements applicable to the case at hand.

The power rate formula for the District adopted by the Secretary in 1990 and used continuously since that time, includes O&M costs allocated to power generation at The Dalles Dam, capital costs allocated to power generation at The Dalles Dam in the form of depreciation, and a power cost adjustment mechanism necessitated by contractual limits upon the timing and frequency of formal rate adjustments. Thus, all costs in the power rate reflect costs of furnishing power to the District from The Dalles Dam. The costs are properly allocable: the rate formula adopts cost allocations as determined by the Corps, and submitted by the Corps to Congress in its 1967 Cost Allocation Report. The costs included in the power rate, including the Corps' cost allocations, are entirely consistent with Reclamation law, which mandate that the Secretary recover all costs for operating and maintaining Reclamation projects. Indeed, the Secretary would be in direct conflict with congressional directive and Reclamation law by failing to include properly allocable O&M and capital costs in the District's power rate. In addition,

subsidizing the District by furnishing below-cost power would result in the unpalatable result of shifting additional costs of benefits received by the District's to other Federal power users.

The discretion accorded by Congress to the Secretary in setting the District's power rate also requires consideration. Congress left the rate-making determination to the Secretary, so long as the rate did not exceed the cost of furnishing power, and the costs were properly allocable under Reclamation law. This congressionally conferred discretion was expressly retained by the Secretary in article 14(a) of the resulting repayment contract.

For the foregoing reasons, we respectfully request that the Court enter judgment against the District.

Respectfully submitted,

JEFFREY S. BUCHOLTZ
Acting Assistant Attorney General

JEANNE E. DAVIDSON
Director

s/ Franklin E. White, Jr.
FRANKLIN E. WHITE, JR.
Assistant Director

OF COUNSEL
CLARK MILLER
U.S. Department of the Interior
Attorney-Advisor
Field Solicitor's Office
960 Broadway Ave., Suite 400
Boise, ID 83706
Tel: (208) 334-1906
Fax: (208) 334-1918

s/ Armando A. Rodriguez-Feo
ARMANDO A. RODRIGUEZ-FEO
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor
1100 L Street, N.W.
Washington, D.C. 20530
Tel: (202) 307 3390
Fax: (202) 514-8624

February 29, 2008

Attorneys for Defendant

CERTIFICATE OF FILING

I hereby certify that on this 29th day of February, 2008, a copy of the foregoing "DEFENDANT'S POST-TRIAL BRIEF" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. The parties may access this filing through the Court's system.

s/Armando A. Rodriguez-Feo