Case No. 05-1042 C

Judge Charles F. Lettow

UNITED STATES COURT OF FEDERAL CLAIMS

THE DALLES IRRIGATION DISTRICT

Plaintiff,

v.

THE UNITED STATES,

Defendant

---

# PLAINTIFF'S REPLY BRIEF

---

**Arden E. Shenker,** OSB No. 62082
Shenker & Bonaparte, LLP
1500 SW First Avenue, Suite 630
Portland, OR 97201
Telephone: 503-294-1118
Facsimile: 503-294-0015
Email: ashenker@ashenkeresq.com

Attorneys for Plaintiff:
**THE DALLES IRRIGATION DISTRICT**

March 28, 2008

# TABLE OF CONTENTS

Table of Contents ........ i

Table of Authorities ........ ii

Introductory Statement ........ 1

Facts ........ 3

- Cost Escalation ........ 3
- Actual Costs ........ 4
- The Conduct of the Parties ........ 6
- Exhibit 31 ........ 7
- Reserve Power ........ 8
- Fish and Wildlife ........ 8
- Depreciation ........ 8
- Feasibility ........ 9
- Summary ........ 10

The Law ........ 10

- Judicial Review ........ 10
- Feasibility ........ 14
- Fish and Wildlife ........ 15
- The Contract ........ 16

CONCLUSION ........ 17

# TABLE OF AUTHORITIES

CASES

*Albuquerque Indian Rights v. Lujan*,
289 U.S. App. D.C. 164 (D.C. Cir., 1991) .......... 7

*Arizona Power Authority v. Morton*,
549 F.2d 1231, 1240 (9th Cir. 1977) .......... 12

*Arizona Power Pooling Association v. Morton*,
527 F.2d 721 (9th Cir. 1975) .......... 12

*Banzhaf v. Smith*,
238 U.S. App. D.C. 20, 737 F.2d 1167 (D.C. Cir. 1984) .......... 12

*Barlow v. Collins*,
397 U.S. 159, 90 S. Ct. 832, 25 L. Ed. 2d 192 (1970) .......... 12, 13

*Blackhawk Indus. Prods. Group Unlimited LLC v. US GSA*,
348 F. Supp. 2d 662 (D. Va. 2004) .......... 12

*Block v. Cmty. Nutrition Inst.*,
467 U.S. 340, 81 L. Ed. 2d 270, 104 S. Ct. 2450 (1984) .......... 12

*Bostwick Irrigation Dist. v. US*,
900 F.2d 1285 (8th Cir., 1990) .......... 16

*Califano v. Sanders*,
430 U.S. 99, 97 S. Ct. 980, 51 L. Ed.2d 192 (1977) .......... 13

*Carson-Truckee Water Conservancy Dist. v. Watt*,
537 F. Supp. 106 (D. Nev. 1982) .......... 12, 13

*Casitas Mun. Water Dist. v. US*,
72 Fed. Cl. 746 (2006) .......... 15, 16

Chaney v Heckler,
231 U.S. App. D.C. 136, 718 F.2d 1174 (D.C. Cir. 1983) .......... 11

*Citizens to Preserve Overton Park, Inc., v. Volpe*,
401 U.S. 402, 91 S. Ct. 814, 28 L. Ed. 2d 136 (1971) .......... 11, 13

*Klamath Irrigation Dist. v. US*,
75 Fed. Cl. 677 (2007) .......... 15

*NLRB v. United Food & Commercial Workers Union, Local 23*,
484 U.S. 112 , 98 L. Ed. 2d 429, 108 S. Ct. 413 (1987) ................................................ 7

*Orange Cove Irrigation Dist. v. US*,
28 Fed. Cl. 780 (1993) ........................................................................................ 16

*Skidmore v. Swift & Co.*,
323 U.S. 134, 89 L. Ed. 2d 124, 65 S. Ct. 161 (1944).................................................... 14

*Stateman Apartments Inc. v. US*,
66 Fed. Cl. 608 (2005) ........................................................................................ 17

