# In the United States Court of Federal Claims

No. 05-1042C
(Filed: June 27, 2008)

| | |
|---|---|
| * * * * * * * * * * * * * * * * * * * * * * * * ) | |
| ) | Post-trial decision in suit by irrigation district |
| **THE DALLES IRRIGATION** ) | for refund of allegedly excessive charges for |
| **DISTRICT,** ) | energy and power under a contract with the |
| ) | Bureau of Reclamation; interpretation of |
| **Plaintiff,** ) | contract guided by statute |
| **v.** ) | |
| ) | |
| **UNITED STATES,** ) | |
| ) | |
| **Defendant.** ) | |
| ) | |
| * * * * * * * * * * * * * * * * * * * * * * * * | |

Arden E. Shenker, Shenker & Bonaparte, LLP, Portland, Oregon.

Armando A. Rodriguez-Feo, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, Washington, D.C., for defendant. With him on the briefs were Jeffrey S. Bucholtz, Acting Assistant Attorney General, Civil Division, Jeanne E. Davidson, Director, and Franklin E. White, Jr., Assistant Director, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, Washington, D.C. Of counsel was Clark Miller, Attorney-Advisor, Office of the Solicitor, U.S. Department of the Interior, Boise, Idaho.

## OPINION AND ORDER

LETTOW, Judge.

This case addresses charges for what is commonly known as "reserved power" supplied to an irrigation district in Oregon. Such power is provided at preferential rates mandated by statute, and the disputed issues concern the nature and scope of the preference arising with the particular statute applicable to the pertinent irrigation project.

A contract between The Dalles Irrigation District ("The Dalles" or "District") and the United States Department of the Interior, Bureau of Reclamation ("Bureau"), calls upon the Bureau to provide the District with power for irrigation pumping. The Dalles Irrigation District

is located near The Dalles Dam on the Columbia River in Oregon, and the Bureau is to provide the District with power produced by the hydroelectric power plant associated with the dam. The Dalles claims that since 1998 the government has overcharged the District for energy by approximately $400,000 in contravention of the contract, and it seeks a refund of the alleged overcharges as well as declaratory relief respecting future charges.

In accord with a stipulation by the parties, accepted by the court, trial of liability and of damages was bifurcated. Trial on liability was held on November 13 through 16, 2007, in Portland, Oregon. Following post-trial briefing and closing argument, the liability issues have become ready for decision.

## FACTS[1]

### A. Authorizing Legislation

1. *The Dalles Dam.*

The Reclamation Act of 1902, Pub. L. No. 57-161, 32 Stat. 388 (codified in various sections of Title 43 of the United States Code, including 43 U.S.C. §§ 372-73),[2] authorized the construction of dams for irrigation and land settlement throughout the western half of the United States. *See The Dalles Irrigation Dist. v. United States*, 71 Fed. Cl. 344, 345 (2006). Following enactment of the Reclamation Act, thirty-one federally-owned multipurpose dams were constructed on the Columbia River and its tributaries, forming the Federal Columbia River Power System ("Columbia River System"). *Id*. at 345. The Columbia River System "is a unique collaboration among three U.S. government agencies: the Bonneville Power Administration (BPA), the U.S. Army Corps of Engineers (the Corps), and the Bureau." *Id*. at 345 n.2.

The specific authorizing legislation for The Dalles Dam is found in the Flood Control Act of 1950, Pub. L. No. 81-516, § 204, 64 Stat. 163, 179. That Act authorized the Corps to construct and operate The Dalles Dam as a multipurpose facility, aiding navigation and generating power by hydroelectric means. Construction of the dam began in January 1952 with the commencement of excavation for the powerhouse and cofferdam. *See* DX 9 (1967 Cost

---

[1]This recitation of facts constitutes the court's principal findings of fact in accord with Rule 52(a) of the Rules of the Court of Federal Claims. Other findings of fact and rulings on questions of mixed fact and law are set out in the analysis.

[2]The Reclamation Act of 1902 is also known as the National Irrigation Act of 1902. *See* 43 U.S.C. § 371 note.

Allocation Report for the Dalles Dam, prepared by the Corps for submission to Congress ("1967 Cost Allocation Report")) at 10.[3] The dam was completed in 1957. *Id.*[4]

"[T]he Act by which The Dalles Dam was authorized (Public Law 516, 81st Congress, 2d Session, HR 5472), contains no mention of or specific requirements in regard to cost allocation." DX 9 (1967 Cost Allocation Report) at 6.[5] However, the Cost Allocation Report prepared by the Corps for Congress regarding the Dam apportioned costs between the authorized purposes of power generation and navigation, and that allocation remains in effect today. DX 9 (1967 Cost Allocation Report); Def's. Post-Trial Br. at 14. As the Report indicated,

> [c]osts are allocated in this report to the nonreimbursable function of navigation for which the Federal government has by general legislation assumed the responsibility for spending its funds to obtain the benefits contemplated and to the function of power for which reimbursement is contemplated. No project costs have been allocated to irrigation, inasmuch as the annual benefit . . . is purely incidental to the operation of the project in the interest of power and navigation. . . . Costs for specific recreation facilities are allocated to recreation; however, joint project costs are not allocated to recreation inasmuch as the project as authorized did not include recreation as a project purpose.

---

[3]Citations to the trial transcript are to "Tr. ___." Plaintiffs' exhibits are denoted as "PX" and defendant's exhibits are denoted as "DX." Citations to demonstrative exhibits are to "PDX __" and "DDX __."

[4]In December 1953, work started on the relocation of the Union Pacific Railroad, the Spokane, Portland and Seattle Railway, and U.S. Highway 30, which work was completed in 1957. *See* DX 9 (1967 Cost Allocation Report) at 10. On March 9, 1957, "diversion of [the] Columbia River through skeleton units 15-22 was halted and The Dalles pool was raised to approximately elevation 130, mean sea level . . . [and] held at that elevation until [March 16,] 1957, when it was raised to elevation 155, mean sea level. On [March 17,] 1957, the navigation lock, north fishway, and east fishway were placed in operation." *Id.*

[5]Section 204 of the Flood Control Act of 1950 required that several projects – including The Dalles Dam – be undertaken in accord with plans detailed in "the report of the Chief of Engineers dated June 28, 1949, and approved in the letter dated February 1, 1950, from the Director of the Bureau of the Budget for construction by the Corps of Engineers." Pub. L. No. 81-516, § 204, 64 Stat. 163, 179; see H.R. Rep. No. 81-1968, at 22-24 (1950) (Conf. Rep.) (describing the Columbia Basin projects (including The Dalles Dam), as being "substantially in accordance with the plans recommended in the report of the Chief of Engineers . . . and approved in the letter . . . from the Director of the Bureau of the Budget").

DX 9 (1967 Cost Allocation Report) at 6-7. The Report allocated both "specific" costs and "joint" costs at the dam. "Specific" costs were assigned to power, navigation, and recreation. *Id.* at 23-25. "Joint" costs benefitted both power generation and navigation at The Dalles Dam and were allocated by the Report between power generation and navigation. *Id.* at 24.

2. *The Dalles Irrigation Project.*

The Dalles Irrigation Project was authorized by a separate and later enactment in 1960. In that year, Congress "authorize[d] the Secretary of the Interior [("Secretary")] to construct, operate, and maintain the western division of The Dalles Federal reclamation project" for the "purpose of furnishing water for the irrigation of approximately five thousand five hundred acres of arid land in Wasco County, Oregon." Act of Sept. 13, 1960, Pub. L. No. 86-745, 74 Stat. 882.[6] The Dalles Irrigation Project was to "consist of the following principal works: a main pumping plant to be located at a site on the Columbia River; a booster and relift pumping plants with reregulating reservoirs; and a distribution system." *Id.*[7]

Pursuant to Section 2(b) of the authorizing legislation, the District was to repay construction costs of the Project consistent with the requirements of Section 9(d) of the Reclamation Project Act of 1939, codified at 43 U.S.C. § 485h(d).[8] Construction costs for the

---

[6]The reports of the Senate and House Committees on Interior and Insular Affairs indicated that the Project consisted of 5,420 acres. H.R. Rep. No. 86-2203, at 2 (1960); S. Rep. No. 86-1752, at 2 (1960). The Secretary of the Interior concurred in that assessment. *See* H.R. Rep. No. 86-2203, at 4; S. Rep. No. 86-1752, at 4.

The Corps's Cost Allocation Report for the Dam indicated that The Dalles reservoir may once have been intended to supply water for as many as 60,000 acres of irrigable land. *See* DX 9 (1967 Cost Allocation Report) at 20. However, the plain language of the statute provides that the western division of The Dalles Irrigation District was only intended to supply about 5,500 acres. *See* H.R. Rep. No. 86-2203, at 2; S. Rep. No. 86-1752, at 2.

[7]As contemplated by the authorizing legislation, farmers primarily grow cherries on the irrigated land.

[8]The Reclamation Project Act of 1939 requires that the Secretary of the Interior must submit a report to Congress addressing the engineering and financial feasibility of any federal irrigation project before it is constructed. *See* Act of Aug. 4, 1939, Pub. L. No. 76-260, §§ 7(c), 9, 53 Stat. 1187, 1192-94 (codified at 43 U.S.C. §§ 485f(c), 485h). Section 9(a) of the 1939 Act provides that if estimated construction costs of a proposed reclamation project cannot be repaid by the beneficiaries in proportion to the benefits received, construction may only commence upon an Act of Congress following the Secretary's submission of a feasibility report. 43 U.S.C. § 485h(a). Section 9(d) of the 1939 Act further provides that no irrigation water may be delivered via an irrigation project "until an organization . . . has entered into a repayment contract with the United States." 43 U.S.C. § 485h(d).