*US v. Fort Belknap Irrigation District*,
197 Fed. Supp. 812 (D. Mont. 1961)........................................................................ 10

*US v. Mead Corp.*,
533 U.S. 218, 150 L. Ed. 2d 292, 121 S. Ct. 2164 (2001) ............................................ 14

*US v. Winstar Corp.*,
518 U.S. 839, 116 S. Ct. 2432, 135 L. Ed. 2d 964 (1996) ............................................ 16

STATUTES AND OTHER AUTHORITIES

5 U.S.C. § 701......................................................................................11, 12, 13, 14

43 U.S.C. § 485...........................................................................................12, 13

Mecham and Simon, "Forging a New Federal Reclamation Water Pricing Policy,"
27 Ariz. St. L.J., 507 (1995) ................................................................................ 3

Pub. L. 86-745, § 2 ........................................................................................... 11

UNITED STATES COURT OF FEDERAL CLAIMS

**THE DALLES IRRIGATION DISTRICT**,

Plaintiff,

**v.**

**THE UNITED STATES OF AMERICA,**

Defendant.

Case No. 05-1042 C

Judge Charles F. Lettow

## PLAINTIFF'S REPLY BRIEF

## INTRODUCTORY STATEMENT

The defendant concedes:

1. It never provided actual costs for the plaintiff.

2. In fact "actual costs" never were used in formulating the bills sent by the defendant to the plaintiff.

3. (The term "actual costs", in fact, does not appear in the defendant's Closing Argument except in connection with the discussion of the lost revenue computation, which itself was never provided for in the Repayment Contract between the defendant and plaintiff.)

4. Fish and wildlife costs are billed by the defendant to the plaintiff, and fish and wildlife activity has increased the generation costs for the power generated at The Dalles Dam, for the plaintiff's irrigation project.

5. The government's memorandum regarding the status of the plaintiff's Repayment Contract (Ex. 31) has never been modified since its approval and execution by the parties, in April of 1990, reporting that there is to be no "continuing annual financial adjustment" for the operation, maintenance or replacement of the generating facilities, for the irrigation project at The Dalles. "Only the generation costs may be passed through."

6. The defendant never made a determination of whether the plaintiff had the ability to pay any of the proposed increases in operating rates, or whether any of those increased charges would affect the plaintiff's ability properly to defray the continuing capital charge annual obligations.

7. No administrative or adjudicative proceedings preceded the rates charged to the plaintiff here.

8. The Bureau of Reclamation has no special expertise for determining actual costs for generating power for the plaintiff's irrigation project.

9. Since "at least 1990" the Bureau of Reclamation has been billing plaintiff for depreciation costs.

**************************

The nub of the dispute is plaintiff's continuing contention that it should pay all – but not more than – the actual costs of the generation of power for the plaintiff's project, as determined by Congress and specified in the Repayment Contract. The defendant, on the other hand, asserts that the plaintiff should pay all costs billed to the plaintiff by the defendant, period. The defendant's position stands on three wobbly props: this Court does not have the right to review the charges made. Secondly, this Court should defer to whatever the defendant has decided. Thirdly, a reading – in plaintiff's view, a "tortured" reading – of the

contract permits the charges made. The first two props are wrong as a matter of law. And the last is wrong as a matter of fact, as well as by the proper application of the law.

## FACTS

### Cost Escalation

The government suggests a reference to a law review article by employees of the solicitor's office of the US Department of the Interior (Def. Br. page 4, n. 2) on calculating O&M costs. As the article points out those costs are limited to remedying conditions brought about by the use of the system. Mecham and Simon, "Forging a New Federal Reclamation Water Pricing Policy," 27 Ariz. St. L.J., 507, 522 (1995). The Repayment Contract between the plaintiff and the US Department of the Interior, Bureau of Reclamation, included O&M, by shorthand, as the costs of generation at The Dalles Dam. Does the defendant argue now that all of the charges it has billed to the plaintiff are limited by the remedying of conditions brought about by the use of the system? The proper construction of the evidence in this record is that the escalation of costs has occurred because of Bonneville's quest for additional payments for the operation of the Columbia River Power system, not for the generation of power necessary for the irrigation district project at The Dalles.