Project "in excess of the amount determined by the Secretary to be within the ability of the irrigators to repay within a fifty-year period" would come from net revenues derived from power marketed by BPA. Pub. L. No. 86-745, § 2(b), 74 Stat. at 882.

The authorizing legislation for The Dalles Irrigation Project specifically provided that power for irrigation purposes would be provided by the Secretary of the Interior "from the Dalles Dam powerplant":

> *Power and energy required for irrigation pumping* for the western division of The Dalles Federal reclamation project *shall be made available by the Secretary from The Dalles Dam powerplant . . . at rates not to exceed the costs of such power and energy from The Dalles Dam* taking into account all costs of the dam, reservoir, and powerplant which are determined by the Secretary under the provisions of the Federal reclamation laws to be properly allocable to such irrigation pumping power and energy.

*Id*. § 2(c), 74 Stat. at 882 (emphasis added).

Finally, Section 2(d) of The Dalles Irrigation Project's authorizing legislation provided that, as determined by the Secretary, costs of constructing "the works authorized by this Act" allocated to fish and wildlife benefits, along with "operation, maintenance, and replacement costs allocated to this function [fish and wildlife conservation], shall be nonreimbursable and nonreturnable under the reclamation laws." *Id*. § 2(d), 74 Stat. at 882.

B. The Contract

On October 19, 1961, The Dalles Irrigation District and the Bureau executed Contract No. 14-06-100-2276, styled "Repayment Contract Between the United States of America and The Dalles Irrigation District." DX 6 (Contract (Oct. 19, 1961)). That contract remains in effect today, being susceptible to termination only "by mutual agreement of the parties." *Id*. at 3 (Contract § 7). The contract obligated the United States to construct a pumping plant to divert water from the Columbia River, "[a] closed pipe distribution and lateral system to provide irrigation water delivery," and "[e]lectrical facilities to . . . transmit pumping power from" The Dalles Dam. *Id*. (Contract § 8(a)). The District was required to pay a fixed portion of the construction costs in fifty annual installments. *Id*. at 5 (Contract § 9).

During a "development period" of ten years, beginning in "the year for which water [wa]s announced as available to the District by the Secretary," the District was excused from making payments on its construction-charge obligation, but it did collect charges "sufficient to cover all operation and maintenance costs involved, including power charges." DX 6 at 6-7 (Contract § 11(a)). "Beginning with the close of the development period," the District was obligated to

collect annual assessments against the lands in the District on a uniform per-acre basis, equaling "an amount necessary to cover the costs of operation and maintenance." *Id*. at 11 (Contract § 13(b)).

Under the contract, the Bureau must make available to the District "that power and energy required for irrigation pumping during the irrigation season from The Dalles Dam powerplant and other federal powerplants connected therewith." DX 6 at 12 (Contract § 14(a)). Power from The Dalles Dam is transmitted to the District by the Bonneville Power Administration.[9] Under Section 14(a) of the contract, the District is obligated to pay for this power and energy at rates per kilowatt-hour sufficient to cover the costs of such power and energy from The Dalles Dam, taking into account all costs of the dam, reservoir and powerplant which are determined by the Secretary under the provisions of the Federal Reclamation Laws to be properly allocable to such irrigation pumping power and energy. *Id*. at 12-13 (Contract § 14(a)). The contractual language departs from the text of the authorizing legislation by deleting the phrase, "at rates not to exceed the costs of such power and energy" and substituting in its place "at rates . . . sufficient to cover the costs of such power and energy." *Compare* Pub. L. No. 86-745, § 2(c), 74 Stat. at 882, *with* DX 6 at 12 (Contract § 14(a)).[10]

Initially, the rate was fixed in the contract at one mill per kilowatt-hour ("mill/kwh"), effective until such time that the Secretary determined that a different rate should be applied. DX 6 at 13 (Contract § 14(a)). Changes by the Secretary to the rate "shall not be made more frequently than once in any five-year period." *Id*.

During the ten-year development period, the power charge was included in the development-period charges. DX 6 at 13 (Contract § 14(b)). Thereafter, payment of the charges for power supply has been and is to be "made each calendar year on the basis of annual estimates by the [Bureau]." *Id*. The Bureau is obliged to furnish a notice of the annual estimate to the

---

[9]Power generated by the Dam is transmitted and marketed by the Bonneville Power Administration, a federal agency charged with marketing and transmitting power in excess of that reserved for direct project requirements from federal generation facilities operated by the Corps and the Bureau as part of the Columbia River System. *See* Bonneville Project Act of 1937, Pub. L. No. 75-329, §§ 1, 2, 50 Stat. 731-33 (codified at 16 U.S.C. §§ 832, 832a, as amended). BPA is the power marketing agency for Pacific Northwest federal hydroelectric power system, *see* Federal Columbia River Transmission System Act, Pub. L. No. 93-454, 88 Stat. 1376-80 (codified at 16 U.S.C. §§ 838-838k), and receives accounting statements from each of the projects comprising the system. In addition, BPA administers and operates the federal transmission lines used to deliver power from The Dalles Dam to The Dalles Irrigation District.

[10]Taken at face value, the modification would effectively remove the rate ceiling imposed by the legislation and instead establish a rate floor. The government, however, does not rely on the contractual divergence from the statute to engender this shift.

District "each year on or before February 1 of the calendar year for which it is to be applicable." *Id*. The District has to provide payment by April 1 of that year. *Id*. If the Bureau finds that the "funds so advanced will be inadequate to pay the actual costs being incurred" for power under the contract, the Bureau may provide a "supplemental power charge notice stating therein the [additional] amount . . . required," and the District is required to pay that amount by the date specified in the notice. *Id*. at 13-14. If the funds advanced by the District exceed the "actual power charges" for the year, the surplus is credited towards the succeeding year's power charges. *Id*. at 14. Under the contract,

> [t]he costs which make up the various obligations to be paid by the District to the United States under this contract shall embrace all expenditures of whatsoever nature or kind in relation to the function for which the charge is made, including, but without limitation by reason of this enumeration, cost of surveys and investigations, labor, property, material and equipment, engineering, legal work, superintendence, administration, overhead, general inspection services, and damage claims of all kinds, whether or not involving the negligence of officers, agents or employees of the United States.

DX 6 at 16-17 (Contract § 18(b)). The contract states that "[t]he [Bureau]'s determination as to what cost is properly chargeable under this contract, and the classification of those charges for repayment purposes, shall be conclusive." *Id*. at 17.

Finally, the repayment contract provides that the cost of fish screens for the Project allocated to fish and wildlife are nonreimbursable and thus should not be charged to the District. *See* DX 6 at 4 (Contract § 8(c)).

C. Post-Contractual Implementation

When both BPA and the Bureau were agencies of the Department of the Interior,[11] several agreements, many informal, were made between those "sister" agencies to account for the delivery of reserved power and energy. PX 31 (Garifo Summary of Memoranda of Understanding ("Garifo Summary")) at BPA 1037. Between 1989 and 1990, Susan Garifo, then a public utilities specialist in contracts for BPA, compiled a history of the various memoranda bearing on charges for power provided to federal irrigation projects. Tr. 55:21 to 60:14 (Test. of Susan Garifo, current manager of sales administration for transmission for BPA); PX 31 (Garifo Summary) at BPA 1037. These memoranda address the fact that BPA as a general matter is "required by statue to deliver to irrigation projects developed by the [Bureau] power and energy reserved for the pumping of water to those projects. BPA is to be paid for the power at charges sufficient to recover costs of transmission and generation at identified hydroelectric projects, if

---

[11]Since 1977, BPA has been part of the Department of Energy. *See* The Department of Energy Organization Act, Pub. L. No. 95-91, § 302, 91 Stat. 565, 578 (Aug. 4, 1977) (codified, as amended, at 42 U.S.C. § 7152).

any." PX 31 (Garifo Summary) at BPA 1037. However, for certain irrigation projects, including especially The Dalles Irrigation Project, the authorizing statute and contract set out terms that vary from this general norm.

With respect to power charges for The Dalles, Ms. Garifo chronicles memoranda leading to the adoption of a Memorandum of Understanding between the Bureau and the BPA dated June 6, 1963, and an "Amendatory Agreement" to it in 1984. Her chronology begins by noting that in House Document No. 431, a report dated June 22, 1960 on The Dalles Irrigation Project made pursuant to Section 9(a) of the 1939 Reclamation Project Act (codified at 43 U.S.C. § 485h(a)), the cost of obtaining power at The Dalles powerplant was estimated at 1 mill/kwh, on the basis of interest-free financing. PX 31 (Garifo Summary) at BPA 1040. That estimate was reiterated in a memorandum dated August 30, 1961 to the Secretary of the Interior by the Commissioner of Reclamation, which confirmed that "the cost of obtaining power at powerplant on the basis of interest-free financing is estimated to be 1 mill per kilowatt[-]hour." PX 36 (Memorandum from Commissioner of Reclamation to the Secretary of the Interior regarding the proposed repayment contract for The Dalles Irrigation Project (August 30, 1961)) at 1. The memorandum provides that the 1 mill/kwh rate is to be "used until another rate is established by the Secretary as provided in Article 14 of the proposed contract." *Id.*

Contemporaneously, a memorandum from the Bureau's Office of the Solicitor submitted to the Bureau's Regional Administrative Officer, dated August 3, 1961, stated the Bureau's understanding that the Bureau would:

> carry in its books as a part of the capital costs of the Reclamation project an amount representing the allocated costs of the generating facilities to generate the power and an allocated amount to represent the [f]ederal investment in the transmission facilities [needed] to carry the generat[e]d power over the lines of the [BPA] from the generating facility to the project pumps. Further, the administrative agreement provides that *there would be no continuing annual financial adjustment for the operating, maintenance or replacement of the generating or transmission facilities represented by the allocated amounts for capital investment.*

PX 31 (Garifo Summary) at BPA 1041; PX 64 (Memorandum from Bureau Solicitor to Regional Administrative Officer (August 3, 1961)) at 2 (emphasis added).