The largest chunk of the charges now billed to the plaintiff comes from the so-called lost revenue component. While the defendant thinks the term "unfortunate" (Def. Br. 18, n. 11), surely the concept is not an element required to remedy conditions brought about by the use of the system. And within O&M the costs breakdown shows that the largest chunk comes from joint uses, that is, beyond the system. (Tr. 663, 664.)

/ / / / /

/ / / / /

Defendant plays with numbers, to mislead[1] by comparing acreage rates (Def. Br., n. 1, p.3). These are irrelevant to kilowatt hours. Acreage is relevant only to recognize that this project is only 10% of what was originally studied.[2] (Tr. 596.) On a per kilowatt hour basis we know the rates have increased 500%; that is what plaintiff pays. Would that it were true that plaintiff "only" paid an increase of 198% as defendant misleadingly suggests.

**Actual Costs**

Twice the Repayment Contract uses the term "actual" to limit costs or charges, but there is no recognition (or mention) of that contract language in the defendant's post trial brief. Section 14(b) limits additional notices of charges to the inadequacy of earlier notices to pay "the actual costs." And at the end of the same contract provision the plaintiff is entitled to credits for funds advanced in excess of the "actual power charges under the provisions of this article." The "article," § 14, provides the limitations for the Secretary's determination of rates to the payment for power and energy required for irrigation pumping during the irrigation season. That is the power and energy of "this article," and that also is the reference to charges that can be properly allocable "to such" irrigation pumping and energy. There is no floor to actual costs, after the initial one mil per kilowatt hour provision.

We know that the defendant has followed the actual costs as generation O&M costs "only" (Ex. 40, page 1), and we know that those actual costs were less than one mil per

[1] And, speaking of misleading, the government protests (Def. Br. p. 17, n. 8) that its failure to supply The District with a complete notice of current rates, with all four pages, and footnotes too, was not on purpose. Since when do accidental clerical errors extend to erased footnotes as well as omitted pages? There's no disputing the result: The District did receive an incomplete and misleading notice. (Tr. 614; Ex. 87, pp. 3, 4.)

[2] The inapplicability of the Corps of Engineer's Cost Allocation Report (Ex. 9) is demonstrated by its study of the tenfold larger project. (*Id*., p. 20, ¶ 2).

kilowatt hour for decades. That is information obtained from the Bonneville Power Administration, by the Bureau of Reclamation. (Tr. 325.)

Defendant blithely suggests that it gave the District notice of actual costs in the 1998 rate notice (Def. Br., p. 11, n. 6). The notice of course doesn't offer the phrase "actual costs." What defendant now claims as notice of "actual charges" (Ex. DX 17, p. 3) is a statement of actual usage and a plug rate!

The Corps of Engineers may be bound by its Cost Allocation Report[3] (Def. Br. p. 15), but the District is not. The Corps accounting needs do not come from, address or relate to the Repayment Contract. The same accounting needs apply to BPA. But not so to the Bureau. Congress did not give the Bureau the right to be so facile as to duck out of the Repayment Contract's proper allocation of actual generation costs for The Dalles irrigation project and substitute whatever BPA may propose.

The lost revenue component is a rate juggling mechanism, manufactured by BPA to defy the five-year rate setting. Defendant justifies the lost revenue component by requiring plaintiff to pay its "proper share" (Def. Br., p. 19) or "fair share" (Def. Br., p. 24). But the defendant has no right to superarrogate to itself the decision-making already completed by the U.S. Congress and set forth in the Repayment Contract. The five-year rate setting was to protect the District, now defendant would turn that protection into an annual abuse.