A subsequent letter from BPA to the Bureau, dated December 13, 1961, followed a meeting between staff members of the two agencies and stated that BPA "would waive the annual costs of the facilities used for [Bureau] service if the capital investments were transferred to the [Bureau's] books." PX 31 (Garifo Summary) at BPA 1041. As of December 1961, the Bureau declined to include a transmission operation and maintenance ("transmission O&M") cost in the rate charged to The Dalles for hydroelectric power. PX 40 (Letter from Neil Stessman, Regional Supervisor, Bureau to L.W. Lloyd, Regional Director, Bureau (Sept. 1, 1982)) at BPA 248. The Bureau had concluded that "[a] repayment contract had already been

executed which established the repayment obligation of the irrigation district," "[n]o transmission O&M costs had been included in determining the district's repayment obligation as we had been unaware of such costs," and "[i]f we were to include transmission O&M costs, we would have to recalculate the repayment obligation and renegotiate the repayment contract." *Id*. At that time, BPA agreed with the Bureau's decision and waived all transmission O&M costs. *Id*.

In a Definite Plan Report for The Dalles Irrigation Project dated August 1962, the Bureau summarized the contract and established the construction plan, explaining that BPA had agreed to waive the costs incurred in the operation and maintenance of substation and transmission facilities used in the transmission of power to the District. DX 7 (Definite Plan Report, August 1962) at 3, 9; *see also* Def.'s Post-Trial Br. at 12. The Definite Plan Report also states that the BPA had advised the Bureau that BPA's "recently enunciated policy of cost sharing of the annual operation, maintenance, and replacement costs of jointly used facilities will not apply to [The Dalles] project." DX 7 (Definite Plan Report, August 1962) at 3.

Ms. Garifo summarizes a Memorandum of Understanding ("Memorandum" or "MOU") between BPA and the Bureau that was effective from June 6, 1963, PX 31 (Garifo Summary) at BPA 1040, concluding that "[t]ransmission and transformation O&M costs are to be borne by BPA according to the 1963 MOU," and that "[t]his was not modified by [any later agreement]." *Id*. at 1042. She then noted that "BPA is still entitled to recapture the [Bureau's] share of generation costs 'not to exceed . . . all costs of the dam, reservoir, and powerplant." *Id*. After commenting that the legislative history of the statute authorizing the Dalles Irrigation Project indicated that the charges for power and energy were to be interest-free, Ms. Garifo expressed the view that "the generation costs include costs of O&M and depreciation only." *Id*.

The 1963 Memorandum provided that "[t]he Administrator will, *at his expense*, operate and maintain all of the facilities and equipment mentioned in section 6 hereof." PX 31 (Garifo Summary) at 1041. "Section 6" in turn "lists substation and transmission facilities," "any special transmission facilities mentioned elsewhere in the MOU or subsequent amendment," and "facilities for which the [Bureau] compensates the [BPA] for reserved capacity," but excludes those "facilities installed for the exclusive use of the [Bureau]" and any "facilities and equipment installed in The Dalles substation to provide for service to the [Bureau] for the Project." *Id*. The Memorandum established a fixed amount of $39,750 to be charged to the Bureau for its proportional cost of transmission and substation facilities jointly used by the Bureau and BPA. *Id*.

A subsequent memorandum, dated February 28, 1967, sets out general guidelines agreed between the BPA and the Bureau "to be used by the Bureau in determining the pumping power charges for new federal irrigation projects." PX 29 (1967 BPA Guidelines for Pumping Power Charges for New Federal Irrigation Projects) at BPA 1135. The guidelines specified that they did not replace contractual terms and arrangements applicable to specific irrigation projects. *Id*. at 1135-36. Rather, they established that as a general matter that "[t]he pumping power charges to

the irrigators will be sufficient to (1) return the system operation, maintenance, and replacement costs allocated to pumping power; and (2) repay the system investment allocated to pumping power during the irrigation repayment period." *Id*. at BPA 1135.

______In 1979, the Assistant General Counsel of BPA provided a legal opinion to the Head of the BPA Contract Section that the language of the authorizing legislation for The Dalles Irrigation Project "was vague, but that '[t]ransmission costs are a customary and proper charge for delivery of electric energy.'" PX 31 (Garifo Summary) at BPA 1041. The opinion "went on to say that the fixed substation-related charge was probably intended by Congress to be a one[-]time payment to BPA for the substation facilities," but that replacement costs for substation equipment could be "legally assessed." *Id*. at BPA 1041-42. Ms. Garifo, however, noted that "the 1963 MOU indicates that O&M costs of transmission and transformation are to be borne by BPA." *Id*. at BPA 1042. She also includes another memorandum, undated but spatially placed in her account between events that occurred in 1980 and 1984, which in discussing "the [Bureau's] ability to charge the irrigation for reserved power and energy[,] states that only the generation costs may be passed through." *Id*.

On September 1, 1982, an internal letter within the Bureau observed that generation O&M costs had "decreased from 1.0 mill to .52 mill[s] per kilowatt-hour." PX 40 (Letter from Neil Stessman, Regional Supervisor, Bureau, to L.W. Lloyd, Regional Director, Bureau, (Sept. 1, 1982)) at BPA 248. At that time, the Bureau concluded that "[i]t would be difficult to support [cutting the rate paid from 1.0 to 0.52 mills/kwh] in view of the need to recover project O&M costs, the fact that The Dalles' rate is already one of the lowest in the Region, the rate has been unchanged for 20 years, and that most other projects have recently had their rates raised substantially." *Id*. The Bureau had received a proposal from BPA to establish a generation charge of 0.52 mills/kwh and a transmission O&M charge of 0.93 mills/kwh, for a total of 1.45 mills/kwh. *Id*. The Bureau concurred in BPA's recommendation based upon the fact that the contract language respecting costs neither included nor precluded transmission O&M charges. *Id*. at 249.

The Dalles objected to the increase to 1.45 mills/kwh upon receiving notice of the proposal from the Bureau in 1982. PX 41 (Letter from Una Mae Harmon, Office Manager, The Dalles, to Bill Lloyd, Regional Director, Bureau (Oct. 25, 1982)); PX 42 (Letter from Don W. Bailey, President, The Dalles Board of Directors, to Lloyd (Dec. 9, 1982)). The District questioned the necessity of the "almost 50%" rate increase and "BPA's involvement in the determination" when, "according to our contract with the [Bureau], our rate is based on production of power from The Dalles Dam, and not upon projections by BPA." PX 41 (Letter from Harmon to Lloyd (Oct. 25, 1982)). The District requested additional information on how the new rate of 1.45 mills/kwh was calculated. *Id*. The Dalles specifically argued that it was obligated to pay for energy supplied by The Dalles Dam powerplant and that the contract contained no reference to transmission charges in that connection. PX 42 (Letter from Bailey to Lloyd (Dec. 9, 1982)) at 2. The Dalles also recited that the contract vested the Secretary of the Interior with the power to determine a different rate and stated the District's understanding that

the Secretary had not acted in this respect. *Id*. Ultimately, the rate was not increased, and The Dalles continued to pay for power and energy at a rate of 1.0 mill/kwh.

Thereafter, the Bureau and BPA negotiated Amendatory Agreement No. 1, effective at midnight on December 31, 1984, which modified the Memorandum between BPA and the Bureau of June 6, 1963. PX 31 (Garifo Summary) at BPA 1040. The Amendatory Agreement included only generation costs in the charges for power and energy, and "[a]lthough a lost revenue component was included in the charges for reserved power and energy for all projects except The Dalles . . . the component was omitted for The Dalles." *Id*. at BPA 1042. The nature and means of calculating a "lost revenue component" is addressed *infra*, at 12 & n.13.

In concluding remarks to her study in 1989-90, Ms. Garifo stated her view that, following Amendatory Agreement No. 1, any "[r]enegotiation of The Dalles should include authorization for BPA to assess the lost revenue component. . . . Also, other modifications to the 'rate language' including the timeframe of the update procedure should be revised." PX 31 (Garifo Summary) at BPA 1043.

As a general matter, beginning in the late 1980s, the Bureau had begun work with BPA to establish a more uniform methodology for rates "for service to small [irrigation] projects," including The Dalles. PX 7 (Mem. from Commissioner, Bureau to Assistant Secretary, Water and Science, Interior (Sept. 28, 1990)) at BPA 1132-33. This effort was carried out in the context of the five-year reviews of rates contemplated in the contracts between the Bureau and the irrigation projects, including The Dalles. *Id*. "During the 1989 negotiation [between BPA and the Bureau], the [lost revenue] component was introduced without objection from [Bureau] staff." PX 31 (Garifo Summary) at BPA 1042. As a consequence of this change, the charge to The Dalles District for "irrigation pumping power" was increased from 1.00 mill/kwh, the rate used from inception through 1989, to 1.23 mills/kwh for the 1990 to 1994 period. *Id*. The Bureau informed The Dalles that the proposed revised energy rate of 1.23 mills/kwh was "based on the cost of generation at The Dalles Powerplant." *The Dalles*, 71 Fed. Cl. at 348.