When the defendant discusses the "lost revenue" component, then it does recognize a role for actual power generation costs. (Def. Br. 18, 19.) While the government is plainly talking about an interest factor, for the lost use of money, the closing brief slips into

[3] What the Report does explain is that if there is to be no allocation to irrigation for direct use, there can be none for joint use, *a fortiori*. In fact the Report does not address The Dalles Irrigation District or its project.

recognition that credits to the district would be based upon actual cost figures. How would the defendant know? Since it does not ask for actual power generation costs currently from the BPA, the defendant would have no way of computing what it concedes should be done.[4]

The defendant makes the point that the actual cost of furnishing power is not static. (Def. Br. 19.) The plaintiff quite agrees: that is the reason that compels the Repayment Contract operation of determining what the actual costs were and measuring that amount against what the defendant billed to the plaintiff.

**The Conduct of the Parties**

The last three regional administrators of the Bureau of Reclamation, Pacific Northwest Region, from Bill Lloyd, to John Keys, to Bill McDonald, have recognized, when confronted on deposition, that the defendant's position cannot be justified on the contract documents.

Keys believed that Lloyd had the greater expertise. (Tr. 547.) Lloyd recognized that his underlings were in error. (Tr. 485.) And McDonald could not explain away the difference between the contract documents and the conduct of the Bureau's representatives in effecting charges, notwithstanding that McDonald had been a lawyer for the Bureau of Reclamation, and assistant commissioner of the Bureau. (Tr. 449-452, 455, 457, 458, 463, 465.)

Terry Kent, the long time Bureau representative, upon whom the regional directors relied, agreed that he omitted the crucial basis for rejecting the plaintiff's protests to new rates proposed by the Bureau. (Tr. 393.) He preferred to talk about transmission costs, which never were an issue, rather than the basis for determining actual costs. (Exs. 19, 37, 62; Tr. 392.)

[4] The Bonneville Power Administration does have the ability to determine actual costs. Sue Garifo asked for and received them. (Tr. 43.)

**Exhibit 31**

The defendant recognizes that the language of Exhibit 31 is case dispositive: so the defendant pooh-poohs the authority of Sue Garifo to have found that "only the generation costs may be passed through," based upon the authorizing legislation. (Exhibit 31, BPA 1042.) Ms. Garifo, however, forthrightly testified that both the Bureau of Reclamation and the Bonneville Power of Administration (BPA) had signed off on Exhibit 31. (Tr. 60.) And John Keys corroborated the execution of that final form of memorandum, which he saw, read and understood. (Tr. 542.) Part of Ms. Garifo's memorandum quoted from an opinion from a solicitor of the Department of the Interior, Bill Burpee, that there would be no continuing annual financial adjustment for the operation, maintenance or replacement of the generating facilities. (Tr. 543.) Not only was that language incorporated, thirty years later, by Ms. Garifo, but, even fifteen years later than that, today, John Keys still agrees with it. (Tr. 544.)

It bears emphasizing that Solicitor Burpee's opinion was a contemporaneous interpretation and entitled, therefore, to even greater weight. *See NLRB v. United Food & Commercial Workers Union, Local 23*, 484 U.S. 112, 124, 98 L. Ed. 2d 429, 108 S. Ct. 413 (1987); *see also Albuquerque Indian Rights v. Lujan*, 289 U.S. App. D.C. 164, 173 (D.C. Cir., 1991).

BPA pulled the Bureau's puppet strings on the rate-making. It made sense for BPA's task force to tell the Bureau how to undo the past, vis-à-vis The Dalles, in order to justify cost escalations. What our case record lacks is the protest from the Bureau, as the District's "advocate" (Tr. 473, 553) that the Bureau's congressionally mandated contract with the District would not permit what BPA was dictating. (Tr. 552.)

**Reserve Power**

BPA is statutorily obligated to sell power to its commercial customers, at BPA's cost. Not so reserve power; it occupies a special, protected, subsidized below costs status, one reflected particularly in the District's 1961 Repayment Contract with the Bureau.

The "unadulterated" costs of The Dalles Dam (Def. Br., p. 27) are the proper concern of BPA and the Corps of Engineers. Those entities, however, are not parties to the District/Bureau Contract. It "adulterates" the costs as Congress directed, to generation O&M alone, as needed for this particular irrigation project.