Promptly thereafter, The Dalles sought clarification of the rationale for the rate increase, based on its understanding that the cost for generation was 0.52 mills/kwh five years previously. The Bureau responded by providing The Dalles with general data regarding power revenues and expenses of the Federal Columbia River Power System. Upon receiving the cost data, Mr. Bailey, Chairman of The Dalles' Board of Directors, informed the Bureau that the information did "not appear to be pertinent to calculating [The Dalles'] power cost, since [The Dalles'] rate is based only on generation cost at The Dalles Dam." PX 62 (Letter from Bailey to Bureau (Oct. 4, 1989)).

For 1990-1994, the revised charge for The Dalles and the other irrigation districts was calculated first by determining the historical cost of providing power and thereafter by increasing that amount "to compensate BPA for increases in cost that w[ould] occur over" the ensuing five years. DX 8 (Revision No. 1 to Memorandum of Understanding between BPA and Bureau)

("Revision No. 1") at 18-21 (effective Jan. 1, 1990)).[12] The so-called "Lost Revenue Component Method" was used in these calculations. *Id.*[13] For those years, the historical cost was 1.160 mills/kwh, based on the average generation costs from 1985 through 1988, plus an additional 0.067 mill/kwh for "lost revenue." DX 8 (Revision No. 1) at 18-21.

In 1990, the Bureau assessed The Dalles an energy rate at 1.23 mills/kwh and computed its overall charge based upon the District's expected usage. It applied a credit from BPA and an additional credit for the operation and maintenance of fish screens. DX 24 (Letter from Chief, Finance Branch, Bureau, to The Dalles (Feb. 15, 1990)) at 11. The Bureau noted at the time that the new rate had not yet been approved by the Secretary of the Interior. *Id.*

In 1995, The Dalles' charge was increased to 1.31 mills/kwh, based upon the average generation cost from 1990 through 1993, *i.e.*, the historical cost, of 1.226 mills/kwh, adjusted upward by 0.086 mill/kwh for "lost revenue." DX 8 (Memorandum of Understanding, Revision No. 2) at 25-28 (effective Jan. 1, 1995) (not signed); PX 93 (Charge and Calculations, The Dalles Project Revisions Nos. 2 & 3) at 1-4 (signed). To determine the energy rates, the Bureau applied the methodology that it had first used for The Dalles for 1990 through 1994. Beginning in 2002, the charge for The Dalles' energy and power was increased to 2.59 mills/kwh, based upon an historical cost of 1.846 mills/kwh, comprising the average generation cost from 1994 through 2000, adjusted upward by 0.748 mill/kwh for "lost revenue." DX 8 at 29-32 (Memorandum of Understanding, Revision No. 3) (effective Jan. 1, 2002)) (signed); PX 93 at 6-10 (Revisions Nos. 2 & 3) (not signed).

---

[12]Revision No. 1 consisted of "Charge and Calculations" for The Dalles Project, and was signed by John W. Keys, III, Regional Director, Bureau, on December 14, 1990, and on January 10, 1991, by Edward W. Sienkiewicz, Senior Assistant Administrator for Power Management, BPA. DX 8 (Revision No. 1) at 21.

[13]The method looked both backward and forward to calculate the rates. The term "lost revenue" for the previous five-year period represented "the difference between the actual cost of service and the revenue collected from the charge in effect for that period." DX 8 (Revision No. 1) at 18. For a five-year period to come, "'lost revenue' refer[red] to the project inflation (*i.e.*, the difference between the historical cost of service and the projected cost of service in a given year)." *Id.* After "lost revenue" had been calculated, "the actual long-term interest rate for each of the past five years and the project cost for the next five years [wa]s determined," and those figures were applied to the "lost revenue" to produce "lost revenue plus interest." *Id.* at 19. After the "lost revenue plus interest" was discounted to obtain an annual cost, that amount was added to the historical cost to produce the ultimate charge for energy costs. *Id.*

D. Procedural History

Prior to the most recent revision to the energy and power charge in 2002, The Dalles notified the Bureau of its objection to the methodology used since 1990 to calculate its energy costs and asserted that under the contract, it should only be charged with generation costs and not a "lost revenue component." PX 37 (Letter from Marvin Polehn, Chairman of The Dalles' Board of Directors to Bill McDonald, Pacific Northwest Area Director, Bureau).[14] Subsequent to the 2002 revision of The Dalles' energy rate, counsel for both parties began meeting to discuss the appropriate methodology for determining The Dalles' energy charge, but ultimately they failed to reach a resolution. DX 15 (Letter from Arden E. Shenker, Shenker & Bonaparte, LLP, to Terrald Kent, Program Manager, Bureau (May 15, 2003)). On August 18, 2004, The Dalles filed a complaint in the District Court for the District of Oregon, alleging that the Bureau and Department of the Interior had breached their contract. The district court transferred the case to this court on September 28, 2005, in light of the Supreme Court's ruling in *Orff v. United States*, 545 U.S. 596 (2005).[15]

On October 25, 2005, The Dalles filed its amended complaint in this court. On June 16, 2006, the court denied a motion by the defendant to dismiss the case for lack of subject matter jurisdiction based on a statute of limitations defense. Following a four-day trial and post-trial briefing and argument, the liability issues are ready for decision.

---

[14] The copy of this letter in the record is undated. During the hearing held on the government's earlier motion to dismiss, The Dalles' counsel represented to the court that the letter was written between June 1999 and November 2000. Hr'g Tr. 40:5 to 41:4 (May 9, 2006).

[15] The United States has explicitly waived sovereign immunity in cases where a party seeks to "join the United States as a necessary party defendant in any suit to adjudicate, confirm, validate, or decree the contractual rights of a contracting entity and the United States regarding any contract executed pursuant to [f]ederal reclamation law." 43 U.S.C. § 390uu. Section 390uu states that "[a]ny suit pursuant to this section may be brought in any United States district court in the [s]tate in which the land involved is situated." *Id*. Subsequent to the filing of this case in the District Court for the District of Oregon, the Supreme Court in *Orff* held that Section 390uu is limited to cases where the United States is joined as a party defendant in an action between other parties and does not waive the government's sovereign "immunity from suits *directly against* the United States." *Orff*, 545 U.S. at 604 (emphasis added). Consequently, The Dalles could no longer pursue the case in the district court under Section 390uu, and the District successfully sought to have this case transferred to this court such that it could proceed under the Tucker Act, 28 U.S.C. § 1491(a)(1). *See* Hr'g Tr. 25:22 to 26:23 (May 9, 2006).

## STANDARDS FOR DECISION

Two doctrines of contract law bear on interpretation of the contract between the Bureau and the District. First, where a contract implements or fulfills a statutory requirement, the interpretation of the contract will be guided by the underlying statute. *See The Dalles*, 71 Fed. Cl. at 354 n.11 (citing *Roedler v. Dep't of Energy*, 255 F.3d 1347, 1352 (Fed. Cir. 2001) ("For determination of contractual and beneficial intent when, as here, the contract implements a statutory enactment, it is appropriate to inquire into the governing statute and its purpose."), and *Rendleman v. Bowen*, 860 F.2d 1537, 1541-42 (9th Cir. 1988)); *see also Maine Yankee Atomic Power Co. v. United States*, 225 F.3d 1336, 1341-42 (Fed. Cir. 2000) (addressing the Standard Contract in terms of the requirements of the Nuclear Waste Policy Act of 1982); *American Hosp. Ass'n v. Schweiker*, 721 F.2d 170, 183 (7th Cir. 1983); *System Fuels, Inc. v. United States*, 79 Fed. Cl. 37, 52-53 (2007). In this instance, the express terms of the repayment contract are illuminated by the authorizing legislation for The Dalles Irrigation District, and, to a lesser extent, by other background legislation such as the authorizing legislation for The Dalles Dam.

Second, the post-adoption actions of parties to a contract can be useful in guiding interpretation. "The practical interpretation of an agreement by a party to it is always a consideration of great weight. The construction of a contract is as much a part of it as any thing else. There is no surer way to find out what parties meant, than to see what they have done." *Brooklyn Life Ins. Co. of N.Y. v. Dutcher*, 95 U.S. 269, 273 (1877); *System Fuels*, 79 Fed. Cl. at 53. The Supreme Court has held that

> [i]n cases where the language used by the parties to the contract is indefinite or ambiguous, and, hence, of doubtful construction, the practical interpretation by the parties themselves is entitled to great, if not controlling, influence. . . . [I]n an executory contract, . . . where its execution necessarily involves a practical construction, if the minds of both parties concur, there can be no great danger in the adoption of it by the court as the true one.

*Chicago v. Sheldon*, 9 Wall. 50, 76 U.S. 50, 54 (1869); *see also Topliff v. Topliff*, 122 U.S. 121, 131 (1887); Richard A. Lord, 11 *Williston on Contracts* § 32:14 (4th ed.) (1999) ("Given that the purpose of judicial interpretation is to ascertain the parties' intentions, the parties' own practical interpretation of the contract – how they actually acted, thereby giving meaning to their contract during the course of performing it – can be an important aid to the court. Thus, courts give great weight to the parties' practical interpretation."). In sum, where a contract is indefinite or ambiguous, the practical construction adopted by the parties is reliable and often controlling because it evidences what the parties believed the contract to require before they confronted the prospect of impending litigation. *See Old Colony Trust Co. v. Omaha*, 230 U.S. 100, 118 (1913) ("Generally speaking, the practical interpretation of a contract by the parties to it for any considerable period of time before it comes to be the subject of controversy is deemed of great, if not controlling, influence."); *Blinderman Constr. Co. v. United States*, 695 F.2d 552, 558 (Fed.