**Fish and Wildlife**

Plaintiff has no concern over the costs of fish and wildlife screening at the irrigation facilities; the District absorbs those costs. What plaintiff should not be paying is the ever-rising costs of BPA and the Corps for fish and wildlife protection in the Columbia River at and beyond The Dalles Dam. The District has not asked for increased payments to it for its operation and maintenance of the fish screens, because that request would not be in keeping with the parties' Contract (Ex. DX 6, art. 12 (d), p. 10).

The defendant agrees that costs allocated to fish and wildlife benefits are not reimbursable to the defendant. (Def. Br. 9.) Yet the record shows substantial escalation to the generation costs billed as a result of fish and wildlife activity. (Tr. 434.)

**Depreciation**

Defendant tries to slip in a capital expense (Def. Br. p. 25) as an operating item, by conflating "depreciation" with "replacement" (as in "OM&R"). Of a certainty depreciation was a proper capital item computed in 1960-1961 when capital cost responsibilities were

divided between the District and the United States. That division is not the subject of revisitation here.

The Bureau did know the difference between includable and excludable depreciation, for annual reserved power actual costs. In 1977 (Ex. 12) those were separated between generation cost (0.37 mil/kwh) and depreciation (then called "Investment Repayment"). (Tr. 308.)

Depreciation may be an appropriate cost for commercial power rates, which constitute BPA's major preoccupation. That element has no part in reserve power rates. (Tr. 663.) The Repayment Contract's limitation of charges to generation costs precludes depreciation, as an operating expense, even as joint uses are precluded as a whole.

Expert witness Opatrny's cited testimony (Def. Br. 34) serves two plain purposes: the capital cost (and its depreciation) was separated from OM&R by the transfer of the capital facilities. (Tr. 710-711.) And the reference to "power" in Exhibit 26 (p. 4) should be taken in context with the "power/energy" differentiation, now more commonly "capacity/energy." (Tr. 712.) Defendant's bootstrap is to no avail in bringing "power generation capital costs" (Def. Br., p. 34, first full ¶, last sentence) into "OM&R."

Defendant admits (Def. Br. p. 33) that it has continued to charge plaintiff for original capital investment costs. Q.E.D.

**Feasibility**

The Bureau's Regional Director, William Lloyd, well recalled the teaching of the Bureau's Interior Department Solicitor, Al Bielefeld: significant rate increases proposed by the Bureau to an irrigation district required ability to pay determinations, absent which, the Bureau needed to report to Congress. (Tr. 483.) Lloyd's successor, John Keys, later the Bureau's Commissioner, recalled the same "lecture" and agreed. (Tr. 535.)

And then the Bureau quintupled the rates, made no feasibility determination, and gave no report to Congress.

**Summary**

Defendant has computed its bills to plaintiff by including escalating charges beyond actual generation costs for the District's project. Those costs have been available to, but ignored by the Bureau. Reserve power should not be billed by BPA and rubberstamped by the Bureau as if it were the charge for commercial customers. The Bureau has never modified the analysis that "only the generation costs may be passed through" (Ex. 31, BPA 1042). Neither increasing fish and wildlife expenses nor capital depreciation items belong in the charges to The District, any more than joint use and lost revenue components have any place in these charges.

In any event, the Bureau has never attempted to ascertain the feasibility of radically increased charges, much less reported those to Congress. (Tr. 386, 415, 483, 484; Ex. 13, BPA 0984.)

## THE LAW

**Judicial Review**

The defendant's first argument is that no court should be able to review what the Secretary has done here. That argument previously has been rejected by this Court, and it is not the law. The court in *US v. Fort Belknap Irrigation District*, 197 F. Supp. 812, 822 (D. Mont. 1961) asked whether the court could review a determination of the commissioner of the Bureau of Reclamation. The answer was that even an administrative finding after appropriate administrative proceedings is not conclusive. Administrative determinations, after all, must

have a basis in law and must be within the granted authority, said the court, concluding that in the final analysis statutory construction is a legal function. *Id*.