Cir. 1982) ("It is a familiar principle of contract law that the parties' contemporaneous construction of an agreement, before it has become the subject of a dispute, is entitled to great weight in its interpretation."); *see also Saul Subsidiary II Ltd. v. Barram*, 189 F.3d 1324, 1326 (Fed. Cir. 1999). The closer in time to contract formation, and the more distant the prospect of litigation, the more reliable the parties' practical interpretation should be. In the face of litigation, when "[s]elf-interest stimulates the mind to activity, and sharpens its perspicacity," parties "often claim more, but rarely less, than they are entitled to." *Brooklyn Life*, 95 U.S. at 273.

**ANALYSIS**

The starting point for analysis of the dispute over the propriety of the Bureau's charges for energy and power is the language of the contract between the Bureau and The Dalles Irrigation District, plus the legislation that underpins the contract. Only after the contract and statute are taken into account can the actions of the parties in implementing the contract be conformably placed in context.

*A. Contractual Language*

Section 14(a) of the contract between the Bureau and The Dalles Irrigation District provides that the Bureau shall supply power and energy to the District

> at rates per kilowatt-hour sufficient to cover the costs of such power and energy from The Dalles Dam, taking into account all costs of the dam, reservoir and powerplant which are determined by the Secretary under the provisions of the Federal Reclamation Laws to be properly allocable to such irrigation pumping power and energy.

DX 6 at 12-13 (Contract § 14(a)).

As noted previously, the contractual language departs from the text of the authorizing legislation by deleting the phrase, "at rates not to exceed the costs of such power and energy" and substituting in its place "at rates . . . sufficient to cover the costs of such power and energy." *See supra*, at 6; *compare* Pub. L. No. 86-745, § 2(c), 74 Stat. at 882, *with* DX 6 at 12 (Contract § 14(a)). Aside from the contract's departure from the statutory language that rates were not to exceed costs of power and energy, the contract generally follows the language of the statute. Additionally, the contract specifies that a fixed rate of one mill/kwh is to be effective until such time that the Secretary determines that a different rate shall be applied, and that the Secretary was not to change the rate "more frequently than once in any five-year period." DX 6 at 13 (Contract § 14(a)).

The statutory text specifies in explicit terms that the rates to be paid by the District must reflect the costs of power and energy from The Dalles Dam powerplant. In this respect, the

Secretary of the Interior has the responsibility to determine "all costs of the dam, reservoir, and powerplant" which are "properly allocable" to irrigation pumping power and energy under the federal reclamation laws. Pub. L. No. 86-745, § 2(c), 74 Stat. at 882. The limitation on costs to those incurred at The Dalles Dam is not debatable. *See United States v. Missouri Pac. R.R.*, 278 U.S. 269, 278 (1929) ("[W]here the language of an enactment is clear, and construction according to its terms does not lead to absurd or impracticable consequences, the words employed are to be taken as the final expression of the meaning intended."); *Leighton v. Office of Pers. Mgmt.*, __ F.3d __, __, 2008 WL 2416189, at *3 (Fed. Cir. June 17, 2008) (same). However, questions as to what costs are "properly allocable" to the "dam, reservoir, and powerplant" are not so susceptible to plain meaning. Consequently, the court will take into account the post-formation actions of the parties to determine their understanding of what costs were properly allocable to power and energy from The Dalles Dam under federal reclamation laws.

*B. Justiciability*

The government raises a threshold question as to whether the decisions by the Secretary of the Interior regarding the rates to be charged to The Dalles are reviewable by this court. It argues on the one hand that the terms of the contract and underlying statute are unambiguous as a matter of law, but also on the other hand that the Secretary is directed to exercise his or her discretion in determining what costs are properly allocable to the District. As the government would have it, the actions of the Secretary to set rates are beyond this court's power to address. Alternatively, if the court should determine that the contract and enabling legislation are ambiguous, the government contends "that the Secretary's reasonable interpretation is controlling." Def.'s Br. at 24. In short, under either alternative analytical route, the government suggests that the District's contractual claims about rates for power and energy are not justiciable because the Secretary's rate-setting role under the statute and the contract is not reviewable.

The contract provides that "[t]he Secretary's determination of what cost is properly chargeable under this contract . . . shall be conclusive." DX 6 at 17 (Contract § 18(b)). Does that contractual provision bar this court from examining the components of cost assigned to the District by the Bureau for the Secretary? The parties have argued this question by reference to whether the Secretary's determinations of cost are reviewable under the Administrative Procedure Act, 5 U.S.C. §§ 701-06. That Act provides a right of judicial review to any person "adversely affected or aggrieved by agency action," 5 U.S.C. § 702, unless a statute itself expressly precludes judicial review, or "agency action is committed to agency discretion by law." 5 U.S.C. § 701(a)(2). Under the Act, "judicial reviewability . . . is the rule, and non-reviewability an exception which must be demonstrated, and which should result only from a showing of 'clear and convincing evidence' of a legislative intent to restrict judicial review." *Arizona Power Pooling Ass'n v. Morton*, 527 F.2d 721, 727 (9th Cir. 1975) (citing *Barlow v. Collins*, 397 U.S. 159, 166 (1969), and *Abbott Labs v. Gardner*, 387 U.S. 136, 141 (1967)). The narrow exception to reviewability is applicable only in "those rare instances where statutes are drawn in such broad terms that in a given case there is no law to apply." *Id.* (quoting *Citizens to Preserve Overton*

*Park, Inc. v. Volpe*, 401 U.S. 402 (1971), *abrogated in part by Califano v. Sanders*, 430 U.S. 99, 105 (1977) (abrogating *Overton Park* to the extent it recognized the APA as an independent grant of subject matter jurisdiction)) (internal quotation marks omitted).

In *Arizona Power Pooling Ass'n*, the Ninth Circuit considered that "Congress circumscribed [the Secretary of the Interior's] discretion in at least one area by making his actions subject to the federal reclamation laws." 527 F.2d at 727. The court of appeals determined that "there is 'law to apply' clearly evident on the face of the statute itself," because the Secretary is given a very specific directive that "no sales contracts shall be made unless, 'in the judgment of the Secretary,' they will not impair the efficiency of the project for irrigation purposes.'" *Id*. at 727-28 (quoting 43 U.S.C.A. § 485h(c)). The judgment of the Secretary to grant or deny the statutorily provided preference for public entities in governmental contracts for power was thus reviewable by a court of law.

A subsequent opinion by the same court of appeals, *Arizona Power Auth. v. Morton*, 549 F.2d 1231, 1233 (9th Cir. 1977), holds that issuance of marketing criteria was an action committed to agency discretion by law. Where neither the underlying statute nor legislative history addressed the question of geography, the Secretary's exercise of geographic preference for customers was deemed not to be reviewable under the Administrative Procedure Act. *Id.*

In this instance, the specific authorizing legislation for The Dalles Irrigation District both addresses and limits the Secretary's ability to assess costs and determine rates charged to the District. Charges are to be assessed

> *at rates not to exceed the costs of such power and energy from The Dalles Dam* taking into account all costs of the dam, reservoir, and powerplant which are determined by the Secretary under the provisions of the Federal reclamation laws to be properly allocable to such irrigation pumping power and energy.

Pub. L. No. 86-745, § 2(c), 74 Stat. at 882 (emphasis added). This lengthy provision, while somewhat ambiguous, effectively limits the Secretary's discretion in several respects: Rates are capped at the cost of power and energy from The Dalles Dam, taking into account the costs of the dam, reservoir, and powerplant. Further, what is a properly allocable cost can only be determined by referring to federal reclamation law. These limitations on the maximum rate also distinguish the District's claims in this case from those at issue in a decision cited by the government, *Flint v. United States*, 906 F.2d 471 (9th Cir. 1990). In *Flint*, the Ninth Circuit held that maximum charges for operation and maintenance costs were committed to agency discretion by law under 43 U.S.C. § 485h(e), which "appears to set a standard for *minimum* charges by requiring that the charges produce sufficient revenues to cover project operation and maintenance costs. . . . We find no meaningful standard for determining a *maximum* price to be charged under § 485h(e)." 906 F.2d at 475-76.

In this instance, Congress has bounded the Secretary's discretion with a statutory maximum. That maximum bound cannot be elided by contractual language that omits reference to the cap, as previously described, and also denominates the Secretary's determinations of cost as "conclusive." In this respect, the contract must be interpreted and applied in light of the underlying statute. *See Killip v. Office of Pers. Mgmt.*, 991 F.2d 1564, 1569 (Fed. Cir. 1993) ("An agency is but a creature of statute. Any and all authority pursuant to which an agency may act ultimately must be grounded in an express grant from Congress.") (citing *Lyng v. Payne*, 476 U.S. 926, 937 (1986)). It is blackletter law that "no . . . rule or regulation can confer on the agency any greater authority than that conferred under the governing statute." *Id.* (citing *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988), and *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 213-14 (1976)). Similarly, a contract entered by an agency may not override statutory limitations. In short, the Secretary's actions in prescribing rates are subject to review and evaluation in the setting of this action to enforce the contract that implements the statute providing for The Dalles Irrigation Project.

Secondarily, the government contends that the Secretary's action in setting rates should be accorded controlling weight under *Chevron, U.S.A., Inc. v. Natural Resources Def. Council, Inc.*, 467 U.S. 837, 843-44 (1984) ("[Where Congress] has explicitly left a gap for the agency to fill, there is an express delegation of authority to the agency to elucidate a specific provision of the statute by regulation. Such legislative regulations are given controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute."). Here, however, the government is arguing not that the court should give deference to legislative regulations issued by the Bureau, but rather to its construction of a contract to which it is a party.