First, the statement that the statute Pub. L. 86-745, § 2 commits "discretion" to the agency is simply false. The statute itself does not use the word "discretion" in any form. This is an important error, because the APA [5 U.S.C. 701(a)(2)] applies only to agency action committed to agency discretion ***by law*"** (emphasis added). The statute directs the agency how to make the decision on rates, rather than giving it broad discretion. The claim that both the statute and the quoted portion of the contract "commit" discretion to the Secretary is unfounded.

Secondly, the government's claim that a broad grant of authority justifies the preclusion of any judicial review under the contract interprets § 701(a)(2) much too broadly. The United States Supreme Court recognized that § 701(a)(2) states a "very narrow exception" to the mandate of the Administrative Procedure Act that the action of "each authority of the Government of the United States" is subject to judicial review. *Citizens to Preserve Overton Park, Inc., v. Volpe*, 401 U.S. 402, 410, 91 S. Ct. 814, 820, 28 L. Ed. 2d 136 (1971), *overruled on other grounds* by *Califano v. Sanders*, 430 U.S. 99, 105, 97 S. Ct. 980, 51 L. Ed.2d 192 (1977). The exception is applicable only "in those rare instances where 'statutes are drawn in such broad terms that in a given case there is no law to apply.'" *Volpe*, loc. cit.

Courts have held that exceptions to judicial review under 5 U.S.C. § 701 should be narrowly construed as § 701 establishes a strong presumption of reviewability. *Chaney v Heckler*, 231 U.S. App. D.C. 136, 718 F.2d 1174 (D.C. Cir. 1983), *reh'ing denied*, 233 U.S. App. D.C. 146, 724 F.2d 1030, and *rev'd on other grounds*, 470 U.S. 821, 84 L. Ed. 2d 714,

105 S. Ct. 1649. Restricting judicial review requires clear and convincing evidence of legislative intent. *See Blackhawk Indus. Prods. Group Unlimited LLC v. US GSA,* 348 F. Supp. 2d 662, 667 (D. Va. 2004). The "presumption of reviewability may be overcome by 'specific language, or specific legislative history,' 'contemporaneous judicial construction barring review and congressional acquiescence in it,' or 'inferences of intent drawn from the statutory scheme as whole.'" *Banzhaf v. Smith*, 238 U.S. App. D.C. 20, 737 F.2d 1167 (D.C. Cir. 1984), quoting *Block v. Cmty. Nutrition Inst.*, 467 U.S. 340, 349, 81 L. Ed. 2d 270, 104 S. Ct. 2450 (1984). None of these factors is present in this case, nor has the government met its burden to overcome the presumption of reviewability.

Interestingly, the government cites *Arizona Power Authority v. Morton,* 549 F.2d 1231, 1240 (9th Cir. 1977) to support its position. In that case, however, the court reached exactly the opposite conclusion as to the reviewability of 43 USC § 485h(c). And in *Arizona Power Pooling Association v. Morton,* 527 F.2d 721 (9th Cir., 1975) the defendant contended that the exception to reviewability in §701 of the APA applied because the Secretary has wide discretion in carrying out reclamation operations. However, the court noted that "to restrict judicial review requires 'clear and convincing evidence' of legislative intent." *Id,* citing *Barlow v. Collins,* 397 U.S. 159, 166, 90 S. Ct. 832, 837, 25 L. Ed. 2d 192 (1970). The court stated: (T)he "committed to agency discretion" exception is a very narrow one which is applicable only in "those rare instances where 'statutes are drawn in such broad terms that in a given case there is no law to apply.'" *Arizona Power Pooling,* 527 F.2d at 727.

The *Arizona Power Pooling Association* case is congruent with another case, *Carson-Truckee Water Conservancy Dist. v. Watt*, 537 F. Supp. 106, 111-112 (D. Nev. 1982), also involving interpretation of the Bureau of Reclamation's statutes. In that case, the Secretary

claimed that a reimbursement provision in 43 U.S.C. § 485h(c) gave the Secretary the wide discretion which allowed that provision to fall into the rare category of cases precluded from judicial review. The court rejected that argument, noting that to restrict judicial review requires "clear and convincing evidence" of legislative intent. *Carson-Truckee*, 537 F. Supp. at 111, citing *Barlow v. Collins*, 397 U.S. 159, 166, 90 S. Ct. 832, 837, 25 L. Ed. 2d 192 (1970). Because the reimbursement statute restricts the secretary's authority, "without judicial review, there would be no mechanism to enforce Congressional instructions." *Id*.