The government cites *United States v. Mead Corp.*, 533 U.S. 218, 230-31 (2001), to support a contention that "[t]here is no requirement that an agency make formal rules, after notice-and-comment, as a predicate to *Chevron* deference." Def.'s Post-Trial Br. at 25-26. In *Mead*, the Supreme Court determined that although "the overwhelming number of our cases applying *Chevron* deference have reviewed the fruits of notice-and-comment rulemaking or formal adjudication," the absence "of that procedure here does not decide the case, for we have sometimes found reasons for *Chevron* deference even when no such administrative formality was required and none was afforded." 533 U.S. at 230-31 (citing *NationsBank of N.C., N.A. v. Variable Annuity Life Ins. Co.*, 513 U.S. 251, 256-57, 263 (1995)). Typically, however, "[a]gency interpretations that are not the result of such formal administrative procedures are generally entitled to a lesser degree of deference under *Skidmore v. Swift & Co.*, [323 U.S. 134 (1944).]" *TeamBank, N.A. v. McClure*, 279 F.3d 614, 618-20 (8th Cir. 2002). Under the *Skidmore* standard of deference, agency interpretations, while not controlling, "constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance. The weight [accorded to an administrative] judgment in a particular case will depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control." *Skidmore*, 323 U.S. at 140.

The District counters that not even the reduced *Skidmore* deference applies to give weight to the government's litigation stance on contract interpretation, because "[t]he government's inconsistent interpretations of the repayment contract did not derive from administrative or adjudicative proceedings." Pl.'s Post-Trial Br. at 15.

There is support for the District's position that an "agency['s] interpretations of its own contracts do not require judicial deference." Pl.'s Post-Trial Br. at 15. In *Mesa Air Group, Inc. v. Dep't of Transp.*, the D.C. Circuit determined that "the terms of the [relevant] statute indisputably establish Congress' intent to make the subsidy agreements contracts, not administrative regulations." 87 F.3d 498, 503 (D.C. Cir. 1996). Because the orders establishing subsidies were "contracts, not departmental regulations," the court concluded they were "subject to interpretation under the neutral principles of contract law, not the deferential principles of regulatory interpretation." *Id*. In an earlier decision, after concluding that a particular settlement agreement should be accorded deference, the D.C. Circuit had identified several circumstances in which deference would be "inappropriate." *National Fuel Gas Supply Corp. v. FERC*, 811 F.2d 1563, 1571-72 (D.C. Cir. 1987). Two are relevant here. First, "[i]f the agency's interpretation of a contract has vacillated, deference might give the agency license to act arbitrarily by making inconsistent decisions without justification." *Id.* at 1571. Second, "if the agency itself were an interested party to the agreement, deference might lead a court to endorse self-serving views that an agency might offer in a post hoc reinterpretation of its contract." *Id*. at 1571-72.

As was the case in *Mesa Air Group*, the enabling legislation for The Dalles Irrigation Project authorizes the Secretary to bind the Bureau in contract, not to issue regulations. The contract is "subject . . . to the neutral principles of contract law, not the deferential principles of regulatory interpretation." *Mesa Air Group*, 87 F.3d at 503. This conclusion is supported by the fact that the circumstances where deference would be inappropriate, as described in *National Fuel Gas Supply*, are applicable to the present facts. Not only is the agency, the Bureau, a party to the agreement, but it has vacillated over the passing decades in its interpretation of the contract. The court recognizes and acknowledges that the underlying statute specifically assigns to the Secretary determination of costs for power delivered to the District. However, the Secretary's actions in that regard are more persuasive to the extent that they reflect a consistent, principled approach to the cost determinations. Within that sphere, the Secretary's actions are entitled to some weight. Thus, the court applies a form of *Skidmore* deference to the Secretary's actions to determine costs of production of power and energy at The Dalles Dam. *See National Fuel Gas Supply*, 811 F.2d at 1571 ("As this court stated even before *Chevron*, 'there is room, in review of administrative agencies, for some deference to their views even on matters of law like the meaning of contracts, as on the meaning of statutes, where the understanding of the documents involved is enhanced by technical knowledge of industry conditions and practices.'") (quoting *Columbia Gas Transmission Corp. v. FPC*, 530 F.2d 1056, 1059 (D.C. Cir. 1976)).

C. Disputed Components of the Reserved-Power Charges

*1. Operation and maintenance costs.*

Under the contract, the Secretary's rates are to be "sufficient to cover the costs of such power and energy from The Dalles Dam, taking into account all costs of the dam, reservoir and powerplant." DX 6 at 12 (Contract § 14(a)). Such rates are also to be the maximum not-to-be-exceeded rates under the authorizing legislation. *See supra*, at 6. These costs include operation and maintenance costs: During the initial ten-year development period, the District was to pay charges "sufficient to cover all operation and maintenance costs involved, including power charges." DX 6 at 6-7 (Contract § 11(a)). After the development period, the District was obligated to collect annual assessments against the lands in the District on a uniform per-acre basis, equaling "an amount necessary to cover the costs of operation and maintenance." *Id*. at 11 (Contract § 13(b)).

The parties agree that "operation and maintenance" costs are chargeable to the District. "Operation and maintenance costs" are not defined specifically by the contract, but the contract sets out a wide-ranging definition of costs generally:

> The costs which make up the various obligations to be paid by the District to the United States under this contract shall embrace *all expenditures* of whatsoever nature or kind *in relation to the function for which the charge is made*, including, but without limitation by reason of this enumeration, cost of surveys and investigations, labor, property, material and equipment, engineering, legal work, superintendence, administration, overhead, general inspection services, and damage claims of all kinds, whether or not involving the negligence of officers, agents or employees of the United States.

DX 6 at 16-17 (Contract § 18(b)) (emphasis added). For purposes of this dispute, the pertinent "function" is power generation. In addition, the allocation of costs must be consistent with those "properly allocable" to "irrigation pumping power and energy" under "the provisions of the Federal Reclamation Laws." *Id*. at 12-13 (Contract § 14(a)).

The Corps's accounting system consistently included an "O&M" classification. *See* Tr. 224:17-20 (Test. of Lisa Kaiser, an accountant for BPA and previously an accountant for the Corps) ("I don't actually provide the rate to the [irrigation] districts, I provide the operation and maintenance costs and depreciation figures to who[m]ever is reviewing the rates in Bonneville."); *see also* Tr. 270:24 to 273:5 (Test. of Karen Miller, an accountant for the Corps). That category of costs was passed along to BPA and then to the Bureau. *See* Tr. 734:23 to 735:21, 743:25 to 747:16, 753:3-24 (Test. of Jerry Dinan, a former accountant for BPA, currently retained as a consultant by BPA). The District did not challenge inclusion of any particular items of cost within the O&M classification.

The Corps's treatment of O&M costs thus appeared to be consistent with that applicable generally to projects under the reclamation laws. Other courts faced with similar classifications have concluded that "[w]hile indefinite, the term 'operating expense' is a broad and comprehensive one, and its meaning in a given case depends on the nature and amount of the expenditure, and all the surrounding circumstances." *Nampa & Meridian Irrigation Dist. v. Bond*, 288 F. 541, 543 (9th Cir. 1923), *aff'd*, 268 U.S. 50 (1925) (holding that the Secretary is authorized in construction and operation of a project to construct a drainage system to prevent water damage and finding that those drainage costs were chargeable as operation and maintenance expenses); *see also Bostwick Irrirgation Dist. v. United States*, 900 F.2d 1285 (8th Cir. 1990) (Bureau could recover operation and maintenance costs incurred by the Corps for the dam and reservoir supplying the district with water); *Casitas Mun. Water Dist. v. United States*, 72 Fed. Cl. 746 (2006) (determining that expenditures made "to maintain [the irrigation system] as an efficient going concern, and to operate it effectively to the end for which it was designed are, at least generally, maintenance and operating expenses").

*2. Fish and wildlife costs.*

The Corps, BPA, and the Bureau considered that costs for mitigation measures to sustain fish and wildlife at the dam, reservoir, and powerplant were "joint costs" that should be allocated to power and navigation under the apportionment formula specified in the 1967 Cost Allocation Report. *See* Tr. 272:24 to 273:5 (Miller), 746:4 to 748:20 (Dinan). The District contests this allocation of fish and wildlife costs to operating and maintenance costs of power and energy at the dam, arguing that such fish and wildlife costs were to be excluded in accord with the authorizing statute for The Dalles Irrigation Project. Pl.'s Post-Trial Br. at 6-7, 11-12. The government contends that the fish and wildlife joint costs were and are properly allocated to power production and thus were and are appropriate costs for energy and power. Def.'s Post-Trial Br. at 36-38.

The enabling legislation for The Dalles Dam and other contemporaneously authorized projects required that they be executed in accord with "the report of the Chief of Engineers dated June 28, 1949, and approved in the letter dated February 1, 1950, from the Director of the Bureau of the Budget for construction by the Corps of Engineers." Pub. L. No. 81-516, § 204, 64 Stat. 163, 179; *see also* H.R. Rep. No. 81-1968, at 22-24 (1950) (Conf. Rep.) (describing the Columbia Basin projects (including The Dalles Dam), as being "substantially in accordance with the plans recommended in the report of the Chief of Engineers . . . and approved in the letter . . . from the Director of the Bureau of the Budget"). That report makes significant reference to and acknowledges the impact of The Dalles Dam and other hydroelectric projects on native fish and wildlife. *See* Report, Columbia River & Tributaries, Northwest United States, H.R. Doc. No. 531, at 2880-84, 2924-25 (1950). The report includes recommendations to mitigate the threat to fish and wildlife species posed by the projects, mandating that "[f]ull consideration be given at each project to be constructed to the inclusion of such plans for the protection, utilization, and development of the fish and wildlife resources as may be recommended by the Fish and Wildlife Service." *Id.* at 2925. More specifically, the report affirmatively and unequivocally states that

measures implemented to preserve endangered fish and wildlife (such as fish screens and ladders) would result in "an increase in the expense for the annual operation and maintenance entailed by the additional fish facilities." *Id*. at 129.