That is the case here. The Secretary's power is restricted to reimbursement of only "properly allocable" and "actual" costs. There is no evidence offered by the government to show that Congress gave such broad discretion to the Secretary that its actions cannot reasonably be reviewed. As in the *Carson-Truckee* case, the statute here restricts the Secretary's authority; therefore, without judicial review, there would be no mechanism to enforce that restriction.

In short, the government's claimed judicial review exception is "very narrow." *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 410, 91 S. Ct. 814, 28 L. Ed. 2d 136, (1971), *overruled on other grounds* by *Califano v. Sanders*, 430 U.S. 99, 105, 97 S. Ct. 980, 51 L. Ed. 2d 192 (1977). The Supreme Court has established that it is only applied "in those rare instances where 'statutes are drawn in such broad terms that in a given case there is no law to apply.'" *Id*. Clearly, under the Supreme Court's test, which the government does not bother to articulate, whether the narrow exception of § 701(a)(2) applies depends on the question at issue in the litigation as applied to the wording of the statute. Here, there is a meaningful standard by which to judge the agency's actions in both the statute and the contract – "whether the costs are properly allocable to such irrigation pumping power and

energy," and what are the "actual costs." The government's contention that this case is one of the rare "unreviewable" cases should be rejected. In this case, The Dalles Irrigation District is claiming specific violations of statutory and contract restrictions. Therefore, § 701(a)(2)'s narrow exception has no application to this case.

After *US v. Mead Corp.,* 533 U.S. 218, 150 L. Ed. 2d 292, 121 S. Ct. 2164 (2001), the only deference the government can seek is pursuant to *Skidmore v. Swift & Co.*, 323 U.S. 134, 89 L. Ed. 2d 124, 65 S. Ct. 161 (1944). The government closing brief, however, ignores the law and the ten cited authorities in plaintiff's Closing Argument (pp 15-16). The defendant offered no trial record to construct a deference claim; neither did the Congress; neither did the Repayment Contract. Both the facts and the law preclude the government's deference claim.

**Feasibility**

Defendant misses the point on the significance of its failure to ask Congress, or at least to report to it, about whether quintupling the cost of annual O&M charges to the plaintiff would be feasible. That is a determination of whether the defendant's decision in effect is *ultra vires*.

Secondly, the test of significance for the defendant not having obtained congressional approval for quintupling the costs to the plaintiff goes to the reasonableness of the defendant's interpretation of the parties' Repayment Contract. If the plaintiff was to bear only one half of the capital costs of the project, then why would it be presumed feasible to more than double the overall amount of plaintiff's payments, thus obliterating the congressional determination of feasibility in 1961.

This contract has no termination clause. It cannot be argued that the plaintiff is getting a free ride. In fact, the cost of the operation of the Columbia River Power System and that of the dams of the Corps of Engineers is borne by the ratepayers, who have the benefit of the entire system. They do not have a repayment contract limiting their responsibility to the actual cost of power generation for an irrigation system, in a particular locality, from a particular source.

Defendant ignores plaintiff's Closing Argument (pp. 12-13), on feasibility, with good reason. There is no answer to the fact that no feasibility study was done, despite the need therefor.

**Fish and Wildlife**.

The defendant misses the point in its effort to bill the plaintiff for fish and wildlife costs. The defendant should comply with federal statutes. And should pay for its compliance. Under the Repayment Contract, however, that is not an obligation of the plaintiff.