Thus, the legislative history of the statutory authorization for The Dalles Dam indicates that the Corps of Engineers and the drafters of the enabling enactment for the dam envisioned that the expenses associated with preserving the indigenous fish and wildlife populations would be treated as a component of The Dalles Dam's operation and maintenance costs. *See* H.R. Doc. No. 531, at 129, 2925.[16] Accordingly, costs associated with fish and wildlife are permissibly included in the category of "all costs of the dam, reservoir, and powerplant which are determined by the Secretary under the provisions of the [f]ederal reclamation laws to be properly allocable to such irrigation pumping power and energy." Pub. L. No. 86-745, § 2(c), 74 Stat. at 882.[17]

---

[16]Neither the reports nor any other part of the legislative history refer to the seasonal releases of water used to protect the anadromous fish population. *See* H.R. Doc. No. 531, at 2863-2926 (describing the fish and wildlife issues posed by the project and recommending solutions). The District cites these releases as one of the main reasons for the rate increases it has been forced to pay. *See* Pl.'s Post-Trial Reply at 15-16. However, the report is firm in its commitment to mitigating the harm to local fish and wildlife populations, and its inclusion of the upkeep of the fish screens and ladders in power facilities' operation and maintenance costs suggests that including other, similar costs in the rates chargeable to electricity purchasers would be within the scope of the proposers' and drafters' intent. *See* H.R. Doc. No. 531, at 2880-84, 2924-2925.

[17]The District makes a secondary argument that "joint use" facilities should not be included within the operating and maintenance costs for power production. *See* Pl.'s Post-Trial Br. at 6-7 ("Cost sharing, that is, joint use of operation, maintenance and replacement on jointly used facilities should not have applied to The Dalles project."). Fish and wildlife costs are joint-use costs and thus are affected by this argument. The District relies in part on language of the 1962 Definite Plan Report included in Ms. Garifo's summary. *See supra*, at 9 (quoting DX 7 (Definite Plan Report) at 3). At trial, Clarence A. Bolin, who was responsible for system planning and transmission contracts at the Bureau's Boise regional office, testified that the Definite Plan Report contemplated that the BPA's "recently enunciated policy of cost sharing" would not be applied to The Dalles. He further testified, however, that the policy itself was limited to transmission costs, and did not pertain to power costs. Tr. 359:15 to 360:1 (Bolin) ("Of course these costs that are referred to here are transmission costs, costs of the [BPA] and not costs of The Dalles Powerplant[;] . . . the references [are] to [BPA's] recently enunciated policy of cost sharing[;] . . . there is a copy of that policy where the Administrator says that [the Bureau] will share in the costs of the transmission which was subsequently waived by [BPA] for this project."). There is no reference to the transmission limitation in the Definite Plan Report, but Mr. Bolin testified that to read it in context,

Fish and wildlife costs associated directly with The Dalles Irrigation Project, however, present a different situation. The authorizing legislation for The Dalles Irrigation Project provided that, as determined by the Secretary, costs of constructing "the works authorized by this Act" allocated to fish and wildlife benefits, along with "operation, maintenance, and replacement costs allocated to this function [fish and wildlife conservation], shall be nonremimbursable and nonreturnable under the reclamation laws." Public L. No. 86-745, § 2(d), 74 Stat. at 882. This caveat was echoed by the contract's provision that the cost of fish screens for the Project allocated to fish and wildlife are nonreimbursable, and thus should not be charged to the District. *See* DX 6 at 4 (Contract § 8(c)). Fish and wildlife costs tied to the Irrigation Project thus must be excluded from charges to The Dalles.[18]

*3. Replacement (or depreciation) costs.*

For some time, "OM&R" has been a major item of cost of the power and energy at The Dalles Dam and has been included in the rates charged the District for pumping power. The "R"

---

A: You would have to look at the recently enunciated policy. . . .
Q: Ye[s]. And if you looked at the recently enunciated policy presumably you would see something referring to the costs of jointly used facilities?
A: Transmission facilities, yes.
Q: Oh. Only transmission facilities?
A: Yes.

Tr. 360:15-22 (Bolin). The memorandum thus communicated the understanding that transmission costs associated with jointly used facilities would not be charged in any part to The Dalles, but it did not refer to shared costs for jointly used power generation facilities.

[18]Two sets of fish screens can be located on the map of The Dalles Irrigation District provided to the court. *See* DDX 1 (Satellite View Map of The Dalles Irrigation District). One set of screens prevents fish and wildlife from entering the turbine that generates power at The Dalles Dam. Costs associated with this screen should be included as part of the generation costs charged to The Dalles.

A different set of screens prevents fish and other wildlife from entering the irrigation pumping system and thus is unrelated to power generation. Operation and maintenance costs associated with that screen should be excluded from any charge to The District because they are nonreimbursable under the repayment contract and enabling legislation for The Dalles Irrigation Project. Evidence presented at trial suggests that such costs in fact have been excluded. Witnesses provided testimony that fish and wildlife costs associated with The Dalles Irrigation Project include costs of the "fish screens and etcetera for the Mill Creek Pumping Plant" and are not and have not been charged to The Dalles. Tr. 397:3-18 (Test. of Terrald Kent, Manager of Facility Operation and Maintenance, the Bureau). While it is the responsibility of the District to operate and maintain the fish facilities at the Mill Creek Pumping Plant at its expense, the District receives a credit for that activity. Tr. 349:1-11 (Kent); *see also* Tr. 397:17-18 (Kent) ("[T]hey pay for O&M and actually get a credit on their billing of $1,700 a year.").

of this component is contested by the parties. No one disputes that the "R" means replacement costs.[19] However, the District contends that the Bureau has inappropriately charged it for depreciation costs. Pl.'s Post-Trial Br. at 10. It argues that depreciation is different from "replacement," where replacement was chargeable to the District as part of "operation, maintenance, and replacement." The District contends that it contracted to pay for capital costs associated with the Irrigation Project but not capital costs associated with power production at The Dalles Dam and powerplant. It alleges that "[s]ince 1992, the BPA has funded the Corps of Engineers and the Bureau of Re[clamation] investments, replacing capital assets to maintain generation 'at appropriate levels' and then the BPA bills the BOR, so that it can bill The [Dalles] Irrigation District. While depreciation may be an operating cost for ratemaking, rates should not recover the capital costs, for recovery of 'R' only should be 'where feasible.'" Pl.'s Post-Trial Br. at 10 (internal citations omitted). The government contends that depreciation costs included in the rate represent capital costs allocated to power generation at The Dalles Dam. Depreciation costs, it avers, are comprised of a proportionate share of the original investment in constructing the dam and powerplant, along with major capital investments thereafter. Def.'s Post-Trial Br. at 31.

The government further responds that there has been overlapping use of the terms "replacement" and "depreciation" in this matter, in part due to the differing usages employed by the Bureau, BPA, and the Corps:

> [The Bureau of] Reclamation distinguishes between original capital (those capital costs incurred in the initial construction of a project) and "replacement" capital (those capital costs incurred after a project has been put into service), while neither the Corps or BPA distinguishes between original capital investment and replacement capital – the concept is the same. In other words, while replacement costs at a [Bureau of] Reclamation power generation facility are considered part of the OM&R costs, replacement costs at a Corps power generation facility are considered "capital" costs (and are recovered through depreciation, like all of its capital costs), and they are both costs associated with power production and must be recovered, regardless of the label.

Def.'s Br. at 33-34 (citing Tr. 738-39 (Dinan)). The court was not provided with any data on the life span of particular items associated with power generation at The Dalles Dam, reservoir, or powerplant. Without such data, and with the defendant's representation regarding agency usage of the terms "depreciation" and "replacement," the court will consider those terms to have strongly overlapping definitions. Depreciation or capital costs associated with The Dalles Dam are divided in two major categories: operation and maintenance and capital costs, "which would

---

[19]In the 1950 Corps Report that served as the foundation for Congress's consideration of the authorization for The Dalles Dam, "replacement" costs were shown as among the costs attributable to power production. *See* H.R. Doc. No. 531, at 280 (1950).

include purchasing, constructing, assets, large dollar items." Tr. 270:24 to 271:4 (Miller). As Ms. Miller testified:

> The costs allocated to power, whether they are specific power costs or the allocated portion of the joint costs, are those costs that are provided to BPA to work into their rate system. . . . It's very similar for capital costs. And these would be any buildings and structures, large operating equipment, land, utilities, things that were capitalized and will be depreciated are either joint, which would be allocated to navigation and power, or they are specific: power generators, turbines, anything to do with generating power specific to navigation, locks or specific to recreation would be campgrounds. And again the joint costs are allocated according to the allocation report, and that does include depreciation. And depreciation is the cost of the asset amortized over the number of years that its useful life is determined. . . . [I]f the capital costs are specific they would be costed accordingly. If they are joint they would be costed accordingly. The joint power portion and the specific power portion of those costs are again reported to BPA.

Tr. 272:3 to 274:21(Miller); *see also* DDX 2 ("Power Cost Allocations at The Dalles Dam"). As a result of the above-listed allocations, only those capital costs associated with power generation are figured into the depreciation costs charged to the District. No amounts are "costed . . . for irrigation" because "that's not one of the allocated purposes . . . of the dam. . . . [T]he irrigation district came after the dam." Tr. 276:5-15 (Miller). In contracting to pay for "all costs" of power and energy associated the dam, reservoir, and powerplant, the District is bound by the Congressional intent and long practice of the Corps and BPA that irrigation districts be charged for capital costs in the form of depreciation associated with power generation.