The government's citation to the sovereign acts doctrine also misses the point. *Klamath Irrigation Dist. v. US*, 75 Fed. Cl. 677, 684 (Ct. Cl. 2007) is a far cry from any holding that the costs of the government's compliance with the ESA should be shifted to an irrigation district in contravention of the terms of the repayment statute and contract. While the government cannot be sued for a breach of contract that results from its compliance with the ESA, no such breach is alleged here. Instead, the breach of contract has to do with whether the Bureau has charged its ESA costs to The District in violation of the authorizing statute and the implementing contract here. The sovereign acts doctrine has no application to this question.

The inapplicability of the sovereign acts doctrine is evident in the language of the

other case that the government cites, *Casitas Mun. Water Dist. v. US*, 72 Fed. Cl. 746, 753 (2006). There the court likened the sovereign acts doctrine to the traditional contract doctrine of impossibility:

> The sovereign acts doctrine is a defense to a breach of contract claim that may be invoked by the government, acting as a contracting party, where its performance of a contract duty is rendered impossible because of an intervening act of the government, acting in its sovereign capacity, that was not anticipated at the time the contract was entered into and the risk of which was not otherwise assumed. *US v. Winstar Corp*., 518 U.S. 839, 891-92, 907-08, 116 S. Ct. 2432, 135 L. Ed. 2d 964 (1996). In essence, the sovereign acts doctrine extends to the government in its role as contractor the same principle of discharge of duty on grounds of impossibility of performance that applies in contracts between private parties. Restatement (Second) of Contracts §§ 261, 264 (1981).

*Casitas Mun. Water Dist*., 72 Fed. Cl. at 753.

Compliance with the ESA here does not make the contract impossible for the Bureau. Nor does the government assert impossibility or the sovereign acts doctrine as a defense in this case. Clearly, the sovereign acts doctrine has no place here. The question remains one of interpreting the contract: does it permit the government to pass along its costs for ESA compliance to the District?

**<u>The Contract</u>**

Defendant urges *Bostwick Irrigation Dist. v. US*, 900 F.2d 1285 (8th Cir., 1990) as the only authority to support the proposition that the plain language of the authorizing act and implementing contract are contrary to plaintiff's contract arguments. (*See* plaintiff's Closing Argument, pp. 13-15.) *Bostwick* supports no such assertion; it construed a different statute, on different facts, to address different arguments of estoppel, laches and waiver. What is relevant to the Repayment Contract of the parties as applied here is the principle discussed in *Orange Cove Irrigation Dist. v. US*, 28 Fed. Cl. 780, 801 (1993), as applied to our case: did

the government set the power rate properly allocable to the actual charges for delivering energy to the project of The Dalles Irrigation District from The Dalles Dam? Defendant's arguments would abrogate the parties' contract, contrary to the law. *See Stateman Apartments Inc. v. US*, 66 Fed. Cl. 608, 616 (2005).

**CONCLUSION**

The defendant breached the Repayment Contract every year by charging rates with improper components instead of applying actual costs of generation. This Court should so declare.

The defendant breached the Repayment Contract every year by failing to provide to plaintiff the actual cost data. This Court should so declare.

DATED this 28th day of March, 2008

SHENKER & BONAPARTE, LLP

/s/ Arden E. Shenker
By:______________________________

**Arden E. Shenker**
OSB No. 62082
ashenker@ashenkeresq.com
Shenker & Bonaparte, LLP
1500 SW First Avenue, Suite 630
Portland, OR 97201
Telephone: 503-294-1118
Facsimile: 503-294-0015

Attorneys for Plaintiff:
**THE DALLES**
**IRRIGATION DISTRICT**

**Certificate of Filing**

I hereby certify that on the 28th day of March, 2008, a copy of the foregoing **"**Plaintiff's Reply Brief" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

SHENKER & BONAPARTE, LLP

/s/ Arden E. Shenker

**Arden E. Shenker,** OSB No. 62082
Shenker & Bonaparte, LLP
1500 SW First Avenue, Suite 630
Portland, OR 97201
Telephone: 503-294-1118
Facsimile: 503-294-0015
Email: ashenker@ashenkeresq.com

Attorneys for Plaintiff:
**THE DALLES**
**IRRIGATION DISTRICT**