*4. Transmission.*

From the earliest days of The Dalles Irrigation Project, dating back to 1961, costs of transmitting power from the dam to the District were intentionally omitted from the charges to the District for power. *See supra*, at 8-9 (discussing internal communications in the latter half of 1961). The Memorandum of Understanding between the Bureau and BPA in 1963 confirmed this understanding. *Id*. However, beginning in 1979, there was an effort by BPA to include transmission costs in the operation, maintenance, and replacement costs allocated to the District. *See supra*, at 10. The District successfully resisted that modification to the terms of performance under the contract. Both parties now agree that transmission costs should not be included in the operation and maintenance costs category. Pl.'s Post-Trial Br. at 1, 5; Def.'s Post-Trial Br. at 28 ("[T]he District has never been required to pay for the operation and maintenance costs of the transmission facilities used to deliver power to the Project."). Transmission costs thus have no bearing on the costs of power and energy associated with the dam, reservoir, and powerplant.

*5. Lost revenue component.*

The District challenges the inclusion of the "Lost Revenue Component" by the Bureau in its charges to the District, commencing in 1990. "Lost revenue" included "[t]he difference between the actual cost of service and the revenue collected from the charge in effect" for the previous five-year period and "project inflation (*i.e.*, the difference between the historical cost of service and the projected cost of service in a given year)." DX 8 (Memorandum of Understanding) (Revision No. 1) at 18. Once "lost revenue" was calculated, "the actual long-term interest rate for each of the past five years and the project cost for the next five years [wa]s determined," and those figures were applied to the "lost revenue" to yield "lost revenue plus interest." *Id*. at 19. "Lost revenue plus interest" was discounted to obtain an annual cost. *Id*.[20] Then, that amount was added to the historical cost to produce the ultimate charge for energy costs. *Id*.

The government endeavors to characterize this method of rate calculation as simply a "true-up" mechanism to ensure that the costs of energy are correctly charged or, if overcharged, credited to the District. Def.'s Post-Trial Br. at 18. The government acknowledges the contractual limitation that the Secretary make no more than one rate change during every five-year period. *See* DX 6 at 13 (Contract § 14(a)). "Simply put, the District's power rate by contract may not be revised more than once in any five-year period. But between the rate periods, costs do not remain stagnant, and thus must be adjusted when the next rate is established." Def.'s Post-Trial Br. at 18. The Lost Revenue Component, the government argues, serves to "true-up" old payments as under or over actual power generation costs and "to anticipate future cost increases to narrow the difference between the power rate and [the] actual power generation costs." *Id*. at 18-19.

Such a characterization of the lost revenue component obscures the fact that it contravenes the terms of the contract in two ways. First, it includes interest as a cost to the District. As Ms. Garifo chronicled in her report on the Memoranda of Understanding between the Bureau and the BPA, the rates charged to The Dalles were intended by Congress to be set on the basis of interest-free financing. *See* PX 31 (Garifo Summary) at BPA 1040. That is evidenced by House Document No. 431, a report on The Dalles Project made pursuant to Section 9(a) of the 1939 Reclamation Project Act, dated June 22, 1960, which provided that the cost of obtaining power at The Dalles powerplant was to be about 1 mill/kwh, estimated *on the basis of interest-free financing*. *Id*. Ms. Garifo's report also included a memorandum dated August 30, 1961 to the Secretary of the Interior from the Commissioner of Reclamation that confirms that "the cost of obtaining power at powerplant on the basis of interest-free financing is estimated to be 1 mill per kilowatt hour." PX 36 (Memorandum from Commissioner of Reclamation to the Secretary of the Interior regarding the proposed repayment contract for The Dalles Irrigation Project (August 30, 1961)).

---

[20]Notably, "discounting" amounts attributable to prior years would generate an increase, not a decrease, in the present value for a given year.

As a general principle, BPA continues to apply a no-interest rule to The Dalles today. As Mr. Dinan testified:

> Q: So then the irrigation project is still subject to, in your opinion, interest-free financing?
> A: Yes. There is no interest expense on federal investment charged to the irrigation district.

Tr. 750:2-5 (Dinan). Mr. Dinan also testified that the interest in effect charged to the District as part of the Lost Revenue Component is not interest on capital facilities used to produce power at the dam or on the base power rate itself, but rather is "interest on the fact of who held the over or under collection at a point in time." Tr. 749:25 to 750:1 (Dinan). Accordingly, the interest aspect of the Lost Revenue Component also implicates the provision restricting rate changes to occur no more often than once every five years. *See* DX 6 at 13 (Contract § 14(a)) (Changes by the Secretary to the rate "[can]not be made more frequently than once in any five-year period.").

As BPA has modified it, the rate-setting process for The Dalles Irrigation District now consists of categories labeled "costs" and "lost revenue." DDX 3 (Rate Setting Process for The Dalles Irrigation District). The "costs" reflect current amounts, while the "lost revenue" incorporates the "true-up" plus "projected costs and usage for next rate period." *Id*. (capitals omitted). While the statute and contract apparently would give the Secretary (acting through the Bureau, guided by BPA) authority to make a projection of known and reasonably certain additions to cost during the next rate cycle, and to add that projection to the rate for the duration of the cycle, for The Dalles Irrigation Project there is no authority to circumvent the periodic five-year cycle itself through a true-up mechanism that entails a substantial interest component (plus a further implied interest component through use of discount rates). The preferential "reserved power" rates for The Dalles Irrigation Project were not to include interest, and they were to be set in five-year incremental cycles. The Lost Revenue Component thus is contrary to law, and the government is liable to the District for the portion of the charges at issue that reflect that component.

### D. Feasability

The District finally contends that the government breached the repayment contract by failing to perform and submit to Congress an assessment of the District's ability to make payments on irrigation pumping power charges before putting rate increases into effect. Pl.'s Post-Trial Br. at 12. Pursuant to Section 2(b) of the authorizing legislation for The Dalles Irrigation Project, construction costs for the Project "in excess of the amount determined by the Secretary to be within the ability of the irrigators to repay within a fifty-year period" would be derived from net revenues derived from power marketed by BPA. Pub. L. No. 86-745, § 2(b), 74 Stat. at 882. *See also supra*, at 4-5 n.8.

The government responds that although the authorizing legislation for The Dalles Irrigation Project and the contract both contemplate that the District's obligation to repay capital costs of the irrigation project is limited by the irrigator's "ability to pay," this limitation does not extend to power generation costs at The Dalles Dam. Def.'s Post-Trial Br. at 32. Rather, the limitation pertains only to construction costs for the Irrigation Project. *See* Pub. L. No. 86-745, § 2(b), 74 Stat. at 882. Thus, the government argues that the feasability assessment "does not bear at all on the question of what the appropriate power rate for usage should be." Def.'s Post-Trial Br. at 32. Mr. Ryan Patterson, a Bureau economist and Program Manager for Repayment and Acreage Limitation, testified to that effect at trial:

> Q: [T]he power consumption portion is not something that is subject to the ability to pay?
> A: No. The ability to pay is for capital costs. The power component originally would have been entered into the ability to pay study but is not – the ability to pay study is not performed to determine the power rate, it's only used to determine the ability to pay for capital construction repayment.

Tr. 429:6-11 (Patterson).

In this respect, the authorizing legislation for the Irrigation Project provides that "[c]osts allocated to irrigation in excess of the amount determined by the Secretary to be within the ability of the irrigators to repay within a fifty-year period shall be returned to the reclamation fund . . . from net revenues derived . . . from the disposition of power marketed through the Bonneville Power Administration." Pub. L. No. 86-745, § 2(b), 74 Stat. at 882. The preface to the authorizing legislation expressly identifies the "principal works" of the Project to include the pumping plant, booster and relift pumping plants, and a distribution system. *Id.* at Preface, 74 Stat. at 882. The contract is consistent with the statute, defining Project works as the pumping plant and distribution system (and transmission facilities from The Dalles substation). DX 6 at 3 (Contract § 8(a)).

In short, feasibility was to be assessed with regard to the works associated with The Dalles Irrigation Project, not also with respect to power generation charges.

E. Synopsis

In sum, the charges for pumping power payable by the District include costs for operation and maintenance of facilities for power production at The Dalles Dam, reservoir, and powerplant, fish and wildlife costs allocated to power production at the dam and reservoir, and replacement or depreciation costs associated with power producing facilities at The Dalles Dam, along with an allocated share of replacement or depreciation costs for joint-use facilities. Costs excluded from consideration in the rates assessed for the District are fish and wildlife costs associated with pumping facilities for The Dalles Irrigation Project, costs associated with transmission of power,

and the so-called "Lost Revenue Component" which inappropriately encompasses substantial interest and contravenes the requirement that rates be set for cycles no shorter than five years in duration. No feasibility assessment needs to be made with regard to The Dalles' ability to pay charges for power generation before the Secretary makes rate changes.

The trial record discloses that the District has *not* been charged rates for irrigation pumping power that included fish and wildlife costs associated with facilities that support the Irrigation Project, nor has it been charged for transmission of power. Thus, the liability proven in this action is limited to the "Lost Revenue Component" for the periods at issue.

**CONCLUSION**

The trial on liability in this case established that the government wrongfully included a "Lost Revenue Component" in the rates charged to The Dalles Irrigation District for irrigation pumping power. Thus, the District has established the government's liability for breach of contract to that extent.

In preparation for resolution of damages, the parties are requested to file a joint status report by August 20, 2008.

IT IS SO ORDERED.

s/ Charles F. Lettow
Charles F. Lettow
Judge